QUINN EMANUEL URQUHART & SULLIVAN LLP
Harold Barza (California Bar No. 80888)
  halbarza@quinnemanuel.com
Carolyn Thomas (California Bar No. 286441)
  carolynthomas@quinnemanuel.com
865 S Figueroa St, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3100

QUINN EMANUEL URQUHART & SULLIVAN LLP
William Burck (DC Bar No. 4015426) (*pro hac vice*)
  williamburck@quinnemanuel.com
Derek Shaffer (California Bar No. 212746)
  derekshaffer@quinnemanuel.com
Jonathan Cooper (DC Bar No. 999764) (*pro hac vice*)
  jonathancooper@quinnemanuel.com
777 Sixth Street NW, 11th Floor
Washington, DC 20001
Telephone:  (202) 538-8000

*Attorneys for Plaintiff*
*Americans for Prosperity Foundation*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| **AMERICANS FOR PROSPERITY FOUNDATION,**<br><br>Plaintiff,<br><br>vs.<br><br>**KAMALA HARRIS,**<br>in her Official Capacity as Attorney General of California,<br><br>Defendant. | Case No.  2:14-cv-09448-R-FFM<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Hearing Date:  January 20, 2015<br>Hearing Time:  10:00 AM<br>Courtroom:  8<br>Judge:  Hon. Manuel L. Real |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iii

INTRODUCTION ...............................................................................1

BACKGROUND ................................................................................3

    I.     AMERICANS FOR PROSPERITY FOUNDATION ...........................3

    II.    THE IRS, FORM 990, AND SCHEDULE B .......................................4

    III.   CALIFORNIA'S REGULATION OF CHARITIES..............................4

    IV.   THE CALIFORNIA ATTORNEY GENERAL'S DEMAND FOR
          SCHEDULE B ...............................................................................6

ARGUMENT.....................................................................................7

    I.     THE FOUNDATION IS LIKELY TO WIN ON THE MERITS ...........8

         A.    The First Amendment Bars California's Demand .......................8

         B.    Federal Law Preempts The Demand..........................................20

    II.    ABSENT AN INJUNCTION, THE FOUNDATION AND ITS
          DONORS WILL SUFFER IRREPARABLE HARM...........................23

    III.   THE EQUITIES TIP SHARPLY FOR THE FOUNDATION.............24

    IV.   AN INJUNCTION SERVES THE PUBLIC INTEREST ...................25

CONCLUSION .................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Acorn Investments, Inc. v. City of Seattle*,
  887 F.2d 219 (9th Cir. 1989) .......................................................................... 11

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) .................................................................... 8, 24

*American Trucking Ass'n v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ........................................................................ 25

*Arc of California v. Douglas*,
  757 F.3d 975 (9th Cir. 2014) ............................................................................ 7

*Arizona Dream Act Coalition v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) .................................................................. 24, 25

*Arizona v. United States*,
  132 S. Ct. 2492 (2012) .................................................................................... 22

*Bates v. Little Rock*,
  361 U.S. 516 (1960) ........................................................................... 9, 17, 18

*Brock v. Local 375, Plumbers International Union*,
  860 F.2d 346 (9th Cir. 1988) .......................................................................... 10

*Brown v. Socialist Workers '74 Campaign Committee (Ohio)*,
  459 U.S. 87 (1982) .................................................................................. 10, 15

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .............................................................................................. 9

*Center for Competitive Politics v. Harris*,
  2014 U.S. Dist. Lexis 66512 (E.D. Cal. May 14, 2014) ........................... 10, 22

*Center for Competitive Politics v. Harris*,
  No. 2:14-cv-006360-MCE-DAD (E.D. Cal.),
  *on appeal*, No. 14-15978 (9th Cir.) ............................................................ 6, 16

*Chula Vista Citizens for Jobs & Fair Competition v. Norris*,
  755 F.3d 671 (9th Cir. 2014) .................................................................. 8, 11, 20

*Dole v. Service Employees Union*,
  950 F.2d 1456 (9th Cir. 1991) .................................................................. 10, 15

*Elrod v. Burns*,
    427 U.S. 347 (1976) ....................................................................... 23

*Farris v. Seabrook*,
    677 F.3d 858 (9th Cir. 2012) ........................................................ 25

*Gaudiya Vaishnava Society v. City & County of San Francisco*,
    952 F.2d 1059 (9th Cir. 1990) ...................................................... 23

*Gibson v. Florida Legislative Investigation Committee*,
    372 U.S. 539 (1963) ................................................................ 18, 23

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ....................................................................... 15

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2008)....................................................... 24

*M.R. v. Dreyfus*,
    697 F.3d 706 (9th Cir. 2012) ..................................................... 8, 24

*McCutcheon v. FEC*,
    134 S. Ct. 1434 (2014) ................................................................... 20

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995) ......................................................................... 9

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ............................................................. 9, 15, 18

*Pacific Operators Offshore, LLP v. Valladolid*,
    132 S. Ct. 680 (2012) .................................................................... 17

*Perry v. Schwarzenegger*,
    591 F.3d 1126 (9th Cir. 2009)................................................. 10, 11

*Planned Parenthood Arizona, Inc. v. Humble*,
    753 F.3d 905 (9th Cir. 2014) ........................................................ 24

*Pollard v. Roberts*,
    283 F. Supp. 248 (E.D. Ark. 1968), *affirmed*, 393 U.S. 14 (1968) ................ 19

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) ........................................................... 17, 18, 23

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006) ....................................................................... 8, 9

PLAINTIFF'S MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

*Secretary of State of Maryland v. Joseph H. Munson Co.*,
  467 U.S. 947 (1984) ........................................................................ 24

*Stokwitz v. United States*,
  831 F.2d 893 (9th Cir. 1987) .......................................................... 22

*Talley v. California*,
  362 U.S. 60 (1960) ........................................................................... 11

*Thalheimer v. City of San Diego*,
  645 F.3d 1109 (9th Cir. 2011) ........................................................ 25

*Valle Del Sol Inc. v. Whiting*,
  709 F.3d 808 (9th Cir. 2013) .......................................................... 23

*Village of Schaumburg v. Citizens for a Better Environment*,
  444 U.S. 620 (1980) .................................................................. 20, 23

*Washington Initiatives Now v. Rippie*,
  213 F.3d 1132 (9th Cir. 2000) ........................................................ 23

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ......................................................................... 21

