1    KAMALA D. HARRIS
     Attorney General of California
2    TAMAR PACHTER
     Supervising Deputy Attorney General
3    JOSÉ A. ZELIDON-ZEPEDA
     Deputy Attorney General
4    State Bar No. 227108
      455 Golden Gate Avenue, Suite 11000
5      San Francisco, CA 94102-7004
      Telephone: (415) 703-5781
6      Fax: (415) 703-1234
      E-mail: Jose.ZelidonZepeda@doj.ca.gov
7    *Attorneys for Defendant Attorney General Kamala Harris*

8

9          IN THE UNITED STATES DISTRICT COURT

10        FOR THE CENTRAL DISTRICT OF CALIFORNIA

11               WESTERN DIVISION

12

| | |
|---|---|
| 13 **AMERICANS FOR PROSPERITY FOUNDATION,** | 2:14-CV-09448-R-FFM |
| 14 | **DECLARATION OF J. ZELIDON-ZEPEDA SUPPORTING** |
| 15 Plaintiff, | **DEFENDANT ATTORNEY GENERAL KAMALA D.** |
| 16 v. | **HARRIS'S RESPONSE TO PLAINTIFF'S MOTION TO** |
| 17 **KAMALA HARRIS, in her Official** | **COMPEL REGARDING** |
| 18 **Capacity as Attorney General of the State of California,** | **PRIVILEGE LOG** |
| 19 Defendant. | Date: [Not set] |
| | Time: 10 a.m. |
| 20 | Courtroom: 8, 2nd Floor |
| 21 | Judge: The Honorable Manuel L. Real |
| 22 | Trial Date: 2/23/2016 |
| | Action Filed: 12/9/2014 |

23      I, Jose A. Zelidon-Zepeda, declare as follows:

24        1. I am a Deputy Attorney General for the State of California and a counsel of

25 record for Defendant Attorney General Kamala D. Harris in this matter. I am

26 competent to testify to the matters in this declaration, and, if called, would so

27 testify. I submit this declaration in support of Defendant's Response to Plaintiff's

28 Motion to Compel Regarding Privilege Log.

1    2.  Attached as Exhibit 1 is a true copy of a partially redacted "Confidentiality

2  of Records" document produced in discovery in this case, Bates-labeled

3  ATTYGEN00003758-61.

4    3.  Attached as Exhibit 2 is a true copy of a partially redacted email exchange

5  produced in this litigation, Bates-labeled ATTYGEN00004047-56.

6    4.  Attached as Exhibit 3 is a true copy of a partially redacted email exchange

7  produced in this litigation, Bates-labeled ATTYGEN00003472-73.

8    5.  Attached as Exhibit 4 is a true copy of a partially redacted email exchange

9  produced in this litigation by Plaintiff, Bates-labeled AFPF002109-13.

10    6.  Attached as Exhibit 5 is a true copy of a partially redacted email exchange

11  produced in this litigation by Plaintiff, Bates-labeled AFPF002114-2117.

12    7.  Attached as Exhibit 6 is a true copy of Defendant's First Amended

13  Responses and Objections to Plaintiff's Interrogatory Number 10 in this action.

14    8.  Attached as Exhibit 7 is a true copy of a partially redacted document

15  produced in discovery in this action, Bates-labeled ATTYGEN00004028-36.

16    9.  Attached as Exhibit 8 is a true copy of a partially redacted document

17  produced in discovery in this action, Bates-labeled ATTYGEN00004037-41.

18    10.  Attached as Exhibit 9 is a true copy of a December 23, 2015 email from

19  Defendant's counsel to Plaintiff's counsel offering to make certain witnesses

20  available for deposition.

21    I declare under penalty of perjury that the foregoing is true and correct to the

22  best of my knowledge.  Executed the 29th day of December, 2015, in San

23  Francisco, California.

24

25                    Jose A. Zelidon-Zepeda

26                    Deputy Attorney General

27

28  SA2014119809

# EXHIBIT 1

## CONFIDENTIALITY OF RECORDS

Since the enactment of the Uniform Supervision of Trustees for Charitable Purposes Act,[1] the Registry has permitted public inspection of the non-confidential documents filed with it.

Government Code section12590 requires that "[t]he register, copies of instruments, and the reports filed with the Attorney General shall be open to public inspection. The Attorney General shall withhold from public inspection any instrument so filed whose content is not exclusively for charitable purposes." Government Code section 6254 states that all documents are public unless designated as confidential by section 6254 or other statute. What follows is a guide to public vs. confidential documents held in Registry files.

A.    Public Documents

The following documents are deemed public information, by law or by administrative judgment, and are available for inspection:

1.    Registration form (CT-1) and all supporting material filed in connection with the original filing by a registrant.

2.    Articles of Incorporation, whether received via Secretary of State or a registrant.

3.    By-laws.

4.    Application for Exemption and supporting documents (IRS Form 1023 and FTB Form 3400).

5.    Periodic reports, including Form RRF-1, Forms 990, 990PF and 990EZ.

6.    Copies of judgments or other final court orders which indicate the disposition of legal action affecting the administration of trust or the affairs of the registrant. copies of stipulated judgments, assurance of voluntary compliance, or similar agreement to settle litigation.

7.    Routine letters of inquiry to or from a registrant, including form letters sent by the Registry and:

a.    An auditor's original inquiry letter for clarification of an item required to be reported on the periodic report. If the response triggers subsequent investigative letters or attention, however, all other letters regarding that subject become confidential, including the original inquiry letter.

---

[1]Now the "Supervision of Trustees and Fundraisers for Charitable Purposes Act.

1

ATTYGEN00003758

    b.    Requests and responses regarding current status, address corrections, extensions of time for filing, delinquency notices, suspension and revocation letters, FTB request to suspend exempt status.

    c.    Letters of transmittal accompanying the periodic report from a registrant or its representative.

8.    Replies from a registrant to routine letters of inquiry, subject to the exception set forth in 7(a) above.

9.    Newspaper or periodical clippings relating to a registrant. If the clipping is felt to be of significant long-term value, it can be placed on the left side of the folder. Material so located will not be purged.

10.    Material from FTB that is not marked "confidential" by FTB.

11.    Memoranda of "routine" telephone calls. See 7 above.

## B.    CONFIDENTIAL (NON-PUBLIC) DOCUMENTS

Confidential (non-public) documents include information which relates to complaints or other investigations by the Attorney General. Material of a confidential nature will not be provided for public review. A separate red-colored folder is made for an organization for which the Registry has confidential information, and the information placed in that folder. The red folder is filed inside or adjacent to the public folder on the shelf.

1.    All non-routine correspondence and response thereto, including telephone communications and email.

"Non-routine" is defined as all communication (oral or written) that is not public information. See 7 above.

2.    Interdepartmental memoranda, reports of investigation or working papers in connection with a complaint about or an investigation of a registrant. Some of this information may also be considered "privileged."

"Privileged" information is that which cannot be disclosed or inspected, even subject to subpoena or court order, although the privilege can be waived. Examples include the investigative work papers of an attorney or auditor. Normally, these documents are retained in the legal file and will not become associated with the Registry file.

2

3.      Complaints from the public, except for those from persons who indicate that they wish the complaint to be made public.

4.      Draft pleadings in litigation affecting a registrant.  Unfiled drafts are privileged as attorney work-product, but copies of pleadings filed with a court are public.

5.      Memoranda or reports discussing litigation, audits or investigations relating to a registrant.  This information may also be considered 'privileged."