**Other Authorities**

26 U.S.C. § 6103 ................................................................................. 22

26 U.S.C. § 6104(b) ....................................................................... 4, 21

26 U.S.C. § 6104(c)(3) .................................................................... 4, 21

26 U.S.C. § 6104(d)(1) ...................................................................... 22

26 U.S.C. § 6104(d)(2) ...................................................................... 22

26 U.S.C. § 6104(d)(3)(A) .......................................................... 4, 21, 22

26 U.S.C. § 7213 ................................................................................... 4

26 U.S.C. § 7431 ................................................................................... 4

Cal. Gov. Code § 12585 ........................................................................ 5

Cal. Gov. Code § 12586(a) ............................................................... 5, 17

Cal. Gov. Code § 12586(b) ................................................................5

Cal. Gov. Code § 12590.........................................................5, 15, 16

Cal. Gov. Code § 12599.7(a)(1)......................................................17

Cal. Gov. Code §§ 12580–12599.8 ...................................................5

**State Cases**

Cal. Code Regs., tit. 11, § 301 ...................................................5, 18

Cal. Code Regs., tit. 11, § 306 ........................................................18

Cal. Code Regs., tit. 11, § 310 ...................................................5, 15

Cal. Code Regs., tit. 11, §§ 300–312.1 .............................................5

**Out of State Cases**

Maheshwari & Maheshwari, *Corporate Accounting* (5th Edition) .........................17

Marion R. Fremont-Smith, *Governing Nonprofit Organizations: Federal & State Law & Regulation* (2004) ...............................................5

**Federal Statutes**

Andy Kroll & Daniel Schulman, *The Koch Brothers Left a Confidential Document at Their Donor Conference*, Mother Jones (Feb. 5, 2014), http:// www.motherjones.com/politics/2014/02/koch-brothers-palm-springs-donor-list..................................................13

Answering Brief of Appellee, *Center for Competitive Politics v. Harris*, No. 14-15978, at 28 (9th Cir. July 8, 2014), *available at* http://www.campaignfreedom.org/ wp-content/uploads/2014/07/HarrisOpposition8july2014.pdf............................17

Ben Smith, *"Anonymous" Takes Down Americans for Prosperity Website*, Politico (Feb. 27, 2011), http://www.politico.com/blogs/bensmith/0211/Anonymous_takes_down_Americans_for_Prosperity_website.html ..............11

California Fair Political Practices Commission, *FPPC Announces Record Settlement in $11 Million Arizona Contribution Case* (October 24, 2013),
http://www.fppc.ca.gov/press_release.php?pr_id=783 .................................14

Clare O'Connor, *Occupy the Koch Brothers: Violence, Injuries, and Arrests at DC Protest*, Forbes (Nov. 5, 2011),
http://www.forbes.com/sites/ clareoconnor/2011/11/05/occupy-the-kochs-violent-clashes-injuries-and-arrests-at-protest-against-corporate-greed/ .......14

Elizabeth Harrington, *Official: Kochs Not Involved in California Campaign Finance Violation*, Washington Free Beacon (Nov. 4, 2013),
http://freebeacon.com/ politics/official-kochs-not-involved-in-california-campaign-finance-violation/..................................................................14

Illinois Form AG990-IL Filing Instructions,
*available at* http://www.illinoisattorneygeneral.gov/ charities/ag990-instructions.pdf ....................................................................18

IRS Form 990,
*available at* http://www.irs.gov/ pub/irs-pdf/f990.pdf ....................................4

IRS Schedule B to Form 990,
*available at* http://www.irs.gov/pub/irs-pdf/f990ezb.pdf................................4

Michigan Renewal Solicitation Registration Form,
*available at*
http://www.michigan.gov/documents/ag/Fillable_renewal_app_Final_2-9-09_266595_7.pdf...............................................................................18

Oregon Form CT-12F,
*available at* http://www.doj.state.or.us/charigroup/pdf/2013_web_ct-12f.pdf
...................................................................................................18

White House, Remarks by the President at a DNC Finance Event in Austin, Texas (Aug. 9, 2010),
*available at* http://www.whitehouse.gov/the-press-office/2010/08/09/remarks-president-a-dnc-finance-event-austin-texas ....................................................12

### INTRODUCTION

The First Amendment grants individuals who donate to private advocacy organizations the right to remain anonymous lest public disfavor and harassment chill their speech.  A federal statute reflects this constitutional right by forbidding the compelled disclosure—whether to the public or to state governments—of the confidential federal tax form (called "Schedule B") that lists the names and addresses of donors to nonprofit charities.  The problem necessitating this lawsuit is that California's Attorney General, for reasons known only to her, is nonetheless trying to compel disclosure of the confidential Schedule B by nonprofits around the State, including this Plaintiff, which is under an especially pronounced threat.  It thus falls to this Court to vindicate the First Amendment and federal law.

Plaintiff Americans for Prosperity Foundation ("Foundation") is a nonprofit that promotes limited government and free markets.  Its views are not universally popular.  It has learned from experience that it must zealously guard the confidentiality of its donors to ensure their safety.  Grotesque threats have been leveled against known associates of the Foundation, ranging from threats to kill or maim, to threats to firebomb buildings.  More mundane threats abound too, including boycotts, firings, and public shaming, all of which are now demonstrated components of the playbook of the Foundation's more extreme opponents.  Disclosure of the Foundation's donors thus poses a grave risk to these individuals' ability to continue expressing themselves robustly and freely.  Precisely because they fear compelled disclosure and the harms that will follow, would-be donors are shying away from contributing to the Foundation, and current donors have warned that they will cease their contributions as and if the prospect of disclosure rises.  It is

to alleviate such chilling that the First Amendment and federal statutes protect against the compelled disclosure of an advocacy organization's donors.

Despite all this, California is demanding, on pain of sanctions, the names and addresses of all the Foundation's donors listed on its Schedule B.  The State requires charities to register with the State and to renew their registrations annually.  Each year since 2001, the Foundation registered without divulging the sensitive content of its Schedule B.  Each year California accepted that registration—until now.

On March 7, 2013, the Attorney General of California out of the blue notified the Foundation that its registration for 2011 was "incomplete" because "the copy of Schedule B . . . does not include the names and addresses of contributors."  No change in California law precipitated this letter:  no new statute or regulation came into effect; no new policy of collecting donor data was announced; no sudden justification for this requirement was invoked.