6.      All indications of transmittal of the public file from the Registry to attorneys or auditors or the return of such file to the Registry.  This includes those transmittals where the only purpose for sending the file is to make it available for public review.

7.      All materials received from FTB which are identified by FTB as confidential.

8.      All materials received from IRS which are identified by IRS as confidential and SCHEDULE B of the 990.

9.      Criminal records, arrest records, and rap sheets.

10.     The Master Data Record (MDR) and fly sheets (CT-14), which are part of our historical files, are technically confidential but may be kept in the public file until a confidential folder is created.

11.     Pending, Miscellaneous, Remainderman, and Closed files.

ATTYGEN00003760

**Hardcopy of email attached to document withheld.  See Withheld Docs Privilege Log Item 1.**

ATTYGEN00003761

# EXHIBIT 2

Confidential

**From:**      Candy Hetherington
**To:**        James.Cordi@doj.ca.gov
**Date:**      7/2/2004 7:54:10 AM
**Subject:**   Public vs. Non-Public File Documents

Jim,

Attached is a report prepared by Registry personnel listing documents that are currently treated as public documents and those that are considered confidential.    Redacted

Redacted

If you have any questions, please let me know.

Candy Hetherington


**CC:**        Anthony Goins;  Dennis Eagan;  Eileen Marxen;  Tanya Marcellana;  Valerie Shea

Redacted

Confidential

James Cord - Public vs. Nonpublic Documents.doc | Case 2:14-cv-09448-CAS-FFM Document 87-2 Filed 12/31/15 Page 10 of 54 Page ID #:1567 | Page 1

# Public vs. Non-Public Documents in the Registry of Charitable Trusts Files

Prepared by the Public vs. Non-Public Task Force:

Anthony Goins
Candy Hetherington
Tanya Marcellana
Valerie Shea

June 28, 2004

ATTYGEN00004048

Confidential

Public vs. Non-Public    2

# Table Of Contents

Charitable Trust (CT) File Contents ...................................................    3 – 4

Commercial Fundraiser Program File Contents .........................................    5

Conservator Guardian Trustee Program File Contents ................................    6

Raffle Program File Contents  ............................................................    7

Dissolution Program File Contents ......................................................    8

Indexed Transactions File Contents .....................................................    9

ATTYGEN00004049

Public vs. Non-Public    3

# Charitable Trust (CT) File Contents

### PUBLIC

- Registration Form (CT-1) or Unified Registration Form (URS)
- Directors/Officers with names and addresses
- Purpose of organization and descriptions of programs/services
- Founding documents
  - Articles of Incorporation or other founding document
  - Amended articles
- Bylaws
  - Original bylaws
  - Amended bylaws
- Tax determination letters
  - Franchise Tax Board Determination Letter
  - Internal Revenue Service Determination Letter
- Financial Documents
  - Periodic Reports (CT-2)
  - 990, 990-EZ, 990-PF, 990-T
    - Attachments
    - Schedule A
    - Schedule B (list of contributors) for private foundations (990-PF) ███████
  - Internal Revenue Service Forms
    - Forms: 109, 872, 1041 & 1041A, 1099, 1116, 1120-A, 1128, 2220, ███
      2758, 2848, 3885, 4797, 8082, Schedule K-1
  - Registration/Renewal Fee Report (RRF-1) ███████████
  - CT-3
  - Bank statements
  - Independent Auditor Reports ████████████
  - Financial statements/reports ██████████████
    - Balance sheets
    - Income/Expense statement
    - Projected budget statement
- Contracts or agreements between Commercial Fund-raiser or Fund-raising Counsel and organization
- Correspondence
  - From Registry to organization
    - Delinquency notices
    - Registration/Renewal Fee Report (RRF-1) program correspondences
    - E-mails, faxes ██████████████
  - From organization to Registry ███████

ATTYGEN00004050

Public vs. Non-Public    4

<u>NON-PUBLIC</u>

- Flysheet
- Master Data Printouts
  - o Master Input Document
  - o Master Data Report(s)
- Attachments to financial documents
  - o Some responses to schedule A and all of schedule B **
    - ▪ Contributor's lists, disqualified persons, and unusual grants
- Franchise Tax Board Form 199
- Copies of checks
- Correspondence
  - o From Registry to organization
    - ▪ CT-220 – memos of telephone conversation
  - o Internal memos from DOJ employees
  - o Letters from DOJ staff (auditors, lawyers) to organization
- Complaints
  - o Complaint Form (CT-9)
- Meeting minutes


\* Same as other Charitable Trust (CT) Files
\*\* Contributor's lists (as listed on Schedule A question 26b and Schedule B) for 990 and 990-EZ are confidential.  Contributor's lists for private foundations (990-PF) are open to public inspection.

Confidential

James Cord - Public vs. Nonpublic Documents.doc        Case 2:14-cv-09448-CAS-FFM   Document 87-2   Filed 12/31/15   Page 14 of 54   Page ID #:1571        Page 5

Public vs. Non-Public    5

# Commercial Fundraiser Program File Contents

PUBLIC

- Registration Application
- Articles of Incorporation
- Bylaws
- Secretary of State printouts *
- Copies of Registration Checks **
- Certificate of Registration
- Financial Reports
- Bonds
  - o  Bond Certificates
  - o  Power of Attorney Attachments
  - o  Continuation Certificates
  - o  Cancellation Notices
- Letters/Correspondence
  - o  Between Registry and Commercial Fundraiser
  - o  Inquiries from public (non-complaints)


NON-PUBLIC

- Contracts/Agreements
- Letters/Correspondence
  - o  Between DOJ employees
  - o  Charity2
- Complaints


\* These are run from the public website
\*\* Currently in Public file, but should it be?



Confidential

Public vs. Non-Public     6

## Conservator Guardian Trustee Program File Contents
*(NOTE: Entire file is confidential) ***

### NON-PUBLIC

- Declaration of Registration (application form)
- Correspondence to and from registrants
- Transcripts
- Complaints
- E-mails
- Responses to requests
- Internal correspondence


\* The confidentiality issue regarding the above documents is subject to change depending on the outcome of the Bowen Bill (SB 1248)

ATTYGEN00004053

Confidential

## Raffle Program File Contents

### PUBLIC

- Application for registration
- Correspondence
    - o  Confirming registration
    - o  Requesting information
    - o  Misc.
- Raffle reports ███████████████████
- Compliance letters
    - o  90/10 violation
    - o  Internet usage
    - o  Misc.

### NON-PUBLIC

- Complaints
    - o  Internal information
        - ▪  Secretary of State printouts
        - ▪  Internal E-mail (legal staff and auditors)

## Dissolution Program File Contents

<u>PUBLIC</u>

- Dissolution request letter from organization
- Articles of Incorporation
- Bylaws
- Secretary of State documents
  - o Certificate to Wind-Up and Dissolve
  - o Certificate of Dissolution
- Financial Reports
  - o 990s
  - o Balance Sheets and Income/Expense Statements
  - o Misc.
- Correspondence between Registry and Organization
  - o Letters to organization
    - ▪ 610 letter
    - ▪ 695 letter(s)
    - ▪ 382 letter(s)
    - ▪ E-mails, faxes
    - ▪ Misc.
  - o Letters from organization
- Dissolution Tracking Log printouts



<u>NON-PUBLIC</u>

- Secretary of State documents
  - o Secretary of State printouts
- Financial Reports
  - o Franchise Tax Board Form 199
- Correspondence between Registry and Organization
  - o Letters to organization
    - ▪ Those between DOJ employees are confidential
- Board resolutions
- Meeting minutes

ATTYGEN00004055

Public vs. Non-Public     9

## Indexed Transactions File Contents

**PUBLIC**

- Merger/Conversion/Sale of Assets
    - Letters from organization
    - Approval letter
    - Notice of sale
    - Financials *
        - Balance sheets

**NON-PUBLIC**

- Merger/Conversion/Sale of Assets
    - Internal DOJ notes attached to the letters from organization
    - Auditor assignment form
    - Internal forms
    - Complaints
    - Print-outs of indexed transaction database
    - Any document stamped "confidential" **

\* Same as Charitable Trust (CT) Files
\*\* There is a conflict in that the organization might stamp "confidential" on a document, but our office might believe otherwise.