The Foundation resisted, but the Attorney General doubled down on her demand.  Matters reached a boil on October 29, 2014, when the Attorney General issued an ultimatum:  unless the Foundation turned over its Schedule B for 2011 and 2012 within 30 days, she would revoke the Foundation's state tax exemption, suspend the Foundation's registration, and impose fines on the Foundation's "directors, trustees, officers, and return preparers," for which these individuals would be "personally liable."  Notably, the Attorney General does not specify the size or nature of the threatened fines—only that they will be imposed on the people most closely associated with the Foundation in their individual capacities.

Faced with these imminent sanctions, the Foundation respectfully requests a preliminary injunction to preserve the *status quo*.  A preliminary injunction is well

warranted because the Attorney General's capricious demand violates the First Amendment and is preempted by a federal tax statute.  Absent a preliminary injunction, the Foundation must either (1) comply with the demand (which would put its donors in harm's way and chill their willingness to associate with the Foundation) or (2) be exposed to suffering the State's sanctions (including the loss of its state registration and, with that, its ability to speak and associate with donors in California).  Either path leads to what is classic irreparable harm long acknowledged by courts:  the loss of First Amendment freedoms that can never thereafter be replaced.  By contrast, a preliminary injunction would not prevent California from later obtaining the information it seeks—information that the State has not had access to, without ostensible incident, complaint, or perceived gap in its policies, for all these many years.  There is, accordingly, no perceptible downside from issuing a preliminary injunction, particularly considering California's complete lack of interest in this information before the Attorney General suddenly and inexplicably demanded the Foundation's donor list on pain of sanctions in 2013. This Court should issue a preliminary injunction in order to preserve the vital First Amendment and federal statutory interests at stake.

## BACKGROUND

### I.    AMERICANS FOR PROSPERITY FOUNDATION

Americans for Prosperity Foundation is a Delaware nonprofit corporation headquartered in Virginia.  Complaint ¶ 7, ECF No. 1.  Two of its co-founders are David Koch, who is also the Foundation's Chairman, and his brother Charles Koch. *Id.* ¶ 14.  In recent years, David and Charles have received constant threats.  *Id.* Others known to have ties to the Foundation have similarly faced public

1  intimidation.  *Id.* ¶ 16.  The Foundation itself has been the subject of violent protests

2  and hacker attacks.   *Id.* ¶¶ 13, 17.   Details of this harassment are in the

3  accompanying declarations and are described more fully below.

4  **II.    THE IRS, FORM 990, AND SCHEDULE B**

5      The Internal Revenue Service ("IRS") recognizes the Foundation as a

6  501(c)(3) nonprofit charity.  *Id.* ¶ 12.  Such charities are exempt from federal

7  income taxes but must file an annual tax return (a "Form 990").  *See* IRS Form 990,

8  *available at* http://www.irs.gov/_pub/irs-pdf/f990.pdf.  Certain charities—including

9  the Foundation—must also file a Schedule B, which lists the name and address of

10 every individual nationwide who donated more than $5,000 to the charity during a

11 given tax year.  *See* IRS Schedule B to Form 990, *available at* http://www.irs.gov/

12 pub/irs-pdf/f990ezb.pdf.

13     Once filed, a nonprofit's federal tax return must be "made available to the

14 public," except for the "name or address of any contributor" to the organization.  26

15 U.S.C. § 6104(b), (d)(3)(A).  Form 990s are thus public, whereas Schedule Bs

16 listing donor names and addresses are not.  Unauthorized disclosure of Schedule B

17 can trigger civil or criminal penalties.  26 U.S.C. §§ 7213, 7431.  State officials who

18 administer state laws regulating charities can—like any member of the public—

19 obtain a charity's public Form 990.  The Tax Code further provides that state

20 regulators of charities can obtain from the IRS the *nonpublic* tax returns (including a

21 Schedule B) of *certain* nonprofits, but *not* of 501(c)(3) organizations.  § 6104(c)(3).

22 **III.   CALIFORNIA'S REGULATION OF CHARITIES**

23     California regulates charitable organizations.  Along with three other States

24 (Illinois, Michigan, and Oregon), California has adopted the Uniform Supervision of

Trustees for Charitable Purposes Act ("Charity Act").  Cal. Gov. Code §§ 12580–12599.8; *see* Marion R. Fremont-Smith, *Governing Nonprofit Organizations: Federal & State Law & Regulation* 312–13 (2004).  The Charity Act requires charities to register with California, § 12585, and to file "periodic reports," the "contents" of which are set by "rules and regulations" promulgated by the Attorney General, § 12586(b).  These reports are "open to public inspection," unless exempted by "rules and regulations adopted by the Attorney General."  § 12590.

According to the Attorney General's regulations, *see* Cal. Code Regs., tit. 11, §§ 300–312.1, a charity must annually file a periodic report that includes its "Form 990."  § 301.  The regulations say nothing, however, about filing a Schedule B. What the regulations are clear about is that an organization's periodic reports will be publicly available:  "the reports filed with the Attorney General . . . shall be open to public inspection."  § 310.[1]  Thus, every periodic report the Foundation files is, as a matter of California law as it exists today, open to the public.

In 2000, the IRS created Schedule B.  Complaint ¶ 26.  Every year since then, from 2001 to the present, the Foundation has filed its Form 990 as part of its periodic report, without going so far as to include the names and addresses of the donors on its Schedule B.  Declaration of Victor Bernson ("Bernson Declaration") ¶¶ 3–4.  For each year from 2001 through 2010, the Attorney General "[a]ccepted"

---

[1] There is one exception:  the Attorney General can withhold material "as provided in Government Code Section 12590."  § 310.  Section 12590 allows withholding an "instrument"—which differs from a "report"—if it is "not exclusively for charitable purposes."  *See also* § 12586(a) (distinguishing "instruments" from "periodic reports").  Thus, certain *instruments* can be withheld, but *periodic reports* are public.

the Foundation's registration renewal and listed the Foundation as an active charity in compliance with the law.  Complaint Ex. A.

## IV.    THE ATTORNEY GENERAL'S DEMAND FOR SCHEDULE B

Recently, without notice or comment, the Attorney General changed course. In a letter dated March 7, 2013, the Attorney General declared the Foundation's 2011 report "**incomplete** because the copy of Schedule B . . . does not include the names and addresses of contributors."  Complaint Ex. B.  On December 17, 2013, she deemed the Foundation's 2012 report "**incomplete**" for the same reason. Complaint Ex. C.  On April 17 and May 19, 2014, she repeated her demands for the Foundation's Schedule B for 2011 and 2012.  Complaint Ex. D & E.