ATTYGEN00004056

# EXHIBIT 3

Message

| | |
|---|---|
| **From**: | Elizabeth Kim [Elizabeth.Kim@doj.ca.gov] |
| **Sent**: | 8/5/2014 12:48:00 AM |
| **To**: | Tania Ibanez [Tania.Ibanez@doj.ca.gov] |
| **Subject**: | RE: Savusavu Community Foundation CT File 125160 |

## Redacted

From: Tania Ibanez
Sent: Monday, August 04, 2014 5:44 PM
To: Elizabeth Kim
Subject: RE: Savusavu Community Foundation CT File 125160

## Redacted

From: Elizabeth Kim
Sent: Monday, August 04, 2014 4:59 PM
To: Tania Ibanez
Subject: FW: Savusavu Community Foundation CT File 125160

# Redacted

From: RRF1
Sent: Monday, August 04, 2014 4:30 PM
To: Elizabeth Kim
Cc: Anthony Salazar
Subject: FW: Savusavu Community Foundation CT File 125160

# Redacted

From: Wayne Allen [mailto████████████]
Sent: Monday, August 04, 2014 4:00 PM
To: RRF1; Wayne Allen
Subject: Re: Savusavu Community Foundation CT File 125160

I received a return call from an Office Technician.  She indicated that she couldn't take any action, so I am re-sending the letter to you with the body of the letter copied below.

Please have an Analyst give me a call.

Thank you

Wayne Allen
████████████

ATTYGEN00003472

Re:      Savusavu Community Foundation (the "Organization")
CT File:  125160

Dear Ms. Harris,

I am writing on behalf our client, Savusavu Community Foundation, with reference to your correspondence of May 9, 2014.  Your correspondence indicates that an independent audit was required to be filed with the Form RRF-1 the Organization filed, pursuant to rules promulgated by your office consistent with and as provided in Government Code Section 12586.

You no doubt arrived at your belief that an independent audit is required based on the total amount of contributions received by the Organization.  However, it is important to note that all but approximately $35,000 of the Organization's receipts were in-kind contributions of medical supplies and other products contributed to the organization for the charitable purpose.  The Organization typically operates on less than $1,000 of administrative expenses per year, with the vast majority of the Organization's cash resources being used to help distribute and deliver the in-kind contributions made to the Organization to charitable beneficiaries.  To require the Organization to conduct an audit would be over burdensome as provided for in Section 12586(b)(2) of the Government Code.  That particular section of the Government Code provides that "periodic reports shall not unreasonably add to the expense of the administration of charitable trusts and similar relationships."  Accordingly, since the expense of an audit would essentially deplete virtually all of the organization's cash resources, leaving the Organization unable provide the in-kind distributions on which the Organization's charitable beneficiaries depend and to otherwise to continue with its charitable purpose, relief from the audit requirement is requested.

Please confirm your agreement to the relief sought; otherwise, contact me so an appropriate resolution can be discussed.

On Fri, Aug 1, 2014 at 2:45 PM, Wayne Allen ███████████ █████ <mailto ███████████ >> wrote:
Please see the attached correspondence.  Can we coordinate a call to discuss?

I look forward to speaking with you.

Wayne
--

J. Wayne Allen
████████████████████████████████

--

J. Wayne Allen
██████████████

# EXHIBIT 4
# Confidential Document

# EXHIBIT 5
# Confidential Document

# EXHIBIT 6

1   KAMALA D. HARRIS
    Attorney General of California
2   TAMAR PACHTER
    Supervising Deputy Attorney General
3   ALEXANDRA ROBERT GORDON
    State Bar No. 207650
4   EMMANUELLE S. SOICHET
    State Bar No. 290754
5   P. PATTY LI
    State Bar No. 266937
6   Deputy Attorneys General
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-7004
      Telephone: (415) 703-1577
8     Fax: (415) 703-1234
      E-mail: patty.li@doj.ca.gov
9   *Attorneys for Defendant*
    *Attorney General Kamala D. Harris*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                      WESTERN DIVISION

13

14

| | |
|---|---|
| 15 **AMERICANS FOR PROSPERITY FOUNDATION,** | 2:14-CV-09448 |
| 16 Plaintiff, | **FIRST AMENDED RESPONSES AND OBJECTIONS OF DEFENDANT ATTORNEY GENERAL KAMALA D. HARRIS TO PLAINTIFF AMERICANS FOR PROSPERITY FOUNDATION'S INTERROGATORY NO. 10 IN THE FIRST SET OF INTERROGATORIES** |
| 17 v. | |
| 18 | |
| 19 **KAMALA HARRIS, in her Official Capacity as Attorney General of the State of California,** | |
| 20 | |
| 21 Defendant. | Judge:      Hon. Manuel L. Real Action Filed: December 9, 2014 |

22  PROPOUNDING PARTY:  Plaintiff AMERICANS FOR PROSPERITY
23                       FOUNDATION

24  RESPONDING PARTY:  Defendant KAMALA D. HARRIS, in her Official
25                     Capacity as Attorney General of the State of California

26  SET NUMBER:        ONE

27

28

1     Defendant Attorney General Kamala D. Harris ("Defendant") amends her

2   responses and objections to Plaintiff Americans for Prosperity Foundation's

3   ("FOUNDATION") Interrogatory No. 10 in the First Set of Interrogatories as

4   follows:

5                          **PRELIMINARY STATEMENT**

6     Defendant has not yet completed the investigation of the facts relating to this

7   case and has not yet completed discovery in this action.  All of the responses

8   contained herein are based solely upon information and documents that  are

9   presently available to and specifically known by Defendant, and disclose only those

10   contentions that presently occur to Defendant.  It is anticipated that further

11   discovery, independent investigation, legal research, and analysis will supply

12   additional facts and lead to additions, changes, and variations from the responses

13   herein.

14     Defendant expressly reserves the right to assert any and all objections as to

15   the admissibility of such responses into evidence in this action, or in any other

16   proceedings, on any and all grounds including, but not limited to, competency,

17   relevancy, materiality, and privilege.  Further, Defendant makes the responses and

18   objections herein without in any way implying that the interrogatories and

19   responses to the interrogatories are relevant or material to the subject matter of this

20   action.

21     An objection or response to an interrogatory shall not be construed as an

22   acknowledgment that Defendant performed any of the acts described in the

23   interrogatory or definitions applicable to the interrogatory, or that Defendant

24   acquiesces in the characterization of the conduct or activities contained in the

25   interrogatory or definitions applicable to interrogatory.

26     The following responses are given without prejudice to the right to produce

27   evidence or witnesses which Defendant may later discover.  Defendant reserves the

28   right to supplement, clarify, revise, or correct any or all of the responses and

First Amended Responses and Objections to
Interrogatory No. 10 (2:14-CV-09448)

1   objections herein, and to assert additional objections or privileges, in one or more

2   subsequent supplemental response(s).