Meanwhile, another organization that received a similar demand sued to challenge the Attorney General's authority to mandate disclosure of a Schedule B from a 501(c)(3) organization.  *Center for Competitive Politics v. Harris*, No. 2:14-cv-00636-MCE-DAD (E.D. Cal.).  The case is currently before the Ninth Circuit on appeal from the denial of a preliminary injunction.  *See* No. 14-15978 (9th Cir.).  On June 17, 2014, the Foundation urged the Attorney General to postpone her demands for its Schedule B until *Center for Competitive Politics* has been finally resolved. Complaint Ex. F.  She refused.  Complaint Ex. G.

Then, on October 29, 2014, the Attorney General sent a new letter adding the threat of imminent penalty.  If the Foundation did not submit its Schedule B for 2011 and 2012 "**within thirty (30) days of the date of this letter**," the Attorney General stated she would (1) notify the California Franchise Tax Board "to disallow the tax exemption of the [Foundation]"; (2) impose late fees on the Foundation's "directors, trustees, officers, and return preparers responsible for failure to timely

1  file the [Schedule B]," and these individuals would be "**personally liable**" for the

2  fees; and (3) "**suspend the registration**" of the Foundation.  Complaint Ex. H.

3    On December 1, 2014, counsel for the Foundation emailed the Attorney

4  General's office in an effort to resolve this dispute amicably.  Complaint Ex. I.  The

5  Attorney General's Office agreed to "temporarily postpone" the issuance of

6  penalties that the Foundation faced for not submitting its Schedule B.  Complaint

7  Ex. J.  On December 4, counsel for the Foundation wrote back to the Attorney

8  General's Office to thank it for the temporary relief, but also to note that the

9  Foundation and its employees, officers, directors, and donors still faced severe and

10  irreparable harm, including the loss of First Amendment liberties, when the

11  "temporary" relief expired and the threatened penalties could be imposed.

12  Complaint Ex. K.  The Foundation thus reiterated the need for the Attorney General

13  to permanently withdraw her demand for the Foundation's Schedule B.  *Id.*  By

14  December 9, the Foundation had received no response.  Complaint ¶ 37.  The

15  Foundation then filed this lawsuit.  *Id.*  Via email the afternoon of December 12, the

16  Senior Assistant Attorney General who had been handling communications about

17  this matter directed all further communications through litigation counsel, noting

18  that "this matter is now in litigation."

19             **ARGUMENT**

20    "A plaintiff seeking a preliminary injunction must establish that he is likely to

21  succeed on the merits, that he is likely to suffer irreparable harm in the absence of

22  preliminary relief, that the balance of equities tips in his favor, and that an injunction

23  is in the public interest."  *Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir.

24  2014) (citation omitted).

The Ninth Circuit uses a "'sliding scale' approach to preliminary injunctions," under which "a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (brackets and citation omitted). That is, a "preliminary injunction is proper if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012). That standard is amply satisfied here, given the glaring legal problems and irreparable harm California's instant course poses under the First Amendment to the United States Constitution.

## I.   THE FOUNDATION IS LIKELY TO WIN ON THE MERITS

The Foundation is likely to prevail on its two claims, namely that the Attorney's General's demand (1) violates the First Amendment and (2) is preempted by federal law. At a bare minimum, these claims raise "serious questions going to the merits" so as to warrant a preliminary injunction under the "sliding scale" test.

### A.   The First Amendment Bars California's Demand

"Supreme Court and Ninth Circuit precedent is deeply skeptical of compelled disclosure." *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 755 F.3d 671, 688 (9th Cir. 2014). "The right to speak is often exercised most effectively by combining one's voice with the voices of others." *Rumsfeld v. FAIR*, 547 U.S. 47, 68 (2006). The First Amendment therefore protects a "right to associate for the purpose of speaking." *Id.* To vindicate this right, the Supreme Court has "held laws unconstitutional that require disclosure of membership lists for groups seeking

anonymity." *Id.* at 69 (citation omitted).  Such laws "ma[k]e group membership less attractive" and violate the First Amendment by "affecting the group's ability to express its message." *Id.*

"It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute an effective restraint on freedom of association." *Bates v. Little Rock*, 361 U.S. 516, 523 (1960) (brackets, ellipsis, & citation omitted).  Anonymous speech is not only accepted but celebrated within American politics.  As "famously embodied in the Federalist Papers," which were published under the pseudonym "Publius," there is a long and "respected tradition of anonymity in the advocacy of political causes" in this country.  *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 343 & n.6 (1995).  For government to take the opposite approach by "[c]ompell[ing] disclosure of membership in an organization engaged in advocacy of particular beliefs" is akin to it "requir[ing] that adherents of particular religious faiths or political parties wear identifying arm-bands." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (citation & quotation marks omitted).  Nor is it any less noxious to compel disclosure of an organization's *donors* than it is to compel disclosure of its *members*:  the Supreme Court has "not drawn fine lines between contributors and members," but has instead "treated them interchangeably." *Buckley v. Valeo*, 424 U.S. 1, 66 (1976).

Because forcing disclosure of a group's donors imperils the freedom of association secured by the First Amendment (made applicable to the States by virtue of the Fourteenth Amendment), the Supreme Court has held that such disclosure is constitutional only if it survives "the closest scrutiny." *NAACP*, 357 U.S. at 460–61. To satisfy this test, a State must show that the disclosure it seeks to compel is

grounded in (1) a "compelling" state interest, and that there is (2) "a substantial relation between the information sought and an overriding and compelling state interest." *Brown v. Socialist Workers '74 Campaign Committee (Ohio)*, 459 U.S. 87, 92 (1982) (brackets, citation, and quotation marks omitted).

Some courts have also required, in certain circumstances, a *prima facie* showing of an arguable First Amendment concern. For example, in *Center for Competitive Politics v. Harris*, the district court refused to preliminarily enjoin the California Attorney General from demanding a Schedule B because the plaintiff ("CCP") did not try to make a *prima facie* showing. 2014 U.S. Dist. Lexis 66512, at *15–19 (E.D. Cal. May 14, 2014). Instead, CCP maintained that plaintiffs need not "make a *prima facie* showing of first amendment infringement." *Id.* at *16.