3

4                              **GENERAL OBJECTIONS**

5          1.   Defendant objects to each instruction, definition, and interrogatory to the

6   extent that it purports to impose any requirement or discovery obligation greater

7   than or different from those under the Federal Rules of Civil Procedure and the

8   applicable Rules and Orders of the Court.

9          2.   Defendant objects to each interrogatory that is overly broad, unduly

10  burdensome, or not reasonably calculated to lead to the discovery of admissible

11  evidence.

12         3.   Defendant objects to each interrogatory to the extent that it seeks

13  information that is not relevant to this litigation.  The Ninth Circuit recently

14  rejected a facial challenge to the SCHEDULE B REQUIREMENT of the same kind

15  asserted by the FOUNDATION here, concluding that "the disclosure requirement

16  bears a 'substantial relation' to a 'sufficiently important' government interest."

17  *Center for Competitive Politics v. Harris*, 784 F.3d 1307, 1317 (9th Cir. 2015).

18  The Ninth Circuit also clarified that to succeed on an as-applied challenge, a

19  plaintiff must show "a reasonable probability that the compelled disclosure of its

20  contributors' names will subject them to threats, harassment, or reprisals from

21  either Government officials or private parties." *Id*.  Defendant's general practices

22  with respect to the SCHEDULE B SUBMISSION REQUIREMENT or the

23  SCHEDULE B CONFIDENTIALITY POLICY are not relevant to any as-applied

24  claim by the FOUNDATION that survives the *Center for Competitive Politics*

25  decision.

26         4.   Defendant objects to each definition and interrogatory to the extent that it

27  seeks information protected from disclosure by the attorney-client privilege, the

28  governmental deliberative process privilege, the law enforcement investigatory

First Amended Responses and Objections to
                                            Interrogatory No. 10 (2:14-CV-09448)

1  privilege, the official information privilege, the attorney work product doctrine, or

2  any other applicable privilege or protection.  Should any such disclosure by

3  Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege

4  or protection.

5      5.   Defendant incorporates by reference every general objection set forth

6  above into each specific response set forth below.  A specific response may repeat a

7  general objection for emphasis or some other reason.  The failure to include any

8  general objection in any specific response does not waive any general objection to

9  that interrogatory.

10

11              **OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS**

12      1.   Defendant objects to the definition of "ATTORNEY GENERAL" as

13  overbroad and unduly burdensome to the extent it includes individuals, agencies, or

14  entities other than the Registry of Charitable Trusts and the Charitable Trusts

15  Section of the California Department of Justice, Office of the Attorney General.

16      2.   Defendant objects to the definition of "SCHEDULE B" to the extent that

17  it includes any "DOCUMENT that contains information (such as the names or

18  addresses of a charitable organization's donors) derived from an IRS form Schedule

19  B (Form 990, 990-EZ, or 990-PF)."  Defendant has no obligation to confirm the

20  source of every piece of information in every DOCUMENT in her possession,

21  custody, or control, or in any DOCUMENT referenced in the interrogatory

22  requests.  For these reasons, Defendant also objects to the definitions of

23  "SCHEDULE B CONFIDENTIALITY POLICY," "POLICY," "SCHEDULE B

24  DEFICIENCY LETTER," "SCHEDULE B DEFICIENCY LETTERS,"

25  "SCHEDULE B PENALTY," "SCHEDULE B PENALTIES," "SCHEDULE B

26  PENALTY LETTER," "SCHEDULE B PENALTY LETTERS," "SCHEDULE B

27  SUBMISSION REQUIREMENT," and "REQUIREMENT."  Defendant interprets

28  "SCHEDULE B" to refer to Schedule B for IRS Forms 990, 990-EZ, or 990-PF.

4

3.  Defendant objects to the definitions of "SCHEDULE B CONFIDENTIALITY POLICY" and "POLICY" to the extent they refer to a "purported policy of keeping Schedule B confidential." Defendant interprets "SCHEDULE B CONFIDENTIALITY POLICY" and "POLICY" to refer to the policy of the Attorney General to keep confidential Schedule B forms submitted by organizations that file a Form 990 or 990-EZ.  Organizations that file a Form 990-PF are not permitted to withhold the names and addresses of donors when they make their SCHEDULE B records available for public inspection.  Internal Revenue Code § 6104(d)(3)(A).

4.  Defendant objects to the definitions of "SCHEDULE B PENALTY" and "SCHEDULE B PENALTIES" to the extent they characterize statutorily authorized fees and penalties as measures taken "to punish a charitable organization."

5.  Defendant objects to the definitions of "SCHEDULE B SUBMISSION REQUIREMENT" and "REQUIREMENT" to the extent they refer to a "purported requirement that a charitable organization annually submit an unredacted copy of its SCHEDULE B to the REGISTRY." Defendant interprets "SCHEDULE B SUBMISSION REQUIREMENT" and "REQUIREMENT" to refer to the Attorney General's use of IRS Form 990 as the primary reporting document for charitable organizations required to file annual reports with the REGISTRY, *see* Cal. Code Regs. tit. 11, § 301, as well as the requirement in the Attorney General's Instructions for Filing Annual Registration Renewal Fee Report that "charities with total gross revenue or assets of $25,000 or more must file a copy of the IRS Form 990, 990-EZ, or 990-PF and attachments with the Attorney General's Registry of Charitable Trusts."

6.  Defendant objects to the use of the undefined term "unredacted" in the context of "unredacted SCHEDULE B."

7.  Defendant objects to Instruction No. 2 regarding information in "relevant files of all appropriate persons within YOUR possession, custody, or control" to the

First Amended Responses and Objections to
Interrogatory No. 10 (2:14-CV-09448)

1  extent that it purports to impose obligations greater than those set forth in the

2  Federal Rules of Civil Procedure.

3

4  **RESPONSES AND OBJECTIONS TO INTERROGATORY NO. 10**

5    Subject to and without waiving the foregoing objections, Defendant amends

6  her responses and objections to Interrogatory No. 10 as follows:

7  **INTERROGATORY NO. 10:**

8    Describe in detail ten specific instances in which possessing the names and

9  addresses listed in an unredacted SCHEDULE B submitted by a charitable

10  organization to the REGISTRY enabled YOU to determine that a specific

11  organization has violated the law, including laws against self dealing, Cal. Corp.

12  Code § 5233; improper loans, *id.* § 5236; interested persons, *id.* § 5227; or illegal or

13  unfair business practices, Cal. Bus. & Prof. Code § 17200.

14  **RESPONSE TO INTERROGATORY NO. 10:**

15    Defendant objects to this interrogatory on the following grounds:  (1) The

16  interrogatory is overly broad and remote and without reasonable limitation in scope

17  and time frame and as such is not reasonably calculated to lead to the discovery of

18  admissible evidence or of information relevant to the subject matter of this action.

19  (2) The interrogatory is vague and ambiguous in its use of the term "unredacted"

20  and requires Defendant to speculate as to the intended meaning and scope of that

21  term.  (3) The interrogatory calls for information protected from disclosure by the

22  attorney-client privilege, the governmental deliberative process privilege, the law

23  enforcement investigatory privilege, the official information privilege, the attorney

24  work product doctrine, and other applicable privileges and protections.  (4) The

25  interrogatory is irrelevant and unlikely to lead to admissible evidence.  Defendant's

26  general practices with respect to SCHEDULE B and Defendant's use of

27  SCHEDULE B in investigations of organizations other than the FOUNDATION

28

6

First Amended Responses and Objections to
Interrogatory No. 10 (2:14-CV-09448)

1  are not relevant to any as-applied claim by the FOUNDATION that survives the

2  *Center for Competitive Politics* decision.