The Foundation agrees with CCP that a *prima facie* showing should not be required of an organization that challenges a governmental policy of compelling donor disclosure. The cases cited in *Center for Competitive Politics* for the proposition that a *prima facie* showing is necessary all involved the quite different circumstances of party invoking the First Amendment to quash a subpoena or a discovery request amidst litigation. *See Perry v. Schwarzenegger*, 591 F.3d 1126, 1140 (9th Cir. 2009) (request for production of documents); *Dole v. Service Employees Union*, 950 F.2d 1456, 1459–60 (9th Cir. 1991) (subpoena); *Brock v. Local 375, Plumbers International Union*, 860 F.2d 346, 350 (9th Cir. 1988) (subpoena). Setting aside the question whether those cases are in step with the Supreme Court, it suffices to note that the liberal dimensions of civil discovery in litigation differentiate that context and may provide special warrant to shift the burden to a discovery recipient to substantiate a First Amendment objection.

But when the First Amendment forms the substantive basis for a separate claim—rather than for defensive invocation of a discovery privilege—courts do not require a *prima facie* showing.  *E.g.*, *Chula Vista Citizens*, 755 F.3d at 682–89; *Talley v. California*, 362 U.S. 60, 65 (1960).  For example, in *Acorn Investments, Inc. v. City of Seattle*, the Ninth Circuit struck down a city's mandatory disclosure rule without requiring that the plaintiff make a *prima facie* showing; instead, the court held flatly that a "disclosure rule is unconstitutional unless it furthers a substantial governmental interest," and that it is the government's burden "to identify" that interest.  887 F.2d 219, 225 (9th Cir. 1989).

In any event, to the extent that a *prima facie* showing of a First Amendment violation may be required, the Foundation makes that showing here.

### 1.  The Foundation has made a *prima facie* showing

A plaintiff establishes a *prima facie* First Amendment claim by showing that the challenged government action "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights."  *Perry*, 591 F.3d at 1140 (citation omitted).

There is no doubt that the Foundation satisfies this threshold.  The Foundation is the target of significant public ire from certain quarters that vehemently oppose its policy positions, real and imagined.  Hackers have struck the Foundation's website.[2]  The events it hosts are regularly protested.  Declaration of Mark Holden ("Holden

---

[2] *See* Ben Smith, *"Anonymous" Takes Down Americans for Prosperity Website*, Politico (Feb. 27, 2011), http://www.politico.com/blogs/bensmith/0211/ Anonymous_takes_down_Americans_for_Prosperity_website.html.

Declaration") ¶ 3.    President Obama himself has called out as suspect the Foundation's sister group (a 501(c)(4) organization called "Americans for Prosperity"):  "Right now all around this country there are groups with harmless-sounding names like Americans for Prosperity, who are running millions of dollars of ads against Democratic candidates all across the country.  And they don't have to say who exactly the Americans for Prosperity are."[3]

When they are known, members and donors of the Foundation encounter concerted harassment, often with violent overtones.  Over the past few years, co-founders David Koch and Charles Koch have faced unrelenting threats and attacks via social media, phone calls, email, and protests outside their homes and places of business, due in part to their work with, or perceived ties to, the Foundation. Holden Declaration ¶ 4.  The threats are serious and often horrific, ranging from threats to kill David and Charles, to threats of violence against their families, to threats to firebomb company facilities or disrupt company business activities, to threats to injure David and Charles in other ways.  *Id.*  One person sent the following email from the address "deadkochs@Safe-mail.net":

> someone offered me $500,000 to kill david and charles koch i declined the offer and said that i'd do it for absolutely nothing just to rub it in there faces that money can't by you happiness because it's going to make me extremely happy to kill the two of them i'm flying to where they are today so by the end of the week the two biggest piles of shit in american will be dead david and charles are the lowest form of human existence in the universe but will be dead very soon and guess what i'm doing it for free.  I'm not even going to give them the chance to plead or beg for they life just going to sneak up behind them a pop pop pop or

---

[3] White House, Remarks by the President at a DNC Finance Event in Austin, Texas (Aug. 9, 2010), *available at* http://www.whitehouse.gov/the-press-office/2010/08/09/remarks-president-a-dnc-finance-event-austin-texas.

– 12 –

maybe get them while they sleep somehow mark my words they will be dead by the end of the month.

Holden Declaration Ex. A at 5.  Posted on social media outlets are statements like:

- "I say we kill the Koch brothers and their entire family line";

- "Let's drag those Koch brothers out, and let the hangman do his deed, so they can twist in the wind"; and

- "If I was given a chance to murder a Koch brother in cold bloo[d] I would SURELY TAKE IT."

Holden Declaration Ex. A at 1–2.

This vitriol extends to others who are publicly connected with the Foundation. Donors whose affiliation with the Foundation is known to the public have received threats of physical harm, have had their businesses boycotted, and have been subjected to character assassination in their hometown newspapers.  Declaration of Christopher Fink ("Fink Declaration") ¶ 5.  For example, a few months ago, reporters published a list of potential donors to the Foundation.  *Id.* ¶ 6.[4]  Individuals on the list were immediately harassed and their businesses boycotted.  *Id.*

The Foundation's events and offices throughout the country regularly draw protests at which associates of the Foundation are threatened with violence.  Holden Declaration ¶ 3.  At the Foundation's 2011 summit held in Washington DC, for example, violent protestors tried to storm the meeting, physically accosted and injured some attendees, and placed the remaining attendees at serious risk.  *Id.*[5]

---

[4] *See* Andy Kroll & Daniel Schulman, *The Koch Brothers Left a Confidential Document at Their Donor Conference*, Mother Jones (Feb. 5, 2014), http://www.motherjones.com/politics/2014/02/koch-brothers-palm-springs-donor-list.
[5] *See* Clare O'Connor, *Occupy the Koch Brothers: Violence, Injuries, and Arrests at DC Protest*, Forbes (Nov. 5, 2011), http://www.forbes.com/sites/clareoconnor/

---

California officials have also previously tried to go after David Koch and Charles Koch, as well as smear the reputation of advocacy groups they thought were associated with David Koch and Charles Koch. *Id.* ¶ 5. For example, state officials at the California Fair Political Practices Commission ("FPPC") imposed fines on two nonprofit organizations and wrongly claimed in public that these groups were part of the "'Koch Brothers' Network' of dark money political nonprofit corporations." *Id.*[6] The former chair of the FPPC later admitted that there was no evidence that showed a connection between the groups' activities or funding at issue in California and David Koch and Charles Koch. *Id.*[7]

Faced with such bullying, current and potential donors are understandably afraid that having their identities disclosed will put them and their families at risk. Dozens of potential donors, a number of whom live in California, have reluctantly refused to contribute to the Foundation because they are too fearful of the reprisal they will face if their contributions become publicly known, and current donors have indicated that they will cease their contributions if their names and addresses are revealed to the State of California. Fink Declaration ¶¶ 9–10.