3      Subject to and without waiving the foregoing general and specific objections,

4  Defendant responds as follows:  The IRS Form 990 and schedules, including

5  SCHEDULE B, provide critical information and are an important law enforcement

6  tool.  Because SCHEDULE B reveals not just the amount of donations a charity

7  receives, but also the identity of the donor and the type of donations received (for

8  example, cash or non-cash gifts in kind), it provides information that may raise

9  concerns or show evidence of misappropriation or misuse of charitable property

10  sufficient to warrant an investigation.  For example, with respect to non-cash gifts

11  in kind, SCHEDULE B requires a charity to report what type of gifts in kind it

12  received, and the value of each such donation.  This is important information to

13  consider in determining whether further inquiry should be made to ensure that a

14  charity is not improperly including overvalued gifts in kind in its reported revenues

15  and program services expenses, thus misrepresenting its size and efficiency to the

16  donating public.  Information contained in SCHEDULE B, in conjunction with

17  other information, can also be used to determine, among other things, whether

18  donors are potentially donating funds to the charity to pass money through to their

19  family members, or to fund the donor's enterprise, project, or venture.  In addition,

20  SCHEDULE B can be used to determine whether donors are related to entities that

21  are doing business with a charity, and to identify witnesses for investigations.

22  These are some of the ways that SCHEDULE B can be used to uncover fraudulent

23  and unlawful conduct.

24      SCHEDULE B also gives investigators access to basic information about a

25  charity without alerting a charity to a possible investigation.  Once a charity is made

26  aware that it is under suspicion by service of a subpoena or audit letter, it is more

27  likely to hide or tamper with evidence, including instructing its donors as to what

28  they should say in response to an investigator's questioning.  Access to

7

First Amended Responses and Objections to
Interrogatory No. 10 (2:14-CV-09448)

1  SCHEDULE B allows investigators to contact donors without triggering such

2  behavior and provides more accurate and truthful information.

3  　The following are general descriptions of some of the investigations in which

4  SCHEDULE B information has played a role.  These descriptions are provided to

5  aid Plaintiff in understanding how SCHEDULE B information may be used in an

6  investigation, and are not intended to and do not waive any applicable privileges or

7  protections.  This list is non-exhaustive.  The Charitable Trusts Section does not

8  track the role played by every piece of information reviewed during each of the

9  many investigations undertaken every year.  Nor does the Section maintain a list of

10  investigations in which Schedule B information has been used.  The Attorney

11  General reserves the right to supplement or amend this interrogatory response in the

12  future.

13  　1. In preparing for an audit of a charity, the Charitable Trusts Section noted

14  a connection between a donor listed on Schedule B and one of the charity's

15  vendors.  To confirm that the vendor was actually performing work for the charity,

16  rather than performing personal work for the donor (which could involve a

17  violation of California Corporations Code section 5231), the Charitable Trusts

18  Section requested information about the vendor's work for the organization.  This

19  audit is ongoing.

20  　2. Two charities shared several common board members.  One charity's

21  Schedule B showed that it received large donations from the other charity.  This

22  helped the Charitable Trusts Section to identify a violation of California

23  Corporations Code section 5233, with respect to one charity.  It also helped the

24  Charitable Trusts Section to determine that the other charity had violated the

25  Uniform Prudent Management of Institutional Funds Act (Cal. Prob. Code

26  §§ 18501 et seq).  The investigation regarding one of these charities is ongoing.

27  　3. Funds were donated from a trust to a foundation with the intention that the

28  foundation donate those same funds to another charity.  The Charitable Trusts

8

First Amended Responses and Objections to
Interrogatory No. 10 (2:14-CV-09448)

Section reviewed the Schedule B for the foundation. This confirmed the donation from the trust to the foundation. The Charitable Trusts Section was also able to determine that the charity intended as the ultimate recipient of these funds never received the donation from the foundation and that the foundation's trustee had engaged in self-dealing, in violation of California Corporations Code section 5233. This investigation is ongoing.

4. In an investigation of possible violations of California Corporations Code sections 5233, 5236, and 5237, the charity's officers/directors refused to provide information and invoked their right against self-incrimination. The Charitable Trusts Section relied on the charity's Schedule B to identify a significant donor whose donation was restricted for specific purposes. The Schedule B also revealed that funds from the founder's family members were listed as donations, which may be inconsistent with claims that certain funds were loans subject to repayment. This investigation is ongoing.

5. In an investigation of possible violations of California Corporations Code section 5233 and improper comingling of charitable assets, the Charitable Trusts Section used Schedule B to help determine whether a charity is being used to support a related for-profit business, or whether the business is supporting the charity. The business does not appear on the charity's Schedule B, which would be the expectation if the business were supporting the charity. This investigation is ongoing.

6. A complaint regarding a charity's alleged misuse of assets (in violation of California Corporations Code section 5233) was filed by a donor who made a large donation to be used for a specific purpose. The Charitable Trusts Section used Schedule B to corroborate information about the donor and donation in connection with its decision to pursue an investigation. The organization ceased operating and transferred its assets to an organization with a similar charitable purpose before an enforcement action was filed.

9

7.  In an investigation involving possible violations of California Corporations Code section 5233, the Schedule B confirmed that the charity was receiving donations from members of the public, and not just the charity's founders, officers, or directors.  The level of possible harm to the public was relevant to the Charitable Trusts Section's decision to continue with the investigation.  The investigation resulted in an agreement by the charity to take corrective action with respect to the section 5233 violation, as well as other violations.

8 – 10.  In investigations of three charities established by the same founder, a consistent lack of Schedule B donors helped the Charitable Trusts Section to conclude these charities lacked established donor bases and were likely sham charities, in violation of numerous provisions of the California Corporations Code and the California Supervision of Trustees and Fundraisers for Charitable Purposes Act.  The charities were simply hiring contractors to solicit funds, most of which were kept by the contractors.  These investigations resulted in settlements and a default judgment.

Dated:  August 31, 2015

KAMALA D. HARRIS
Attorney General of California
TAMAR PACHTER
Supervising Deputy Attorney General
ALEXANDRA ROBERT GORDON
EMMANUELLE S. SOICHET
Deputy Attorneys General

P. PATTY LI
Deputy Attorney General
*Attorneys for Defendant*
*Attorney General Kamala D. Harris*

10

1

**VERIFICATION OF INTERROGATORY ANSWERS**

2       I, Steve Bauman, am employed by the State of California Department of

3  Justice as a supervising investigative auditor of the Office of the Attorney General.

4  I believe, based on reasonable inquiry, that the foregoing answers are true and

5  correct to the best of my knowledge, information and belief.