The Ninth Circuit has held that an organization makes out a *prima facie* First Amendment claim simply by asserting that two members will cease attending the

---

2011/11/05/occupy-the-kochs-violent-clashes-injuries-and-arrests-at-protest-against-corporate-greed/.

[6] California Fair Political Practices Commission, *FPPC Announces Record Settlement in $11 Million Arizona Contribution Case* (October 24, 2013), http://www.fppc.ca.gov/press_release.php?pr_id=783.

[7] *See* Elizabeth Harrington, *Official: Kochs Not Involved in California Campaign Finance Violation*, Washington Free Beacon (Nov. 4, 2013), http://freebeacon.com/politics/official-kochs-not-involved-in-california-campaign-finance-violation/.

organization's meetings if the meeting minutes are disclosed.  *Dole*, 950 F.2d at 1459–61.  The chilling effect in the present case is far greater:  publication of the identities of the Foundation's donors will predictably expose them to death threats, economic reprisal, and other manifestations of public hostility.  This is the sort of harassment that has led the Supreme Court repeatedly to strike down as unconstitutional government demands that an organization identify its membership and donors.  *E.g.*, *Brown*, 459 U.S. at 93–94; *NAACP*, 357 U.S. at 462–63.

The Attorney General has suggested that the Foundation's fears are overblown because California's Registry of Charitable Trusts has, "since its inception, maintained the Schedule B filed by public charities as a confidential document."  Complaint Ex. G.  Yet the Foundation fears reprisal not only from members of the public but also from California officials.  *See John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010).  That prospect is no mere bogeyman here: California officials have previously tried to smear the reputation of advocacy groups they thought were associated with Charles and David Koch.  Holden Declaration ¶ 5.  The Foundation's donors rightly worry that disclosure to the Attorney General will lead to their own persecution at the hands of state officials.  Fink Declaration ¶ 11.  Thus, even if the Attorney General does withhold the Foundation's Schedule B from the public, the fact that her office has access to the Schedule B will by itself chill the exercise of donors' First Amendment rights.

Furthermore, the Attorney General's blithe assurance of non-disclosure is suspect, and her promise that a Schedule B will stay confidential rings hollow. California's laws *require* public disclosure of a charity's periodic reports.  Cal. Gov. Code. § 12590; Cal. Code Regs., tit. 11, § 310.  Only a "rule" or "regulation"

"adopted by the Attorney General" can exempt part of a periodic report from the disclosure requirement.  § 12590.  The Attorney General has neither promulgated a rule exempting Schedule B from disclosure, nor provided notice that one is in the works.  It appears the current Attorney General is choosing, for the time being, to treat Schedule B as a confidential document.  Complaint Ex. G.  But nothing prevents this Attorney General, or any subsequent Attorney General, from reversing course.  Indeed, the Attorney General recently admitted as much before the Ninth Circuit.  Case No. 14-15978, 12/5/2014 Oral Arguments at 20:15-21:15, *audio available at* http://www.ca9.uscourts.gov/media/view.php?pk_id=0000013683.  Nor can the Foundation be confident that her discretionary withholding of Schedule B would withstand legal scrutiny (such as a request under the California Public Records Act) in the face of the statutory command that every periodic report—including a Schedule B contained in the report—"shall be open to public inspection."  § 12590.  Thus, irrespective of the Attorney General's assurances of confidentiality, placing the Foundation's Schedule B in the Attorney General's hands will ineluctably chill the associational rights of its donors who fear reprisal from the State, just as it will expose them to the ensuing risk of further disclosure and public harassment.  The Foundation thus states a *prima facie* claim.

> **2.** **The Attorney General's demand for the Foundation's donor list lacks a substantial relationship to a compelling interest.**

It is unclear what interest, exactly, the Attorney General will claim justifies her demand for the Foundation's donor list in Schedule B.  None of the Attorney General's correspondence with the Foundation offers any rationale for her demand.  Nor does any public law, regulation, or policy.  In *Center for Competitive Politics*,

the Attorney General has argued (ostensibly *post hoc*, solely for purposes of litigation) that she has a compelling interest in "performing" oversight of charities and in "securing compliance with the law."[8]  But that cannot suffice, even if it is credited on faith, for a "State's generalized interest in unilaterally imposing its notion of fairness on [charitable activities] is . . . constitutionally invalid."  *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 792 (1988).  Absent a "compelling" interest, the State's demand is unconstitutional.  *Bates*, 361 U.S. at 524.  Indeed, the Attorney General's demand exceeds the scope of her statutory authority under California law[9]; it follows that she lacks even a *legitimate* interest in demanding the Foundation's Schedule B, let alone a *compelling* interest.

---

[8] Answering Brief of Appellee, *Center for Competitive Politics v. Harris*, No. 14-15978, at 28 (9th Cir. July 8, 2014), *available at* http://www.campaignfreedom.org/wp-content/uploads/2014/07/HarrisOpposition8july2014.pdf.

[9] The Charity Act requires charities to file "written reports, under oath, setting forth information as to the nature of the assets held for charitable purposes and the administration thereof by the corporation."  Cal. Gov. Code § 12586(a).  Nothing in this provision requires a charity to report the *source* of its assets.  Under § 12586's plain language, the "nature" of assets refers to such basic features as their monetary value and classification (e.g., real property, stocks, cash), as opposed to their source.  *See* Maheshwari & Maheshwari, *Corporate Accounting* (5th Edition), Chapter 6: Valuation of Assets p. 3.231 ("Nature of Assets").

When the California Legislature wanted charities to report the source of donated assets, it expressly said so in the Charity Act.  For example, § 12599.7(a)(1) provides that "commercial fundraisers for charitable purposes" must disclose to the Attorney General the "date and amount of each contribution received as a result of the solicitation campaign and, for noncash contributions, the name and mailing address of each contributor."  The fact that donor information is required in § 12599.7 but not in § 12586 signals the legislature's intent to exclude such information from the periodic reports called for by § 12586.  *See Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 687–88 (2012).  Because the Attorney General has exceeded her lawful authority, she has no legitimate interest in demanding the Foundation's Schedule B.