6       I declare under penalty of perjury under the laws of the United States of

7  America that the foregoing is true and correct.

8       Executed on August 31, 2015, at Los Angeles, California.

9

10



11                      STEVE BAUMAN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Responses and Objections to
Interrogatory No. 10 (2:14-CV-09448)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   ***Americans for Prosperity Foundation v. Kamala Harris***

No.:         **2:14-CV-09448**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On August 31, 2015, I served the attached **FIRST AMENDED RESPONSES AND OBJECTIONS OF DEFENDANT ATTORNEY GENERAL KAMALA D. HARRIS TO PLAINTIFF AMERICANS FOR PROSPERITY FOUNDATION'S INTERROGATORY NO. 10 IN THE FIRST SET OF INTERROGATORIES** by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

Harold Barza, Esq.
Quinn Emanuel Urquhart & Sullivan LLP
865 S Figueroa Street, 10th Floor
Los Angeles, CA  90017

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on August 31, 2015, at San Francisco, California.

| | |
|---|---|
| Susan Chiang | _(signature)_ |
| Declarant | Signature |

SA2014119809
20778487.doc

# EXHIBIT 7



*KAMALA D. HARRIS*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

300 S. SPRING STREET, SUITE 1702
LOS ANGELES, CA 90013

Public:  (213) 897-2000
Telephone:  (213) 897-2179
Facsimile:  (213) 897-7605
E-Mail:  sonja.berndt@doj.ca.gov

January 16, 2015

Board of Directors

█████████████████████████

Board of Charitable Trustees

█████████████████████████

█████████████████████████

RE:     Attorney General's Investigations of ████████████████████ and ████
        ████████████ Settlement Proposal

Dear Members of the Board of Directors of ████ and Board of Charitable Trustees of ████

We have concluded our investigation of ████ and our related investigation of ████. This letter
discusses our findings in summary form and sets forth proposed terms to settle these matters
short of litigation. As such, it is an offer of compromise and is a privileged communication
pursuant to Evidence Code section 1152.

We note at the outset that ████ and its board have been very cooperative in our investigation and
we appreciate that. We also appreciate the fact that ████ provides critical services to the
████ population in ████████████████.

ATTYGEN00004028

January 16, 2015
Page 2

We received a complaint alleging that the fees ███ paid to ████████, the accounting firm
of ███ board member ████████, were excessive.  During our investigation, we discovered a
series of substantial, unsecured loans from ████ to ███ that required our review in light of the
fact that ████ and ████ have two common board members and in light of the fact that ████ is
an endowment subject to the strict standards for management, investment, and expenditure set
forth in California's Uniform Prudent Management of Institutional Funds Act.  We discuss each
of these issues separately, below.

A.      ████████'s Fees for Services Provided to ████

From documents we reviewed and interviews we conducted, ████████████
performed substantial services for the fees it charged ███.  Those services consisted of much
more than simple bookkeeping and preparing accounting reports.

However, because ████ had a material financial interest in any services agreement between
███ and ██, the agreement was subject to California Corporations Code section 5233
governing self-dealing transactions.  Self-dealing transactions between a charity and one of its
board members are prohibited unless the board conducts a stringent inquiry and makes specific
findings related to reasonableness and necessity.  The statutory restrictions on self-dealing
transactions exist to help protect charitable assets from improper diversion and waste in
situations where a director has a conflict of interest.

The ███ board passed a resolution in June 2003 retaining ███ to perform "all financial
functions and management of fund development" for one year.  While the conclusions in the
resolution parrot the language of section 5233 concerning the need for, and reasonableness of,
████'s services, we received no documents showing how the board came to those conclusions.
Further, while ███ continued providing services to ███ until 2014, there is only one other
board resolution, in 2012, retaining ███'s services.  That resolution "ratified" ███'s retention
of ██ for the period of April 1, 2004 to 2012, even though section 5233 requires board
approval of self-dealing transactions before they take place.

Additionally, there is only one engagement letter between ███ and ███ dated July 2, 2012.
Prior to 2012, the issue of an engagement letter "never came up."  An engagement letter or
similar document detailing services to be provided should always be prepared and approved in
advance of those services.  This avoids confusion regarding the agreed-upon services and the
potential duplication of services provided by third-party service providers and paid staff.

Finally, we reviewed ███'s invoices and billing statements.  It is unclear whether any member
of ███'s board or staff reviewed the statements.  Review of such statements is critical in order
to avoid potential improper diversion and waste of charitable assets.

In sum, ███ provided substantial services to ███.  However, the ███ board failed to follow
the requirements of Corporations Code section 5233 in its transactions with ███ and failed to
maintain and review documents that are important in a charity's relationship and transactions
with its service providers.

January 16, 2015
Page 3

B.     The 

 created the ███████████████ (later shortened to
████████████) by trust instrument dated █████████, which was amended six times.
The relevant provisions of the trust instrument are as follows:

1.     Annual distributions of *net income* only;
2.     Distributions are to support and further (a) the "relief of medical housing and
       nutritional and other problems of poor and underprivileged elderly persons;"
       and/or (b) "education about and the further [sic] of the protection of the natural
       environment and threatened and endangered wildlife;"
3.     Trustees should attempt to balance the distributions for the purposes referenced
       above; and
4.     "It is Trustor's intention that the ████████████████████ be a
       permanent charitable organization having either an indefinite life or a life limited
       only by any applicable law."

████s Board of Charitable Trustees ("trustees") for the period of 2008 to the present were/are
as follows:

       ████████ (2008 to present; also ███board member)
       ████████ (2008 to present; also ███board member)
       ██████████ (2008 to June 2014)
       ██████████ (2012 to present)

The following table is a summary of grants and loans ████ reported for 2008 through 2012:

| YEAR | Total Grants | Grants to ████ | ████'s Year-End Loan Balances |
|------|-------------|----------------|-------------------------------|
| 2008 | $  164,380  | $    N/A       | $    N/A                      |
| 2009 | $  202,700  | $  100,000     | $  300,000                    |
| 2010 | $  200,200  | $  100,000     | $  860,000                    |
| 2011 | $   61,175  | $    N/A       | $ 1,684,269                   |
| 2012 | $   89,200  | $   60,000     | $ 2,298,999                   |
| **Total** | **$ 717,655** | **$ 260,000** |                          |

For each fiscal year above, ████ made loans only to ████.

The following table shows ████'s operating losses for 2008 through 2011 as reported in its IRS
Forms 990:

ATTYGEN00004030

January 16, 2015
Page 4

| Year | Operating Loss Before Grants | Operating Loss After Grants |
|------|------------------------------|------------------------------|
| 2008 | $ <743,270> | $ <907,650> |
| 2009 | $ <524,422> | $ <727,122> |
| 2010 | $ < 41,778> | $ < 241,978> |
| 2011 | $ < 1,667> | $ < 62,842> |

For fiscal year 2012, ███ had net income of $186,223 prior to grant disbursements of $89,200. Thus, with the exception of fiscal year 2012, charitable distributions were not authorized under the trust instrument because ███ had no net income. However, IRC section 4942 requires a private foundation like ███ to make qualifying distributions each year in an amount equivalent to 5 percent of the fair market value of the foundation's investment assets. Our review of ███s financial documents revealed that ███'s trustees made total charitable distributions exceeding the 5 percent minimum distribution amounts. While this is permissible under California's Uniform Prudent Management of Institutional Funds Act ("UPMIFA"), the trustees were required to consider the factors set forth in Probate Code section 18504 before making those distributions.

███'s loans to ███ are problematic. By June 1, 2013, ███ owed ███ $2,153,900. As of June 30, 2014, ███ forgave $1 million plus accrued interest of $129,571 as part of a "Loan Modification and Extension Agreement" ("Loan Modification"). This was the equivalent of a charitable distribution of $1,129,571 for 2014. While we do not have ███s 2013 or 2014 Forms 990, it is likely that this amount is far in excess of ███'s net income, if any, and far in excess of ███'s 5 percent minimum distribution amount.

The Loan Modification extended the maturity date for the loan from 6 years to 10 years and decreased the annual interest rate from 5 percent to 3 percent. In addition, if the loan payments are current, concurrent with each monthly payment from ███ to ███, ███ will make a monthly grant of $6,250 until the maturity date. This effectively decreases monthly payments on the note from $11,142 to $4,892, and results in a "rolling debt forgiveness" of $75,000 annually.