---

– 17 –

Even assuming that California has a valid compelling interest in "protecting charities (and the public) from fraud," *Riley*, 487 U.S. at 792, the Attorney General's demand is not substantially related to that interest.  The State must "demonstrate the existence of any substantial relationship" between chosen means and desired ends, *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 554–58 (1963), and cannot accomplish that "by mere assertion," *Bates*, 361 U.S. at 525.

The Attorney General has yet to explain how the information on Schedule B—the names and addresses of all of the donors to the Foundation nationwide who contribute more than $5,000—would advance a compelling state interest.  The Foundation already submits extensive information to California in its periodic reports, including its Form 990.  Cal. Code Regs., tit. 11, §§ 301, 306.  It remains a mystery what marginal benefit the Attorney General would gain from also obtaining the names and addresses of the Foundation's donors nationwide.  *See NAACP*, 357 U.S. at 464–65 (Supreme Court "unable to perceive that the disclosure of the names of petitioner's rank-and-file members has a substantial bearing" on Alabama's enforcement of its foreign corporation registration statute).

It is telling that every other State that has enacted the Uniform Supervision of Trustees for Charitable Purposes Act explicitly instructs charities *not* to file Schedule B as part of their periodic reports.  *See* Illinois Form AG990-IL Filing Instructions ¶ 3 (directing charities to file "IRS form 990 (excluding Schedule B)"); Michigan Renewal Solicitation Registration Form at 3 (instructing charities that "if you file Form 990 . . . do not provide a copy of Schedule B"); Oregon Form CT-12F at 7 ("Organizations which file Form 990 . . . are not required to attach the Schedule

B.").[10]  If there actually were a compelling state need for the specific information on Schedule B, then surely California's sister States ought to have perceived it.

Casting further doubt on the Attorney General's need for this information is the fact that California accepted, without incident, the Foundation's registration from 2001 through 2010 even though the Foundation never revealed the donors on its Schedule B.  Bernson Declaration ¶¶ 3–4.  No compelling need was perceived for the Schedule B during those ten years.  Nor has the Attorney General pointed to any change in circumstance or understanding that suddenly spawned a compelling need. The Attorney General therefore has not satisfied her burden of showing that disclosure of all the names and addresses on the Foundation's Schedule B connects to any compelling state interest.  *See Pollard v. Roberts*, 283 F. Supp. 248, 257 (E.D. Ark. 1968), *affirmed*, 393 U.S. 14 (1968) ("[T]here is no showing here that the identities of Party contributors and the amounts of their contributions are reasonably relevant to defendant's investigation of alleged vote buying or that the public interest, if any, in the disclosure of that information is sufficiently cogent and compelling to outweigh the legitimate and constitutionally protected interests of the Party and its contributors in having that information remain private.").

California's efforts to police any charitable misconduct should, if nothing else, be better tailored.  The "legitimate interest in preventing fraud can be better served . . . by measures less destructive of First Amendment interests," *Village of*

---

[10] These Forms are available at http://www.illinoisattorneygeneral.gov/ charities/ag990-instructions.pdf, http://www.michigan.gov/documents/ag/ Fillable_renewal_app_Final_2-9-09_266595_7.pdf, and http://www.doj.state.or.us/charigroup/pdf/2013_web_ct-12f.pdf.

1   *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 636–38 (1980).

2   The Attorney General recently conceded to the Ninth Circuit that she could achieve

3   her goals through more narrowly-tailored means, such as by subpoenaing Schedule

4   B only from specific charities under investigation.  Case No. 14-15978, 12/5/2014

5   Oral Arguments at 23:05-23:30.  The availability of alternatives more respectful of

6   First Amendment freedoms is confirmed by the practice of Illinois, Michigan, and

7   Oregon, each of which polices fraud without requiring every charity in its borders to

8   submit a Schedule B each year.  California itself similarly managed without resort to

9   donor information for years.  If, despite all this contrary evidence, Schedule B

10   actually holds particular information vital to a compelling state interest, then the

11   Attorney General at the very least should revise the registration requirements to

12   target that precise information and to identify the circumstances where it is required;

13   should promulgate regulations securing the confidentiality of such information; and

14   should cogently explain and document the need.  In actuality, however, the Attorney

15   General has done no such thing.

16        It "is California's burden to show that the alternative methods of satisfying its

17   anti-fraud goal are insufficient."  *Chula Vista Citizens*, 755 F.3d at 688.  California

18   has not begun to make such a showing, even though its demand for the Foundation's

19   Schedule B creates substantial exposure for donors, *see* Section I.A.1.  On this

20   record, it is patently unconstitutional to demand the Foundation's Schedule B.

21       **B.**    **Federal Law Preempts The Demand.**

22        The demand is also preempted by statute.  Under federal tax law, nonprofits

23   "are not required to publicly disclose their donors."  *McCutcheon v. FEC*, 134 S. Ct.

24   1434, 1460 (2014) (plurality opinion).  A nonprofit charity must make "available to

the public" every part of its tax return *except* for the "name or address of any contributor" to the organization. 26 U.S.C. § 6104(b). The IRS cannot publish an organization's Schedule B, § 6104(b), and the charities themselves need not publish their donor information, § 6104(d)(3)(A).

Most telling of all, Congress expressly carved out *certain* circumstances in which state officials who regulate charities might access *certain* charities' nonpublic federal tax information. Specifically, Congress provided in § 6104 that state charity regulators can obtain from the IRS the nonpublic tax returns—including Schedule B—of charitable organizations other than 501(c)(3) organizations, such as the Foundation. § 6104(c)(3). The statutory language is perfectly clear about this:

> Upon written request by an appropriate State officer, the Secretary may make available for inspection or disclosure returns and return information of any organization described in section 501(c) (*other than organizations described in paragraph (1) or (3) thereof*) for the purpose of, and only to the extent necessary in, the administration of State laws regulating the solicitation or administration of the charitable funds or charitable assets of such organizations.

§ 6104(c)(3) (emphasis added).