Given that pursuant to the trust instrument the assets are not wholly expendable on a current basis, it is an endowment subject to the Uniform Prudent Management of Institutional Funds Act ("UPMIFA"). (Prob. Code § 18501 et seq.) Probate Code section 18504, subdivision (d), provides as follows: "The appropriation for expenditure in any year of an amount greater than 7 percent of the fair market value of an endowment fund . . . creates a rebuttable presumption of imprudence." We were advised that it was in ███'s best interest to forgive $1 million of the loan (plus interest) because a failure to restructure the note to a principal balance of $1,153,900 would almost certainly result in complete loss of the entire $2,153,900 remaining balance of the note. We were further advised that preserving 60 percent of the value of the note as a major asset of the ███████ fund reflects consideration of the "duration and preservation of the endowment fund," and "the purposes of the institution and the endowment fund," two of the UPMIFA factors to be considered in appropriating endowment funds for expenditure. (Prob. Code, § 18504, subd. (a).) This misses the point.

ATTYGEN00004031

January 16, 2015
Page 5

The Attorney General has a duty to protect charitable gifts, including those provided by donors in a trust instrument. The provisions of UPMIFA protect against the unwarranted depletion of endowed assets, and they give donors confidence that their wishes in providing charitable gifts will be honored long after they are deceased. Trustees must use due care in managing and investing endowment funds (Prob. Code, § 18503, subd. (b)) and have a duty to diversify "unless the purposes of the fund are better served without diversification." (Prob. Code, § 18503, subd. (c)(4).) ███'s loans to ███ constituted approximately 80 percent of its total assets. None of ███'s loans were secured. The loans were "interest only" loans, but ███'s interest payments over the period totaled only $133,730. ███ had $129,571 in accrued interest as of May 2014. Additionally, ███'s substantial deficits started in 2007 and continued until ███ instituted drastic measures starting in 2013. Given that ███ and ███ were members of ███'s board and also ███ trustees, ███'s severe financial difficulties were well known to ███'s trustees.

We were not provided evidence showing that the ███ board adequately considered the prudence of the loans, the requirements of UPMIFA, or the provisions of the trust. While we understand the trustees' motivation was to help rescue ███ from its dire financial condition, they could not violate UPMIFA and harm ███ in doing so. We believe at the very least, the trustees should have involved the court before substantially depleting ███'s endowment. Since that was not done and we believe the trustees did not exercise due care with regard to its loans to ███, the trustees are financially responsible for the damage to ███ – the amount of the loan forgiveness of $1,129,571. In addition, the ███ trustees are liable for penalties under Business and Professions Code section 17200 et seq. because the loans violated UPMIFA and therefore constituted an unfair business practice. Finally, if this case were to be successfully litigated by the Attorney General, the trustees would be liable for the Attorney General's fees and costs (including auditor costs), which now total over $125,000. (Gov. Code, § 12598.)

C.  Proposed Settlement Terms

In an effort to resolve the investigations short of litigation, we propose to enter into a settlement agreement with the ███ board, the ███ trustees, and ███ and ███, individually. We make this offer in advance of presenting a proposed settlement agreement to the Attorney General in light of the urgency you have expressed to us occasioned by a possible merger with ███. We cannot guarantee that the Attorney General will accept these terms, but we will recommend that she do so. However, the Attorney General may believe that additional monetary recovery, including fees and costs, is required under the circumstances of this case.

1.  ███ and ███ resign from the ███ board. If the merger with ███ is accomplished, ███ and ███ agree not to serve as directors of ███ for at least 5 years and only if they first complete training on the duties and responsibilities of directors of charitable organizations. Their service on ███'s advisory board, if any, would not be prohibited.

January 16, 2015
Page 6

2.      If the merger with ████ is accomplished, any ████ board members other than ████ and ████ invited to join ████'s board of directors must complete training on the duties and responsibilities of directors of charitable organizations within 6 months of election to ████'s board. If the merger with ████ is not accomplished, ████'s remaining board members must complete training on the duties and responsibilities of directors of charitable organizations within 6 months of the execution of the settlement agreement.

3.      The Attorney General will not seek monetary recovery and penalties related to the violations of Corporations Code section 5233. The Attorney General will not seek attorney fees and auditor costs allowed under Government Code section 12598.

4.      Pursuant to Section II, E.2.b of the Sixth Amendment to ████████████ 1981 Trust as Amended and Restated ████████, the ████ Board of Charitable Trustees elects to terminate the Board and appoints a community foundation selected by the Attorney General's Office as trustee.

4.      ████████████████████████ pay $50,000 (total) to ████

5.      ████████████████████████ agree not to serve as trustee of any trust subject to UPMIFA for at least 5 years and only if they first receive training on the requirements of UPMIFA.

6.      The Attorney General will not seek to void the Loan Modification and Extension Agreement between ████ and ████ executed by ████ on June 30, 2014, and/or seek recovery of ████'s lost assets in connection with the loans it made to ████ as long as all parties abide by the terms of the settlement agreement.

Thank you for your consideration of this proposal. If you have any questions, you may reach me at 213-897-2179.

                        Sincerely,

                        SONJA K. BERNDT
                        Deputy Attorney General

            For    KAMALA D. HARRIS
                        Attorney General

SKB:al
Cc:    James Toma, SDAG
          Elyse Rendon, DAG

LA2013510592

## Sonja Berndt

| | |
|---|---|
| **From:** | Sonja Berndt |
| **Sent:** | Friday, January 16, 2015 4:47 PM |
| **To:** | ███████████████████████████████ |
| **Cc:** | James Toma; Elyse Rendon |
| **Subject:** | Letter from AG's Office ████████████████ |
| **Attachments:** | ████████Letter.pdf |

All:

Please see attached letter this date regarding the Attorney General's investigation of ████████ and related investigation of ████████████. I would appreciate if someone would send me ████████'s email address as soon as possible so I can send the letter to him as well.

Thank you.

Sonja Berndt
Deputy Attorney General

ATTYGEN00004034

## Sonja Berndt

| | |
|---|---|
| **From:** | Sonja Berndt |
| **Sent:** | Tuesday, January 20, 2015 9:36 AM |
| **To:** | ███████████████████ |
| **Cc:** | Elyse Rendon |
| **Subject:** | FW: Letter from AG's Office re: ████████ and ██████████ |
| **Attachments:** | ████████████.pdf |

███████

Please see attached email with my correspondence dated January 16, 2015.  If you have any questions, please contact me.  Also, please confirm that you received the attachment.  Thank you.

Sonja Berndt
Deputy Attorney General

---

**From:** Sonja Berndt
**Sent:** Friday, January 16, 2015 4:47 PM
██████████████████████████████████████████████████████████████
**Cc:** James Toma; Elyse Rendon
**Subject:** Letter from AG's Office re: ████████ and ████████████

All:

Please see attached letter this date regarding the Attorney General's investigation of ████████ and related investigation of ████████████.  I would appreciate if someone would send me ████████'s email address as soon as possible so I can send the letter to him as well.

Thank you.

Sonja Berndt
Deputy Attorney General

ATTYGEN00004035

**Sonja Berndt**

---

**From:** ███████████████████

**Sent:** Tuesday, January 20, 2015 11:16 AM

**To:** Sonja Berndt

**Cc:** Elyse Rendon

**Subject:** Re: Letter from AG's Office re: ████████ and ████████████

have received the information sent.