The "ultimate touchstone" in a preemption challenge is "the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). The comprehensive provisions of § 6104 leave no doubt about what Congress intended when it comes to release of federal tax returns containing a nonprofit's donor information. By generally requiring that a nonprofit's tax return be publicly disclosed, but specifically exempting the "name or address of any contributor" from the disclosure requirement, Congress signaled that donor information is entitled to special solicitude—consistent with the First Amendment concerns surrounding release of such information, *see* Section I.A, above.

Moreover, by expressly addressing when state charity regulators could obtain a nonprofit's Schedule B—and by expressly forbidding the release of such information for a 501(c)(3) organization—Congress demonstrated a clear intent to prevent a state charity regulator from accessing a Schedule B for a 501(c)(3) organization. A State may not "frustrate federal policies." *Arizona v. United States*, 132 S. Ct. 2492, 2503 (2012). Section 6104 thus preempts the Attorney General's grab for the Foundation's Schedule B.

In *Center for Competitive Politics*, 2014 U.S. Dist. Lexis 6612, at *9–14, the district court rejected this preemption argument by citing *Stokwitz v. United States*, 831 F.2d 893 (9th Cir. 1987), which held that a *different* provision of the tax code, 26 U.S.C. § 6103, governs distributions of information by the IRS but not by citizens directly. Whatever the scope of § 6103 may be, the relevant provision in this case, § 6104, *does expressly* apply to others besides the IRS. Section 6104 commands that an "organization described in subsection (c) or (d) of section 501"— *e.g.*, a 501(c)(3) organization like the Foundation—"shall" make "available . . . for inspection during regular business hours by any individual" its annual tax returns for the previous three years, § 6104(d)(1), (2), except for the "name or address of any contributor to the organization," § 6104(d)(3)(A), *i.e.*, it need not divulge its Schedule B. Section 6104 is thus quite different from § 6103 in that it expressly regulates the dissemination of tax returns by 501(c)(3) organizations themselves. By comprehensively addressing when an organization's tax return is to be made public or shared with state charity regulators, § 6104 signifies Congress's clear intent to preempt any contrary disclosure requirements, including the instant one from the California Attorney General. Otherwise, § 6104 would be substantively

negated:   States could circumvent it at their whim simply by demanding from 501(c)(3)'s the very same Schedule B's that Congress shielded against disclosure and prohibited States from obtaining from the IRS.  That is not a sensible result.

## II.   ABSENT AN INJUNCTION, THE FOUNDATION AND ITS DONORS WILL SUFFER IRREPARABLE HARM

The "loss of First Amendment freedoms, for even minimal amounts of time, unquestionably constitutes irreparable injury."  *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  Absent relief from this Court, such irreparable harm looms. Disclosure requirements have a "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association." *Gibson*, 372 U.S. at 557.  "Even when it does not have the effect of facilitating harassment, [a] disclosure requirement chills speech by inclining individuals toward silence." *Washington Initiatives Now v. Rippie*, 213 F.3d 1132, 1138 (9th Cir. 2000).

Without a preliminary injunction, the Foundation will have two choices. Either it must disclose its donor list, which, as *Gibson* and *Washington Initiatives Now* point out, will chill the protected speech of its donors.  Or else it must bear the penalties of noncompliance with California's demand, which the Attorney General warns will result in personal fines against the Foundation's employees and forfeiture of the Foundation's charitable registration.  Complaint Ex. H.  "[F]und-raising for charitable organizations is fully protected speech," *Gaudiya Vaishnava Society v. City & County of San Francisco*, 952 F.2d 1059, 1063 (9th Cir. 1990); *accord Riley*, 487 U.S. at 789; *Schaumburg*, 444 U.S. at 632, so levying fines on the Foundation's employees and taking away its license to fundraise will chill the Foundation's

1  protected speech.  *See Secretary of State of Maryland v. Joseph H. Munson Co.*, 467

2  U.S. 947, 969 (1984).  Accordingly, whichever way the Foundation goes with this

3  Hobson's choice, it stands to lose First Amendment freedoms—and thus suffer

4  irreparable harm—unless this Court issues a preliminary injunction.

5  **III.   THE EQUITIES TIP SHARPLY FOR THE FOUNDATION**

6        In cases like this where First Amendment rights are at stake, the "balance of

7  equities" "tip[s] sharply in favor of" enjoining the offending governmental action.

8  *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2008).  The scales

9  further favor a preliminary injunction because the Attorney General's demand

10  tramples not only First Amendment freedoms but also the will of the U.S. Congress

11  as reflected in federal statute.  *Arizona Dream Act Coalition v. Brewer*, 757 F.3d

12  1053, 1069 (9th Cir. 2014) (equities favor enjoining state violation of federal law).

13        By contrast, entering a preliminary injunction will impose negligible, if any,

14  costs on the Attorney General.  If this Court ultimately decides the merits in favor of

15  the Foundation, then the Attorney General will have suffered no harm from the

16  injunction.  And in the unlikely event that this Court preliminarily enjoins the

17  Attorney General but later rules in her favor,  she can reissue her demand for the

18  Foundation's Schedule B at that time.  The delay will not cause any meaningful

19  injury to the Attorney General, who cannot seriously claim urgent need for the

20  Foundation's Schedule B, especially after having made do without it for many years.

21        When the balance of equities "tips sharply" in the plaintiff's favor—as it does

22  here—then an injunction is proper under the "serious questions" sliding-scale test.

23  *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014);

24  *M.R.*, 697 F.3d at 725; *Alliance for the Wild Rockies*, 632 F.3d at 1135.

## IV.   AN INJUNCTION SERVES THE PUBLIC INTEREST

Finally, the Ninth Circuit has "consistently recognized" that there is a "significant public interest in upholding First Amendment principles." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1129 (9th Cir. 2011) (citation omitted).  It similarly "is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Arizona Dream Act Coalition*, 757 F.3d at 1069 (citation omitted).  Injunctive relief in this case would thus serve the "public interest in upholding free speech and association rights," *Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012) (citation omitted), as well as the "public interest represented in . . . the Constitution's declaration that federal law is to be supreme," *American Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1059–60 (9th Cir. 2009).

### CONCLUSION

The Attorney General's demand that the Foundation disclose its list of donors stifles the Foundation's exercise of its First Amendment rights and contravenes federal law that protects against disclosure of the relevant tax information.  This Court should grant the Foundation's application for a preliminary injunction.

Dated: December 15, 2014

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN LLP

By_____
Harold Barza

*Attorneys for Plaintiff*
*Americans for Prosperity Foundation*