████████████

On Jan 20, 2015, at 9:35 AM, Sonja Berndt wrote:

<██████ Letter.pdf>

1

ATTYGEN00004036

# EXHIBIT 8



**KAMALA D. HARRIS**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

300 SOUTH SPRING STREET, SUITE 1702
LOS ANGELES, CA  90013

Public:  (213) 897-2000
Telephone:  (213) 897-2179
Facsimile:  (213) 897-7605
E-Mail: sonja.berndt@doj.ca.gov

March 19, 2015

Board of Directors
███████████████

RE:   Investigation of ███████████
Corrective Action Letter

Dear Members of the Board of Directors:

The Attorney General's Office has concluded our investigation of ███████ ███████████████ and our related investigation of ███████████ ███████.  Our investigation of ██████ revealed that ████ 's board of directors failed to follow the procedures required by law in approving ███████ 's accounting and other services to ████.  Because ████ board member ███, a principal of ███████ had a material financial interest in any services agreement between ████ and ███████, the agreement was subject to California Corporations Code section 5233 governing self-dealing transactions. Self-dealing transactions between a charity and one of its board members are prohibited unless the board conducts a stringent inquiry and makes specific findings related to reasonableness and necessity.  The statutory restrictions on self-dealing transactions exist to help protect charitable assets from improper diversion and waste in situations where a director has a conflict of interest.

The ████ board passed a resolution in June 2003 retaining ███████ to perform "all financial functions and management of fund development" for one year.  While the conclusions in the resolution parrot the language of section 5233 concerning the need for, and reasonableness of, ███████ 's services, we received no documents showing how the board came to those conclusions.  Further, while ███████ continued providing services to ████ until 2014, there is only one other board resolution, in 2012, retaining ███████ 's services.  That resolution "ratified" ███ 's retention of ███████ for the period of April 1, 2004 to 2012, even though section 5233 requires board approval of self-dealing transactions before they take place.

Additionally, there is only one engagement letter between ███████ and ███, dated July 2, 2012.  An engagement letter or similar document detailing services to be provided should always be prepared and approved in advance of those services.  This avoids confusion

ATTYGEN00004037



March 19, 2015
Page 2

regarding the agreed-upon services and the potential duplication of services provided by third-party service providers and paid staff.

Finally, we reviewed ███████████'s invoices and billing statements. It is unclear whether any member of ████'s board or staff reviewed the statements. Review of such statements is critical in order to avoid potential improper diversion and waste of charitable assets. In sum, the ████ board failed to follow the requirements of Corporations Code section 5233 in its transactions with ██████████ and failed to maintain and review documents that are important in a charity's relationship and transactions with its service providers.

In our investigation of a related matter involving ██████, we found that the ██████ Trustees violated the provisions of the Uniform Management of Institutional Funds Act ("UPMIFA") in connection with the very substantial loans ██████ made to ████ during the period of 2009 to June 30, 2014, and in connection with the $1 million in loan forgiveness ██████ extended to ████ in 2014. ██████ board members ████████ and ██████████ are also ██████ Trustees and were aware of ████'s dire financial condition when they approved the loans as well as the loan forgiveness. The Attorney General, ██████ and ████'s Trustees are resolving the ██████ matter with a formal Assurance of Voluntary Compliance.

The parties executing this letter acknowledge and agree that it is in their mutual best interest to resolve the Attorney General's concerns by way of this corrective action letter. This letter does not constitute an approval by the Attorney General of any of practices or past conduct of ████, its Directors, ████████ or ██████████ and they shall not make any representation to the contrary. Conversely, nothing in this corrective action letter will be deemed to be an admission by ████, its Directors, ████████ or ██████████ of any wrongdoing of any kind or nature.

### Required Corrective Action

1.   Due to the seriousness of the UPMIFA violations in the ██████ matter, ██████████ and ██████████ must resign from ████'s board. If ████ merges with ██████████, as is planned, ██████████ agree not to serve as directors of ████ for at least 5 years and only if they first complete pre-approved training on the duties and responsibilities of directors of charitable organizations. Their service on ██████'s advisory board, if any, would not be prohibited.

2.   If the merger with ██████ is accomplished, any ████ board members other than ██████ and ██████████ invited to join ████'s board of directors must complete pre-approved training on the duties and responsibilities of directors of charitable organizations within 6 months of election to ██████'s board. If the merger with ██████ is not accomplished, ██████'s remaining board members must complete pre-approved training on the duties and responsibilities of directors of charitable organizations within 6 months of the execution of the settlement agreement.

ATTYGEN00004038

March 19, 2015
Page 3

     If ▮▮▮'s board of directors is in agreement with the required corrective action, please have the chairperson, ▮▮▮▮, and ▮▮▮▮▮▮ sign below and return the executed letter to me along with a board resolution showing that all board members agreed with the corrective action set forth above.

     Thank you for your cooperation during the investigation.  If you have any questions, you may reach me at 213-897-2179.

Sincerely,

SONJA K. BERNDT
Deputy Attorney General

For    KAMALA D. HARRIS
Attorney General

     The ▮▮▮ board of directors, ▮▮▮▮, and ▮▮▮▮▮ agree to the required corrective action set forth above in this letter.

On Behalf of ▮▮▮▮▮▮▮▮

DATED: 3/25/15

CHAIRPERSON
Board of Directors

DATED: 3/25/15

DATED: 3/25/15

SKB:al

ATTYGEN00004039

March 19, 2015
Page 4

Cc:     Elyse Rendon, DAG

LA2013510592

ATTYGEN00004040

March 24, 2015

I am unable to attend the ▮▮▮▮▮▮▮ Board of Directors meeting on
March 25, 2015, at which time the Corrective Action Letter is scheduled to be
approved.

I have read the attached Corrective Action Letter dated March 19, 2015 from
the Attorney General of California, and agree with its terms and conditions.

▮▮▮▮▮▮▮▮▮▮                                   3/24/15
——————————————————                    ———————————————
                                              Date

# EXHIBIT 9

| From: | Kevin Calia |
|---|---|
| To: | Keith Forst (keithforst@quinnemanuel.com) |
| Cc: | QE AFP Foundation Team (QEAFPFoundationTeam@quinnemanuel.com) |
| | (QEAFPFoundationTeam@quinnemanuel.com); Tamar Pachter; Alexandra RobertGordon; Emmanuelle Soichet; |
| | Jose ZelidonZepeda |
| Subject: | AFPF v. Harris - Bob Ralls and other witnesses |
| Date: | Wednesday, December 23, 2015 12:51:47 PM |

Keith,

You asked us to check about Bob Ralls's availability for a deposition.  He can be available in
Sacramento on January 12, 2016.

In addition, as we discussed last week, there are three witnesses who we may seek to call at trial for
whom you have not requested depositions.  Those witnesses are Jami Cantore, Joseph Zimring, and
Sonja Berndt.  Ms. Cantore is the Deputy Attorney General who is working on the proposed changes
to regulations that codify the Attorney General's longstanding policy of keeping Schedule Bs
confidential.  As you know, Joseph Zimring and Sonja Berndt are the Deputy Attorneys General who
worked on several of the investigations listed in our response to Interrogatory 10.   Mr. Bauman
provided more specific testimony about the investigations on which each lawyer worked during his
deposition.  These attorneys likewise have information about the general ways that Schedule B can
be and has been used in investigations for which there are no records that would indicate which
specific schedules attached to Form 990 were used to advance the investigation, which was also a
subject of Mr. Bauman's testimony.

Kevin

Kevin A. Calia
Deputy Attorney General
California Department of Justice
1300 I Street
Sacramento, California 95814
916.322.6114