QUINN EMANUEL URQUHART & SULLIVAN LLP
Harold Barza (California Bar No. 80888)
    halbarza@quinnemanuel.com
Carolyn Thomas (California Bar No. 286441)
    carolynthomas@quinnemanuel.com
865 S Figueroa St, 10th Floor
Los Angeles, CA  90017
Telephone: (213) 443-3000

QUINN EMANUEL URQUHART & SULLIVAN LLP
William Burck (DC Bar No. 4015426) (*pro hac vice*)
    williamburck@quinnemanuel.com
Derek Shaffer (California Bar No. 212746)
    derekshaffer@quinnemanuel.com
Keith H. Forst (NY Bar No. 4746806) (*pro hac vice*)
    keithforst@quinnemanuel.com
Jonathan Cooper (DC Bar No. 999764) (*pro hac vice*)
    jonathancooper@quinnemanuel.com
777 Sixth Street NW, 11th Floor
Washington, DC  20001
Telephone:   (202) 538-8000

*Attorneys for Plaintiff*
*Americans for Prosperity Foundation*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| **AMERICANS FOR PROSPERITY FOUNDATION,**<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>**KAMALA HARRIS,**<br>in her Official Capacity as Attorney General of California,<br><br>　　　　　Defendant. | Case No.　2:14-cv-09448-R-FFM<br><br>**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Final Pretrial Conf.: February 16, 2016<br>Conf. Time:　11:00 am<br>Courtroom:　8 – 2nd Floor<br>Judge:　Hon. Manuel L. Real<br><br>Trial Date:　February 23, 2016<br>Action Filed:　December 9, 2014 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... V

PROPOSED FINDINGS OF FACT ........................................................... 1

I.    Parties and Background ......................................................................... 1

    A.    Plaintiff Americans for Prosperity Foundation ........................ 1

    B.    Form 990 and Schedule B ....................................................... 4

    C.    Defendant Attorney General Kamala Harris............................. 5

    D.    Genesis of This Lawsuit........................................................... 6

II.   The Attorney General Lacks a Compelling State Interest in Collecting Schedule B ........................................................................... 7

    A.    The IRS Does Not Endorse Charities Submitting Schedule B to State Authorities Absent a Specific On-Point Regulation ..................... 7

    B.    Other States Do Not Require Charities To File Schedule B .................. 8

    C.    No California Law or Regulation Specifically Requires Schedule B ..................................................................................... 15

    D.    The Attorney General Did Not Begin Demanding Schedule B from Any Charity Until 2010 ................................................. 18

    E.    The Attorney General Does Not Need Schedule B To Fulfill Any Charitable Oversight or Law Enforcement Purposes ................... 21

        1.    The Attorney General Never Looks at Most Schedule Bs ................................................................... 21

        2.    Schedule B Is Inconsequential to the Attorney General's Audits and Investigations of Charities............ 22

        3.    Other Forms Are Much More Important Than Schedule B................................................................. 26

    F.    The Foundation's Schedule B Would Not Aid the Attorney General's Oversight of the Foundation ................................. 28

    G.    The Attorney General Has Less Restrictive Means of Obtaining Any Necessary Donor Information ...................................... 30

III.   The Attorney General Systematically Fails To Uphold Her Guarantee That She Keeps Schedule B Confidential ...................................................... 33

    A.   The Purported Confidentiality Policy ................................................ 33

    B.   The Attorney General's Storage of Charities' Files ............................ 34

    C.   The Registry Protocols for Storing Schedule B Do Not Meet Basic Security and Cybersecurity Standards ........................................ 36

    D.   The Attorney General Does Not Stringently Train Staff on the Confidentiality of Schedule B ............................................................. 39

    E.   The Attorney General Acknowledges but Fails To Rectify Human Error in Processing Confidential Filings .................................. 40

    F.   The Attorney General Believes It Is the "Responsibility" of Charities Themselves To Ensure That the Attorney General Does Not Publish Schedule B ............................................................... 41

    G.   The Attorney General Runs Inadequate Searches To Identify Mistakenly Uploaded Confidential Documents .................................... 42

    H.   The Attorney General Does Not Impose Penalties for Violating Her Purported Confidentiality Policy ..................................................... 43

    I.   The Attorney General Discloses Schedule B to Vendors Outside of the Charitable Trusts Section .......................................................... 45

    J.   The Attorney General's Knowledge of Inadvertent Disclosures .......... 46

    K.   The Attorney General Has Repeatedly, Systematically, and Predictably Violated Her Confidentiality Policy by Publishing Over 1700 Schedule Bs on Her Website ................................................. 48

    L.   During This Lawsuit, Every Single Confidential Record About A Charity Was Available Through The Registry's Website ................. 53

    M.   The Attorney General Has Not Attempted Any Serious Remediation of Her Schedule B Public Disclosures or Implementation of a Plan To Prevent Future Disclosures ................... 56

    N.   The Attorney General Does Not Notify Charities or Donors When She Discloses Their Schedule B Information .......................... 59

    O.   The Foundation and Its Donors Reasonably Fear Disclosure by the Attorney General and Other California Officials ........................... 60

P.  The Proposed Rulemaking To Keep Schedule B Confidential ............ 62

IV.  Compelling Charitable Organizations To Disclose Schedule B Burdens First Amendment Rights .................................................... 63

V.  Compelling the Foundation To Disclose Its Schedule B Burdens Its First Amendment Rights ................................................................... 66

A.  The Foundation Keeps Confidential Its Schedule B Information ........ 66

B.  The Foundation's Donors Have Valid Reasons for Maintaining Their Anonymity and Fearing Public Reprisal if Their Identities Are Disclosed ........................................................................ 70

C.  The Foundation's Donors Reasonably, Legitimately, and Predictably Fear Public Reprisal, if Their Donations to the Foundation Become Known. ........................................................ 72

D.  The Foundation, Its Employees, Supporters, Donors, and Affiliated Network Regularly Experience Public Threats, Harassment, Intimidation, and Retaliation............................................ 74

E.  The Foundation's Donors Fear Disclosure on Schedule B .................. 79

F.  The Foundation and Its Donors Reasonably Fear Disclosure to and Reprisal by the Attorney General and Other California Officials ......................................................................................... 81

G.  The Foundation's Charitable Activities Have Been Chilled by the Attorney General's Demand for Schedule B and Will Be Chilled Further if the Foundation Is Required To Disclose Its Schedule B ..................................................................................... 86

PROPOSED CONCLUSIONS OF LAW .................................................... 88

I.  This Court Has Jurisdiction............................................................... 88

II.  The Foundation Prevails on Its First Amendment Claims ............................ 89

A.  The First Amendment................................................................. 89

B.  The Attorney General's Demand for Schedule Bs Triggers First Amendment Scrutiny ........................................................... 92

C.  The Foundation Prevails on Its Facial Challenge ................................ 97

D.  The Foundation Prevails on Its As-Applied Challenge ..................... 107

III.   The Foundation Should Prevail on Its Preemption Claim But It Is Foreclosed by Circuit Law ............................................................................ 111

IV.   The Attorney General Has Abandoned Her Affirmative Defenses .............. 113

V.   The Foundation Is Entitled To Injunctive And Declaratory Relief .............. 114

VI.   The Foundation Is Entitled to Attorney's Fees .............................................. 116

1

# TABLE OF AUTHORITIES

2

## Cases

*ACLU of Nevada v. Heller*,
  378 F.3d 979 (9th Cir. 2004) ...................................................88, 89

*ACLU v. Clapper*,
  785 F.3d 787 (2d Cir. 2015)...........................................................94

*Allee v. Medrano*,
  416 U.S. 802 (1974) .....................................................................115

*Alpha Delta Chi-Delta Chapter v. Reed*,
  648 F.3d 790 (9th Cir. 2011)..........................................................91

*American Communications Ass'n v. Douds*,
  339 U.S. 382 (1950) ........................................................................92

*Americans for Prosperity Foundation v. Harris*,
  809 F.3d 536 (9th Cir. 2015) .................................................passim

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
  131 S. Ct. 2806 (2011) .................................................................105

*Arizona v. United States*,
  132 S. Ct. 2492 (2012) .................................................................113

*Bates v. City of Little Rock*,
  361 U.S. 516 (1960) ...............................................92, 94, 107

*Bernhardt v. Los Angeles County*,
  339 F.3d 920 (9th Cir. 2003) .......................................................117

*Boorda v. Subversive Activities Control Board*,
  421 F.2d 1142 (D.C. Cir. 1969) .....................................................94

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000) ...............................................................90, 91

*Brock v. Local 375, Plumbers International Union*,
  860 F.2d 346 (9th Cir. 1988) ...................................................91, 95

*Brown v. Socialist Workers '74 Campaign Committee (Ohio)*,
  459 U.S. 87 (1982) .............................................97, 109, 114

*Buckley v. Valeo*,
  424 U.S. at 1 (1976) ................................................................passim

*California Bankers Ass'n v. Shultz*,
    416 U.S. 21 (1974) ........................................................................88

*California Pro-Life Council, Inc. v. Getman*,
    328 F.3d 1088 (9th Cir. 2003) ....................................................106

*Center for Competitive Politics v. Harris*,
    784 F.3d 1307 (9th Cir. 2015) ...............................................passim

*Center for Food Safety v. Vilsack*,
    718 F.3d 829 (9th Cir. 2013) ......................................................102

*Chula Vista Citizens for Jobs & Fair Competition v. Norris*,
    782 F.3d 520 (9th Cir. 2015) (en banc) ........................................95

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ...............................................................93, 95

*Clark v. Burleigh*,
    841 P.2d 975 (Cal. 1992) ..............................................................98

*Clark v. Library of Congress*,
    750 F.2d 89 (D.C. Cir. 1984) ........................................................95

*Correctional Services Corp. v. Malesko*,
    534 U.S. 61 (2001) ......................................................................114

*Davis v. FEC*,
    554 U.S. 724 (2008) ...............................................................94, 95

*Democratic Party of Washington State v. Reed*,
    388 F.3d 1281 (9th Cir. 2004) ....................................................117

*Dennis v. Chang*,
    611 F.2d 1302 (9th Cir. 1980)......................................................118

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) ...............................................115, 116

*Doe v. Reed*,
    561 U.S. 186 (2010) ......................................................................95

*Dole v. Service Employees Union, AFL-CIO, Local 280*,
    950 F.2d 1456 (9th Cir. 1991) ......................................................95

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ....................................................................114

FOUNDATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Elrod v. Burns,*
   427 U.S. 347 (1976) ............................................................................ 115

*Eustace v. Commissioner of Internal Revenue,*
   312 F.3d 905 (7th Cir. 2002) ............................................................ 102

*Familias Unidas v. Briscoe,*
   619 F.2d 391 (5th Cir. 1980) ........................................................ 88, 95

*Family PAC v. McKenna,*
   685 F.3d 800 (9th Cir. 2012) .............................................................. 96

*Farris v. Seabrook,*
   677 F.3d 858 (9th Cir. 2012) ............................................................ 115

*Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,*
   812 F.2d 105 (3d Cir. 1987)................................................................. 94

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
   561 U.S. 477 (2010) .......................................................................... 114

*Gaudiya Vaishnava Society v. City & County of San Francisco,*
   952 F.2d 1059 (9th Cir. 1991) ............................................................ 90

*General Motors Corp. v. Franchise Tax Board,*
   139 P.3d 1183 (Cal. 2006) .................................................................. 99

*Gibson v. Florida Legislative Investigation Committee,*
   372 U.S. 539 (1963) ...............................................................92, 93, 94, 107

*Gikas v. Zolin,*
   863 P.2d 745 (Cal. 1993) .................................................................... 98

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) .......................................................................... 117

*Herrington v. County of Sonoma,*
   883 F.2d 739 (9th Cir. 1989) ............................................................ 117

*Hollingsworth v. Perry,*
   558 U.S. 183 (2010) .......................................................................... 115

*Human Life of Washington, Inc. v. Brumsickle,*
   624 F.3d 990 (9th Cir. 2010) .............................................................. 96

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.,*
   538 U.S. 600 (2003) ...................................................................90, 107

*In re First National Bank*,
   701 F.2d 115 (10th Cir. 1983)........................................................................88

*J & J Sports Products v. Zambrano*,
   2015 U.S. Dist. Lexis 73999 (N.D. Cal. June 8, 2015)..............................113

*Klein v. City of Laguna Beach*,
   --- F.3d ----, 2016 WL 158600 (9th Cir. Jan. 14, 2016) ...........................117

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009)..........................................................115, 116

*Kusper v. Pontikes*,
   414 U.S. 51 (1973) ...........................................................................................95

*Louisiana ex rel. Gremillion v. NAACP*,
   366 U.S. 293 (1961) ......................................................................88, 92, 95

*McCutcheon v. FEC*,
   134 S. Ct. 1434 (2014) ....................................................93, 95, 112

*McIntyre v. Ohio Elections Commission*,
   514 U.S. 334 (1995) ...............................................................................89, 90

*Mendez v. City of San Bernardino*,
   540 F.3d 1109 (9th Cir. 2008)............................................................117

*Mississippi ex rel. Hood v. AU Optronics*,
   134 S. Ct. 736 (2014) ....................................................................................98

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) ..............................................................................passim

*NAACP v. Button*,
   371 U.S. 415 (1963) ......................................................................................92

*National Association for the Advancement of Psychoanalysis v. California Board of Psychology*,
   228 F.3d 1043 (9th Cir. 2000) ...................................................................98

*Pacific Operators Offshore, LLP v. Valladolid*,
   132 S. Ct. 680 (2012) ....................................................................................98

*Perry v. Schwarzenegger*,
   591 F.3d 1147 (9th Cir. 2010)......................................................................95

*Pollard v. Roberts*,
   393 U.S. 14 (1968),
   *affirming* 283 F. Supp. 248 (E.D. Ark. 1968)...........................................92, 94

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Department of Agriculture*,
    499 F.3d 1108 (9th Cir. 2007)................................................................. 106, 111

*Red Lion Hotels Franchising, Inc. v. MAK, LLC*,
    663 F.3d 1080 (9th Cir. 2011)..........................................................................98

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) ...............................................................................90, 104

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) ...........................................................................90, 91, 92

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ...........................................................................................91

*Sammartano v. First Judicial District Court*,
    303 F.3d 959 (9th Cir. 2002) .........................................................................116

*Sanchez v. City of Austin*,
    774 F.3d 873 (5th Cir. 2014) .........................................................................117

*Sanders County Republican Central Committee v. Bullock*,
    698 F.3d 741 (9th Cir. 2012) .........................................................................115

*Santomenno ex rel. John Hancock Trust v. John Hancock Life Insurance Co.*,
    768 F.3d 284 (3d Cir. 2014)...........................................................................102

*Schneider v. State*,
    308 U.S. 147 (1939) .......................................................................................105

*Sebelius v. Cloer*,
    133 S. Ct. 1886 (2013) .....................................................................................98

*Secretary of State v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984) .........................................................................................90

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ...............................................................................95, 110

*Southern Oregon Barter Fair v. Jackson County*,
    372 F.3d 1128 (9th Cir. 2004).................................................................106, 111

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009)........................................................................115

*Sweet v. Sheahan*,
    235 F.3d 80 (2d Cir. 2000)..............................................................................102

*Talley v. California,*
 362 U.S. 60 (1960) .................................................................. 89, 94

*Thalheimer v. City of San Diego,*
 645 F.3d 1109 (9th Cir. 2011)........................................... 115, 116

*United States v. Mayer,*
 503 F.3d 740 (9th Cir. 2007) ..................................................... 107

*United States v. Stevens,*
 559 U.S. 460 (2010) ...................................................................... 97

*United States v. Virginia,*
 518 U.S. 515 (1996) .................................................................... 108

*University of Texas v. Camenisch,*
 451 U.S. 390 (1981) ........................................................... 106, 110

*Valle Del Sol Inc. v. Whiting,*
 709 F.3d 808 (9th Cir. 2013) ..................................................... 115

*Vasquez v. Rackauckas,*
 734 F.3d 1025 (9th Cir. 2013) .............................................. 91, 117

*Village of Schaumburg v. Citizens for a Better Environment,*
 444 U.S. 620 (1980) ........................................................... 90, 104

*Washington Initiatives Now v. Rippie,*
 213 F.3d 1132 (9th Cir. 2000).................................................... 89

*Washington State Grange v. Washington State Republican Party,*
 552 U.S. 442 (2008) ...................................................................... 97

*White v. Lee,*
 227 F.3d 1214 (9th Cir. 2000) ..................................................... 91

*Williams-Yulee v. Florida Bar,*
 135 S. Ct. 1656 (2015) ................................................................. 89

*Wilson v. Stocker,*
 819 F.2d 943 (10th Cir. 1987) ..................................................... 95

*Wolfson v. Concannon,*
 --- F.3d ----, 2016 WL 363202 (9th Cir. Jan. 27, 2016) (en banc) ................. 89

*Wyeth v. Levine,*
 555 U.S. 555 (2009) .................................................................... 113

**Statutes**

10 Pa. Cons. Stat. § 162.5(b) ..............................................................13

225 Ill. Comp. Stat. 460/4 ...................................................................10

26 U.S.C. § 501(c)(3) ...........................................................................1

26 U.S.C. § 6033 ..................................................................................4

26 U.S.C. § 6104 ..........................................................................passim

26 U.S.C. § 7213 ..................................................................8, 44, 86

26 U.S.C. § 7431 ..................................................................8, 44, 86

28 U.S.C. § 1331 ................................................................................88

28 U.S.C. § 1343 ................................................................................88

42 U.S.C. § 1983 ..............................................................................116

42 U.S.C. § 1988 ......................................................................116, 117

Ala. Code § 13A-9-71(g) .....................................................................9

Alaska Stat. §§ 45.68.010–45.68.900 .................................................9

Ark. Code Ann. §§ 4-28-403 .............................................................10

Cal Gov. Code § 12585 .....................................................................5, 6

Cal. Gov. Code § 12586 ..............................................................5, 98, 99

Cal. Gov. Code § 12590 ..............................................5, 30, 101, 108

Cal. Gov. Code § 12595 .....................................................................99

Cal. Gov. Code § 12599.7 ..................................................................97

Cal. Gov. Code §§ 12580–12599.8 .....................................................5

Colo. Rev. Stat. § 6-16-104 ..............................................................10

Conn. Gen. Stat. §§ 21a-175–190l ...................................................10

D.C. Code §§ 47-1700–1714, 47-2581 ............................................10

Fla. Stat. §§ 496.401–496.426 .........................................................10

Ga. Code Ann. § 43-17-5 ..................................................................10

Haw. Rev. Stat. § 467B- .............................................................................. 10

Kan. Stat. Ann. § 17-1763 ........................................................................... 11

Ky. Rev. Stat. Ann. § 367.657 .................................................................... 11

La. Rev. Stat. Ann. § 51:1901 .................................................................... 11

Mass. Gen. Laws ch. 12, § 8F ................................................................... 11

Me. Rev. Stat. tit. 9, § 5005-B ................................................................... 11

Mich. Comp. Laws §§ 400.275, 400.277 ................................................... 11

Minn. Stat. § 309.53 ................................................................................... 11

Miss. Code Ann. § 79-11-507 .................................................................... 12

Mo. Rev. Stat. § 407.462 ............................................................................ 12

N.C. Gen. Stat. § 131F-5(c) ....................................................................... 12

N.D. Cent. Code § 50-22-04 ....................................................................... 13

N.H. Rev. Stat. Ann. § 7:28 ........................................................................ 12

N.J. Stat. Ann. § 45:17A-18 ....................................................................... 12

N.M. Stat. Ann. § 57-22-6(c) ..................................................................... 12

N.Y. Exec. Law § 172-b .............................................................................. 12

Ohio Rev. Code Ann. § 1716.04 ................................................................. 13

Okla. Stat. tit. 18, § 552.3 ........................................................................... 13

Or. Rev. Stat. § 128.670 .............................................................................. 13

R.I. Gen. Laws § 5-53.1-4 ........................................................................... 13

S.C. Code Ann. § 33-56-10 ......................................................................... 13

Tenn. Code Ann. § 48-101-506 ................................................................... 13

Utah Code Ann. §§ 13-22-6, 13-22-15 ....................................................... 14

Va. Code Ann. § 57-49 ................................................................................ 14

W. Va. Code § 29-19-5 ................................................................................ 14

Wash. Rev. Code Ann. § 19.09.075 ............................................................ 14

1

Wis. Stat. § 202.12 ........................................................................................ 14

2

**Other Authorities**

3

California Constitution art. V, § 13 ............................................................. 100

4

U.S. Constitution amendment I ..................................................................... 89

5

6

**Regulations**

1-15 Miss. Code R. § 2.05 .............................................................................. 12

7

2 Va. Admin. Code § 5-610-30(A) ................................................................. 14

8

Alaska Admin. Code tit. 9, § 12.010 .............................................................. 9

9

Cal. Code Regs., tit. 11, § 302 ........................................................................ 6

10

Cal. Code Regs., tit. 11, § 310 ............................................... 6, 30, 101, 108

11

Cal. Code Regs., tit. 11, § 312 ........................................................................ 6

12

Conn. Agencies Regs. §§ 21a-190k-1–190k-8 ........................................... 10

13

D.C. Mun. Regs. tit. 16, § 13 ....................................................................... 10

14

Ill. Admin. Code tit. 14, § 400.60 ................................................................ 10

15

Kan. Admin. Regs. § 7-42-1 ......................................................................... 11

16

La. Admin. Code tit. 16, § 515 ..................................................................... 11

17

Md. Code Bus. Reg. § 6-408 ........................................................................ 11

18

N.J. Admin Code § 13:48-5.1 ....................................................................... 12

19

N.Y. Comp. Codes R. & Regs. tit. 13, § 91.5 ............................................. 12

Or. Admin. R. § 137-010-0020(7) ................................................................ 13

20

Tenn. Comp. R. & Regs. 1360-03-01-.03 .................................................... 13

21

Utah Admin. Code r. 152-22 ........................................................................ 14

22

Wis. Admin. Code DFI-Bkg § 60.08 ........................................................... 14

23

24

Americans for Prosperity Foundation ("Foundation") respectfully submits the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, Local Civil Rule 52-1, and this Court's Order Granting Stipulation To Extend Time To Complete Discovery and To Continue the Pre-Trial Conference (January 4, 2016), ECF 95.[1]

## PROPOSED FINDINGS OF FACT

### I.      PARTIES AND BACKGROUND

####      A.      Plaintiff Americans for Prosperity Foundation

1.      Plaintiff Americans for Prosperity Foundation is a Delaware charitable corporation, headquartered in Virginia, and organized under Section 501(c)(3) of the United States Tax Code.   *See* 26 U.S.C. § 501(c)(3); PX-142.   The Foundation was incorporated in 1987 and was originally called the "Citizens for a Sound Economy Educational Foundation." The Foundation adopted its current name— Americans for Prosperity Foundation—on November 20, 2003.   Fink Dep. 238:11– 19.   The Foundation funds its activities by raising charitable contributions from donors throughout the country, including in California.   PX-67; *see also* Fink Dep. 33:21–34:9.

2.      The Foundation is devoted to the promotion of limited government and free markets.   PX-67.   To that end, the Foundation hosts conferences, issues policy papers, and runs educational programs to engage policymakers, the media, and individual citizens in policy discussions that seek to persuade why policies that

------------------------------------

[1]      The Foundation will lodge copies of all exhibits and depositions, in both paper and electronic format, in advance of trial.

1  promote the American enterprise system are the best method of ensuring prosperity

2  for all Americans.   PX-67.   The Foundation actively works to advance free market

3  policies in California.   PX-67; *see also* Oelke Dep. 38:13–14 (the Foundation has a

4  California chapter).

5       3.    The Foundation's purpose "is to educate citizens on the principles of

6  economic freedom and how they benefit their lives and opportunities."   Oelke Dep.

7  133:18–22.   The Foundation pursues this purpose through an array of educational

8  initiatives.   Oelke Dep. 133:23–134:6.   Specifically, the Foundation's educational

9  activity involves (1) the Bridge to Wellbeing program, (2) the Grassroots Leadership

10  Academy, and (3) educational outreach.   Fink Dep. 308:16–20.

11       4.    Bridge to Wellbeing is the initiative through which the Foundation

12  "live[s] out [its] values."   Oelke Dep. 57:21–24.   Bridge to Wellbeing events

13  include educational programs on "sustainable gardening, couponing, health and

14  welfare classes where [participants] learn[] to eat healthier, [and] live a healthier

15  lifestyle," as well as events on how to "teach[] [one's] kids the Constitution."

16  Oelke Dep. 57:24–58:4.   The Foundation "measure[s] the success of this program

17  . . . [by] the number of events held" and the "number of attendees."   Heaton Dep.

18  59:11–14.

19       5.    The Grassroots Leadership Academy delivers in-person educational

20  programming to Foundation activists.   *See* Heaton Dep. 59:20–21.   The

21  overarching purpose of the Grassroots Leadership Academy is to "educat[e] activists

22  about economic freedom and help[] them figure out ways to amplify their voice."

23  Fink Dep. 161:24–165:7.   Grassroots Leadership Academy programming includes

24  the "Lunch & Learn Series" of events, the "Insight to Action" series, as well as

"sharing your story" meetings.   Heaton Dep. 59:7–18.   At "sharing your story" meetings, Foundation activists learn how "important it is" to communicate the principles of the "[r]ule of law, the Bill of Rights, the Constitution, . . . free market[s], . . . [and] individual liberty," and to share their stories as to how and why such "principles lead to a better life and opportunity."   Oelke Dep. 59:16–60:4. Through "Insight to Action," the Foundation hosts speakers on topics such as "the moral case for free markets" or "Millennials."   Oelke Dep. 59:11–14.   The Foundation measures the success of the Grassroots Leadership Academy initiative by, for example, the number of "training sessions" convened, and the number of people it "graduate[s]."   Heaton Dep. 59:20–60:2.

6.   The Foundation also conducts educational grassroots outreach.   As part of this outreach, the Foundation organizes public events.   For example, the Foundation hosted a "Constitution Rally" at the University of Arkansas where the Foundation "handed out Constitutions" to interested passersby and spoke about "the principles in the Constitution that made our country great."   Oelke Dep. 45:15–20. At the national level, the Foundation annually hosts RightOnline, a conference intended to educate the Foundation's supporters on effective strategies for using the Internet to advance the Foundation's mission.   Phillips Dep. 201:23–202:6.   In 2015, the RightOnline presentations offered advice on, among other things, how to "create YouTube videos that can draw broad[] audiences" or take advantage of the connections between various "social media platforms."   Phillips Dep. 205:16–21.

**B.     Form 990 and Schedule B**

7.     The United States Internal Revenue Service ("IRS") requires 501(c)(3) charitable corporations to annually file IRS Form 990.   26 U.S.C. § 6033(b); PX-3 (IRS Form 990).

8.     Charities which received more than $5,000 in contributions from one contributor in a calendar year are required to file Schedule B, the Schedule of Contributors, to IRS Form 990.   PX-237 (Blank 2015 IRS Schedule B).   Schedule B lists the names and addresses of major donors, defined as those who contributed $5,000 or more in a given tax year or who accounted for 2 percent of all charitable receipts in that year.   PX-237 (Blank 2015 IRS Schedule B); Johns 98:18–22.[2]

9.     Although IRS Form 990 had existed for decades, Schedule B to IRS Form 990 specifically dates back to the year 2000.   PX-234 (Blank 2000 Schedule B); PX-415 (Report of IRS Advisory Committee on Tax Exempt and Government Entities).   Schedule B was created at least in part to cut down on inadvertent disclosures of confidential donor information.   PX-418.

10.     The Foundation's Schedule B has traditionally listed donors above the 2-percent threshold, with that threshold varying from year to year based on the total donations the Foundation receives.   Heaton Dep. 258:24–259:3; *see also* Fink Dep. 123:1–7.

---

[2]   For purposes of these Findings of Fact and Conclusions of Law, "Schedule B" refers to the confidential document filed by public foundations as a schedule to IRS Form 990.   Unless otherwise noted, the Foundation's references to Schedule Bs will not include those filed by private foundations on Form 990-PF; those filings differ as no part of a 990-PF is confidential.   *See* Foley Dep. 27:18–28:15.

## C.   Defendant Attorney General Kamala Harris

11.   Defendant Kamala Harris is the Attorney General of California.   She is also currently running as a Democrat for the United States Senate in California. PX-435.

12.   California has enacted the Uniform Supervision of Trustees for Charitable Purposes Act ("Supervision Act"), which is administered by the Attorney General.   Cal. Gov. Code §§ 12580–12599.8.

13.   The Supervision Act is a uniform statute that has been adopted by four states:   California, Illinois, Michigan, and Oregon.   PX-568 at 312–13.

14.   The Supervision Act governs the registration of charities in California. It requires charities that operate in California to register with the Attorney General, § 12585, and to renew their registrations annually by filing "periodic reports" that set forth "information as to the nature of the assets held for charitable purposes and the administration thereof," § 12586(a).

15.   Subject to the limits laid out in § 12586(a), the Attorney General is empowered to specify the contents of the periodic reports pursuant to "rules" or "regulations."   § 12586(b).

16.   According to the Attorney General's regulations, *see* Cal. Code Regs., tit. 11, §§ 300–312.1; PX-16, a charity must annually file a periodic report that includes its "Form 990," *id*. at § 301; PX-16.

17.   The Supervision Act also mandates that a charity's periodic reports "shall be open to public inspection," unless exempted by "rules and regulations adopted by the Attorney General."   Cal. Gov. Code § 12590; PX-233.   The

1   Attorney General has not adopted any regulations that exempt Schedule B from this

2   public-inspection requirement.   *See* Cal. Code Regs., tit. 11, § 310.

3        18.   The Attorney General has delegated to the Registry of Charitable

4   Trusts, a branch of the Charitable Trusts Section of the California Department of

5   Justice, the responsibility for supervising and maintaining the registration of

6   charities in California under the Supervision Act.   *See* Cal. Gov. Code § 12585;

7   Cal. Code Regs., tit. 11, § 302.

8        19.   The Registry maintains a public website where it posts charities' public

9   filings, including their periodic reports.   Foley Dep. 207:14–208:13; *see also* PX-

10  14 (Declaration of Kevis Foley); Cal. Code Regs., tit. 11, § 312.

11      **D.**   **Genesis of This Lawsuit**

12       20.   The Foundation has been registered with the Attorney General since

13  2001 and has filed its Form 990 as part of its periodic report every year, without

14  including its Schedule B or the names and addresses of its donors on Schedule B.

15  PX-339; PX-158 (Declaration of Victor Bernson).

16       21.   For each year from 2001 through 2010, the Attorney General

17  "[a]ccepted" the Foundation's annual registration and listed the Foundation as an

18  active charity in compliance with the law.   PX-339; PX-158.   The Foundation did

19  not file its unredacted Schedule B with the Attorney General during any of these

20  years.   PX-394 at 15 (Responses to the Foundation's Requests for Admission).

21       22.   On March 7, 2013, the Attorney General informed the Foundation by

22  letter that its annual filing for 2011 was "**incomplete** because the copy of Schedule

23  B . . . does not include the names and addresses of contributors."   PX-204.   Over

24  the next year and a half, the Attorney General sent additional letters notifying the

1   Foundation that its filings for 2011 or 2012 were incomplete because they did not

2   include complete Schedule Bs.    PX-205; PX-206; PX-207; PX-210.

3         23.    The Registry's website now lists the Foundation's registration status as

4   delinquent.   The only reason the Registry has listed the Foundation as a delinquent

5   registrant is because the Foundation has not filed unredacted copies of its Schedule

6   B.   Allen Dep. 174:7–175:3.

7         24.    On October 29, 2014, the Attorney General warned the Foundation that

8   unless it submitted its 2011 and 2012 Schedule Bs within 30 days, the Attorney

9   General would (1) notify the California Franchise Tax Board "to disallow the tax

10   exemption of the [Foundation]"; (2) impose late fees on the Foundation's "directors,

11   trustees, officers, and return preparers responsible for failure to timely file the

12   [Schedule B]," with these individuals "personally liable" for the fees; and (3)

13   "suspend the registration" of the Foundation.   PX-31.   Since then, the Attorney

14   General has taken the position that the Foundation's 2013 filings are also incomplete

15   because the Foundation did not file its Schedule B.   PX-394 at 16 (Responses to

16   the Foundation's Requests for Admission).

17         25.    On December 9, 2014, the Foundation filed this lawsuit, requesting the

18   Attorney General be enjoined from demanding its Schedule B and that her demand

19   be ruled violative of federal law, including the U.S. Constitution.   ECF 1.

20   **II.    THE ATTORNEY GENERAL LACKS A COMPELLING STATE**
       **INTEREST IN COLLECTING SCHEDULE B**

21

22         **A.    The IRS Does Not Endorse Charities Submitting Schedule B to**
              **State Authorities Absent a Specific On-Point Regulation**

23         26.    Schedule B, as filed by 501(c)(3) charities that file IRS Form 990, has

24   always been entitled to confidentiality under federal statute, such that it is not open

1   to public inspection as filed with the IRS. PX-234; PX-235, PX-236; PX-237 (Blank

2   Schedule Bs for 2000, 2005, 2010, and 2015); 26 U.S.C. § 6104(b).   The IRS

3   imposes civil and criminal penalties for unauthorized disclosure of a confidential

4   Schedule B.   26 U.S.C. §§ 7213, 7431.

5        27.   Since the inception of Schedule B, the IRS has always instructed

6   charities that, "[i]f an organization files a copy of Form 990 or 990-EZ, and

7   attachments, with any state, it should not include its Schedule B (Form 990, 990-EZ,

8   or 990-PF) in the attachments for the state, unless a schedule of contributors is

9   specifically required by the state."   PX-234; PX-235, PX-236; PX-237 (Blank

10  Schedule Bs for 2000, 2005, 2010, and 2015).   The IRS further instructs that

11  "[s]tates that do not require the information might make the schedule available for

12  inspection along with the rest of the Form 990 or Form 990-EZ."   PX-234; PX-

13  235, PX-236; PX-237 (Blank Schedule Bs for 2000, 2005, 2010, and 2015).

14       28.   The Attorney General has communicated with the IRS directly about its

15  instruction to charities to not include their Schedule B in state filings.   PX-195

16  (February 10, 2014, email from IRS official emphasizing that states must

17  "specifically require[]" the Schedule B).

18       **B.    Other States Do Not Require Charities To File Schedule B**

19       29.   The Attorney General has never tried to compare her performance as a

20  charitable regulator to regulators in other states, nor has she looked to other states

21  for points of comparison.   Ibanez Dep. 260:22–261:19.

22       30.   Many other states across the country do not require charities to file

23  Schedule B.   Johns Dep. 107:4–12; Ibanez Dep. 257:9–12; PX-524; PX-525; PX-

24  526.

31.     In particular, each of the three other states that adopted the Supervision Act—namely, Illinois, Michigan, and Oregon—expressly instruct charities *not* to file Schedule B as part of their annual registration.   *See* PX-565 ¶ 3 (Illinois instructions directing charities to file "IRS form 990 (excluding Schedule B)"); PX-566 at 3 (Michigan form instructing charities that "if you file Form 990 . . . do not provide a copy of Schedule B"); PX-567 at 7 (Oregon form explaining that "Organizations which file Form 990 . . . are not required to attach the Schedule B.")).

32.     All told, 48 of the 50 other states (counting the District of Columbia) do not specifically require charities to file Schedule B with state officials.   Only 2 states—Hawaii and New York—ostensibly require charities to file Schedule B, *see* Fishman Dep. 59:2–5, 136:6-23, and New York's purported requirement is currently under legal challenge, *see Citizens United v. Schneiderman*, No. 1:14-cv-03703-SHS (S.D.N.Y.).   The following chart lists whether each jurisdiction outside California does or does not specifically require charities to file Schedule B:

| State | Schedule B Specifically Demanded? | Governing Authorities | Notes |
|---|---|---|---|
| Alabama | No | Ala. Code § 13A-9-71(g) | Alabama permits charities to file either a state financial statement or IRS Form 990, but does not mention attachments or Schedule B. |
| Alaska | No | Alaska Stat. §§ 45.68.010–45.68.900; Alaska Admin. Code tit. 9, § 12.010 | Alaska permits charities to file either an audited financial statement or IRS Form 990, but does not mention attachments or Schedule B. |
| Arizona | No | -- | Arizona does not require charities to submit an annual report. |

FOUNDATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

| State | Schedule B Specifically Demanded? | Governing Authorities | Notes |
|---|---|---|---|
| Arkansas | No | Ark. Code Ann. §§ 4-28-403 | Arkansas specifically exempts charities from filing "any schedules of contributors." Ark. Code Ann. § 4-28-403(a)(1) |
| Colorado | No | Colo. Rev. Stat. § 6-16-104 | Colorado specifically exempts charities from filing Schedule B.   Colo. Rev. Stat. § 6-16-104(f). |
| Connecticut | No | Conn. Gen. Stat. §§ 21a-175–190l; Conn. Agencies Regs. §§ 21a-190k-1–190k-8. | Connecticut requires IRS Form 990 and attachments, but does not mention Schedule B. |
| Delaware | No | -- | Delaware does not require charities to submit an annual report. |
| District of Columbia | No | D.C. Code §§ 47-1700–1714, 47-2581; D.C. Mun. Regs. tit. 16, § 13 | The District of Columbia does not require charities to submit an annual report, except for a bi-annual application to solicit donations. |
| Florida | No | Fla. Stat. §§ 496.401–496.426 | Florida allows charities to "redact information that is not subject to public inspection" under federal law.   Fla. Stat. § 496.407(2)(b). |
| Georgia | No | Ga. Code Ann. § 43-17-5 | Georgia requires IRS Form 990, but does not mention attachments or Schedule B. |
| Hawaii | Yes | Haw. Rev. Stat. § 467B-1; Hawaii Charity Financial Report Guide (September 2014) | Hawaii demands that charities file Schedule B in the "Hawaii Charity Annual Financial Report Guide" of September 2014, despite a lack of statutory authority. |
| Idaho | No | -- | Idaho does not require charities to submit an annual report. |
| Illinois | No | 225 Ill. Comp. Stat. 460/4; Ill. Admin. Code tit. 14, § 400.60; Form AG990-IL.INS | Illinois specifically instructs charities not to file Schedule B. |

FOUNDATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

| State | Schedule B Specifically Demanded? | Governing Authorities | Notes |
|-------|-----------------------------------|-----------------------|-------|
| Indiana | No | -- | Indiana does not require charities to submit an annual report. |
| Iowa | No. | -- | Iowa does not require charities to submit an annual report. |
| Kansas | No. | Kan. Stat. Ann. § 17-1763; Kan. Admin. Regs. § 7-42-1(b) | Kansas specifically instructs charities to "not include any list of contributor names."   Kan. Admin. Regs. § 7-42-1(b). |
| Kentucky | No. | Ky. Rev. Stat. Ann. § 367.657 | Connecticut requires IRS Form 990, but does not mention attachments or Schedule B. |
| Louisiana | No. | La. Rev. Stat. Ann. § 51:1901; La. Admin. Code tit. 16, § 515 | Louisiana does not require charities to file IRS Form 990. |
| Maine | No. | Me. Rev. Stat. tit. 9, § 5005-B; Annual Fundraising Activity Report Form | Maine does not require charities to file IRS Form 990. |
| Maryland | No. | Md. Code Bus. Reg. § 6-408 | Maryland requires IRS Form 990, but does not mention attachments or Schedule B. |
| Massachusetts | No. | Mass. Gen. Laws ch. 12, § 8F; Form PC Instructions | Massachusetts requires IRS Form 990, and specifically instructs charities to include "all required IRS schedules except Schedule B." Mass. Form PC |
| Michigan | No. | Mich. Comp. Laws §§ 400.275, 400.277; Renewal Solicitation Form (CTS-02) | Michigan specifically instructs charities not to file Schedule B. |
| Minnesota | No. | Minn. Stat. § 309.53 | Minnesota specifically instructs charities not to file "any schedules of contributors to the organizations."   Minn. Stat. § 309.53. |

| State | Schedule B Specifically Demanded? | Governing Authorities | Notes |
|-------|-----------------------------------|-----------------------|-------|
| Mississippi | No. | Miss. Code Ann. § 79-11-507(1); 1-15 Miss. Code R. § 2.05 | Mississippi requires IRS Form 990 and attachments, but does not mention Schedule B. |
| Missouri | No. | Mo. Rev. Stat. § 407.462(2); Charitable Organizations Annual Report Form | Missouri does not require charities to file IRS Form 990. |
| Montana | No. | -- | Montana does not require charities to submit an annual report. |
| Nebraska | No. | -- | Nebraska does not require charities to submit an annual report. |
| Nevada | No. | -- | Nevada does not require charities to submit an annual report. |
| New Hampshire | No. | N.H. Rev. Stat. Ann. § 7:28. | New Hampshire requires IRS Form 990, but does not mention attachments or Schedule B. |
| New Jersey | No. | N.J. Stat. Ann. § 45:17A-18; N.J. Admin Code § 13:48-5.1(b)(5) | New Jersey requires IRS Form 990 and all schedules, but does not mention Schedule B. |
| New Mexico | No. | N.M. Stat. Ann. § 57-22-6(c) | New Mexico requires charities to file IRS Form 990 "and the accompanying Schedule A."   It does not mention Schedule B. |
| New York | Yes. | N.Y. Exec. Law § 172-b; N.Y. Comp. Codes R. & Regs. tit. 13, § 91.5; New York Form CHAR500 | New York requires IRS Form 990 and all schedules.   Form CHAR500 specifically demands "[a]ll additional . . . Schedules including Schedule B." |
| North Carolina | No. | N.C. Gen. Stat. § 131F-5(c); N.C. Solicitation License Application Form | North Carolina requires charities to file IRS Form 990 and Schedule A.   It does not mention Schedule B. |

FOUNDATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

| State | Schedule B Specifically Demanded? | Governing Authorities | Notes |
|---|---|---|---|
| North Dakota | No. | N.D. Cent. Code § 50-22-04 | North Dakota specifically instructs charities not to file "schedules of contributors." N.D. Cent. Code § 50-22-04(4). |
| Ohio | No. | Ohio Rev. Code Ann. § 1716.04; Charitable Registration and Filing User Guide | Ohio does not require charities to file IRS Form 990. |
| Oklahoma | No. | Okla. Stat. tit. 18, § 552.3; Okla. SOS Form 101-01/13 | Oklahoma requires IRS Form 990, and state law separately does not authorize the collection of donor lists. |
| Oregon | No. | Or. Rev. Stat. § 128.670; Or. Admin. R. § 137-010-0020(7); Or. Form CT-12F | Oregon specifically exempts charities from filing Schedule B. |
| Pennsylvania | No. | 10 Pa. Cons. Stat. § 162.5(b); Pa. Form BC-10 | Pennsylvania requires charities to file IRS Form 990 and Schedule A.   It does not mention Schedule B. |
| Rhode Island | No. | R.I. Gen. Laws § 5-53.1-4 | Rhode Island permits charities to file either a state financial statement or IRS Form 990, but does not mention attachments or Schedule B. |
| South Carolina | No. | S.C. Code Ann. § 33-56-10 | South Carolina specifically exempts charities from filing information that "the [IRS] would not release pursuant to a [FOIA] request."   S.C. Code Ann. § 33-56-10(C). |
| South Dakota | No. | -- | South Dakota does not require charities to submit an annual report. |
| Tennessee | No. | Tenn. Code Ann. § 48-101-506; Tenn. Comp. R. & Regs. 1360-03-01-.03(1); Filing Instructions For Renewing Registration | Tennessee specifically instructs charities not to file Schedule B. |

| State | Schedule B Specifically Demanded? | Governing Authorities | Notes |
|---|---|---|---|
| Texas | No. | -- | Texas does not require charities to submit an annual report. |
| Utah | No. | Utah Code Ann. §§ 13-22-6, 13-22-15; Utah Admin. Code r. 152-22 | Utah requires IRS Form 990, but does not mention attachments or Schedule B.. |
| Vermont | No. | -- | Vermont does not require charities to submit an annual report. |
| Virginia | No. | Va. Code Ann. § 57-49; 2 Va. Admin. Code § 5-610-30(A) | Virginia requires IRS Form 990, and specifically instructs charities to include "all schedules, as required by the IRS, except Schedule B." 2 Va. Admin. Code § 5-610-30(A)(2)(a). |
| Washington | No. | Wash. Rev. Code Ann. § 19.09.075(3) | Washington does not require charities to file IRS Form 990, as long as they "compl[y] with all federal tax law requirements with respect to public inspection."   Wash. Rev. Code Ann. § 19.09.075(3) |
| West Virginia | No. | W. Va. Code § 29-19-5 | West Virginia requires charities to file IRS Form 990 and Schedule A.   It does not mention Schedule B. |
| Wisconsin | No. | Wis. Stat. § 202.12; Wis. Admin. Code DFI-Bkg § 60.08; Wis. Form #1952 | Wisconsin specifically instructs charities not to file Schedule B. |
| Wyoming | No. | -- | Wyoming does not require charities to submit an annual report. |

33.    At conferences of the National Association of Charitable Officials, which brings together state charity regulators from across the country, any perceived utility of Schedule B has never been specifically raised.   Johns Dep. 69:4–70:6.

**C.      No California Law or Regulation Specifically Requires Schedule B**

34.      No California statute or regulation specifically refers to Schedule B, much less requires a charity to file it with the Attorney General.   Foley Dep. 25:21–24; Cantore Dep. 125:13–17.

35.      California regulations did not specifically reference IRS Form 990 until 2005.   *Compare* PX-16 (1999 Periodic Written Report regulation), *with* PX-17 (2005 Periodic Written Report regulation).   In 2005, the Attorney General amended the regulations implementing the Supervision Act.   These amendments specifically directed charities to file their "Form 990" as part of their periodic report, but did not reference Schedule B.   Johns Dep. 163:10–21; PX-126 at Exhibit J.

36.      The rulemaking file for the 2005 amendments includes a copy of every form referenced or incorporated in the regulations; Form 990 is one of those forms, but Schedule B is not.   Johns Dep. 156:3–160:19, 163:10–21; PX-126.   The rulemaking file also discusses how all charity reports will be made publicly available; there is no suggestion that the rules might contemplate any exception to this public-disclosure requirement for Schedule B.   PX-126 at ATTYGEN00002248, ATTYGEN00002255.

37.      Belinda Johns, the primary drafter of the 2005 amendments, did not have Schedule B in mind when she wrote the amendments, which included the new requirement that charities file Form 990 with the Attorney General.   Johns Dep. 164:7–14.   Because she did not have Schedule B in mind, she did not propose in the 2005 amendments a carve out that would exempt Schedule B from the Supervision Act's public-disclosure requirement.   *Id.*   The rulemaking file for the 2005 amendments states that no alternative regulations would be more effective, but

1   Ms. Johns conceded the failure to protect Schedule B's confidentiality renders this

2   untrue, as there could have been more effective regulations.   Johns Dep. 164:15–

3   166:4.

4       38.   Since 2005, California's laws and regulations regarding the required

5   contents of the periodic report have remained unchanged.   PX-17 (reflecting that

6   the applicable section was last amended in 2005).   The Attorney General at no time

7   sought to amend her regulations so as to specifically require charities to file

8   Schedule B.   Cantore Dep. 122:7–123:8, 124:10–20, 125:7–12.

9       39.   Also in 2005, the Attorney General published a Guide for Charities that

10  sets forth instructions on how charities registered in California can comply with the

11  law, including in their submissions to the Registry.   PX-18.   This 56-page Guide

12  for Charities is still available on the Attorney General's website, and is intended "to

13  help [charities] be able to comply" with California's regulatory requirements.

14  Foley Dep. 40:5–41:15; Ibanez Dep. 89:16–25.

15      40.   The Guide conspicuously omits Schedule B.   PX-18; Foley Dep.

16  42:19–22; Ibanez Dep. 92:18–22.   One section of the Guide, in providing "A

17  Summary Of Important Statutes And Cases That Apply To Nonprofit Corporations

18  And Charitable Trusts" lists "the most important of these laws that relate directly to

19  the Attorney General's charitable trust enforcement role."   This includes:

20  "Reporting to Government Agencies . . . IRS Forms 990, Schedule A."   PX-18 at

21  43.   Thus, in listing charitable reporting requirements to government agencies, it

22  refers only to "IRS Forms 990, Schedule A;" while omitting Schedule B.   *Id.*

23      41.   The Guide also states that a Form 990 submitted to the Registry is a

24  public record available for inspection by members of the public.   PX-18 at 25.   In

doing so, the Guide gives no indication that a charity must include its Schedule B when filing its Form 990 with the Registry or, if it must, that the Schedule B would be exempt from this public-inspection requirement.   *Id.*   The former head of the Charitable Trusts Section, who helped draft this Guide, has claimed in this litigation that the Guide is inaccurate because "it should have included accompanying schedules and it should [have] had a carveout for any confidential documents but it didn't."   Johns Dep. 167:7–21.   Similarly, her successor offered much the same observation when testifying in this litigation.   Ibanez Dep. 93:6-23, 170:7-20. At no time between 2005 and 2015 did the Attorney General propose such a carve-out.

42.   Also in 2005, the Attorney General published a new RRF-1 form that charities must submit to her annually as part of their periodic report.   PX-6.   The instructions to that form do not expressly reference Schedule B.   The instructions do specify that charities must file a "copy of the IRS Form 990 . . . and attachments."   PX-7.   These instructions are what the Attorney General has cited and continues to cite as specifying that the Foundation and other 501(c)(3) nonprofits must file their Schedule Bs in order to retain their registration in California.   Foley Dep. 48:20–49:19.

43.   The Attorney General claims that her requirement that charities file Schedule B as part of their periodic report is coextensive with the lifespan of Schedule B, since its inception in 2000; from the moment Schedule B existed, charities had to file it with the Attorney General, according to her position in this case.   Johns Dep. 104:8–20.   The Attorney General contends that her instructions to file IRS 990 and attachments trumps the IRS's contrary, on-point, uniform

1   instructions that state requests for "Form 990 . . . and attachments" do *not* include a

2   request for Schedule B.   Ibanez Dep. 121:8–123:25; *see* PX-4.

3       44.   Only in individualized deficiency letters, not as any general

4   "worldwide announcement," has the Attorney General specifically requested that

5   charities file Schedule B as part of their annual registration renewal.   She has never

6   told all charities to "[t]urn in your Schedule B."   Foley Dep. 38:2–17; *see also*

7   Ibanez Dep. 107:8–108:6 (admitting that the instructions in which charities are to

8   infer the Schedule B requirement do not specifically mention Schedule B).

9       45.   The Attorney General claims that she has never considered not

10  requiring Schedule B to be filed.   Johns Dep. 107:13–21; Cantore Dep. 248:19–24,

11  256: 7–19.

12  **D.   The Attorney General Did Not Begin Demanding Schedule B from**
    **Any Charity Until 2010**

13

14      46.   Until 2010, the Attorney General never expressly told a charity to file

15  Schedule B.   Before 2010, there is no record that the Attorney General ever

16  considered a charity's periodic report to be incomplete solely because it did not

17  include Schedule B.   The Attorney General admits that she received 990s that did

18  not attach Schedule Bs in each year from 2005 through 2010.   PX-394 at 9–10.

19  Despite the Attorney General's insistence that she has always required Schedule B,

20  the Attorney General has been unable to identify a single instance before August

21  2010 in which she sent a letter requesting a charity to file Schedule B.   PX-242 at 3

22  (Letter from Patty Li to Derek Shaffer affirming that "the earliest letter from the

23  Registry of Charitable Trusts requesting that a charity submit its unredacted

24  Schedule B" is dated September 2, 2010); *see also* PX-15 at 26 (refusing to provide

– 18 –

1   information about how many deficiency letters the Attorney General has sent per

2   month since 2000).

3       47.    The Attorney General did not begin enforcing an across-the-board

4   demand for Schedule B until 2010.   Foley Dep. 90:11–19; Ibanez Dep. 230:6–16.

5   Nor did the Attorney General create a form deficiency letter referencing Schedule B

6   until 2010.   Foley Dep. 86:20–87:11; Johns Dep. 187:20–188:6.

7       48.    A statistical census of all of the Schedule B deficiency letters on the

8   Registry's website shows that the Attorney General has issued around 8,000 letters

9   demanding that charities file an unredacted Schedule B, but none of these letters was

10  sent before August 2010.   PX-248 at 17–20.   The insistence by the Attorney

11  General's former Registrar, Kevis Foley, that "hundreds" of such letters were sent

12  before 2010 is not credible, Foley Dep. 78:16–80:19, particularly because she had

13  not attempted to find and could not identify even one such instance for purposes of

14  testifying as the Attorney General's relevant designee under Rule 30(b)(6), Foley

15  Dep. 81:17–82:3.

16      49.    No change in circumstances or law occurred in 2010 that would newly

17  require charities to file Schedule Bs with California.   In particular, there was no

18  change in the Attorney General's funding, resources, staffing, or costs associated

19  with requiring Schedule B.   Indeed, the Registry has never requested, obtained, or

20  suggested need for additional budget authority to enforce her demand for Schedule

21  B.   PX-394 at 6–7 (Attorney General's response to the Foundation's RFA No. 3).

22  Instead, the Registry has been operating with a budget surplus for years.   Foley

23  Dep. 76:2–13.   The budget has recently increased, and the Registry continues to

24  run at a surplus.   Eller Dep. 124:13–19, 126:13–129:4.

FOUNDATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

50.     The decision to send letters demanding Schedule B beginning in 2010 reflected an unacknowledged change in the Attorney General's substantive policy regarding the submission of Schedule B.    Belinda Johns, the head of the Charitable Trusts Section in 2010, claims that she implemented the change after noticing that some Schedule Bs were missing from investigative files.    Johns Dep. 181:16–183:20; PX-42.    From that point forward, the Registry began notifying charities "on an ad hoc basis" that they should file Schedule B.    Johns Dep. 181:10–15. Even today, the Registry does not send a Schedule B deficiency letter to every organization that has failed to include Schedule B with its IRS Form 990.    PX-394 (Responses to the Foundation's Requests for Admission No. 13).

51.     The Attorney General has received many inquiries and objections from charities regarding what they perceive to be her new policy regarding the submission of Schedule B.    PX-23; PX-42; PX-43; PX-128 (Attorney General form letter addressing perception that the Schedule B requirement is a new policy); PX-399.

52.     The Attorney General's policy regarding Schedule B confused her own Registry staff.    Foley Dep. 51:4–25, 52:13–25, 60:18–61:2; Ibanez Dep. 128:3–19, 129:24–130:13;  PX-20;  PX-21;  PX-23.    Enforcement of the Schedule B submission policy declined in 2012, before increasing again in 2013.    PX-248 at 19 (Figure 4 of Expert Report of James McClave).    At one point in early 2014, Registry staff believed that they were no longer sending "a delinquency letter if the only outstanding item is the Schedule B."    PX-192.    Later in 2014, the decision was made to not hold charities retroactively delinquent for their failure to file Schedule B, if the Registry had previously accepted their Form 990 without a

Schedule B.   Foley Dep. 54:3–55:1, 62:7–15, 63:22–64:2; Ibanez Dep. 136:4–137:24; PX-22; PX-24.   This internal confusion was the telltale result of an unannounced change by the Attorney General in requiring Schedule Bs for the first time.

**E.   The Attorney General Does Not Need Schedule B To Fulfill Any Charitable Oversight or Law Enforcement Purposes**

**1.   The Attorney General Never Looks at Most Schedule Bs**

53.   The Attorney General's Registry of Charitable Trusts collects thousands of tax forms from charities each year.   Foley Dep. 94:9–16 (Registry staff processes 60,000 forms a year).   In California alone, over 90,000 charities are registered with the Attorney General, and most must file an annual return with the Registry.   As a result, the Registry's database contains hundreds of thousands of files.   PX-3 at 1 (Guide to Charitable Giving for Donors); PX-231 at 5–6 (Expert Report of Dr. James Fishman); PX-248 at 11 (Expert Report of Dr. James T. McClave noting over 1 million documents downloadable from Registry's website); Bauman Dep. 94:2–9.

54.   The Registry staff does not review or analyze Schedule Bs of charities as they are received.   *See* PX-394 at 11.   Instead, forms submitted to the Registry are checked for "completeness" and then scanned into the Registry's database.   Foley Dep. 92:11–18.   According to the former Registrar, if Registry staff did an "in-depth review of every form, they would never have been able to get any of their work done."   Foley Dep. 94:9–16.

55.   In fact, only a tiny fraction of the forms filed with the Registry are ever substantively reviewed, and not every organization that fails to file a Schedule B

receives a Schedule B deficiency letter.   PX-394 at 12 (Responses to the Foundation's Requests for Admission).

56.     The reason for the infrequency of the review of documents on file with the Registry is simple:   As a rule, a charity's file with the Attorney General is never examined absent a specific external complaint or media report that triggers concern. The Registry does not conduct random audits of charities.   Zimring Dep. 49:2–9. Investigations are typically initiated upon receipt of a written complaint or a media report.   Bauman Dep. 67:12–68:8.   Only after receiving instruction or a complaint to look into a charity will auditors or attorneys review a charity's files.   Auditors and attorneys in the Registry have testified that most of their investigations were triggered by a written complaint or a referral from another state agency.   Bauman Dep. 69:13–70:1; Cantore Dep. 65:22–66:4; Ibanez Dep. 35:5–17; Berndt Dep. 17:19–18:8; Zimring Dep. 26:21–27:19.

57.     Over the past ten years, the Charitable Trust Section has conducted approximately 360 investigations.   Bauman Dep. 34:19–35:9.   Even assuming every one of those investigations involved substantive review of a Schedule B (notwithstanding testimony by the Attorney General's lead auditor and 30(b)(6) designee that Schedule B mattered to only a handful), it would follow that no more than a few dozen Schedule Bs are actually put to use by the Attorney General and her staff in a given year.

### 2.     Schedule B Is Inconsequential to the Attorney General's Audits and Investigations of Charities

58.     No member of the Attorney General's office, including investigative auditors, Registry staff, or the head of the Charitable Trusts Section, ever requested

more access to Schedule Bs.   Foley Dep. 114:18–116:1.   The absence of a Schedule B in a charity's file does not "concern" or raise a "red flag" for the Attorney General. Cantore Dep. 82:8–83, 88:16–89:11.   Attorney General staff processing Form 990s and Schedule Bs might not even notice a Schedule B deficiency, "because not every 990 has a Schedule B."   Foley Dep. 93:23–94:4. The Registry does not request any individual donor information from charities who do not file Schedule B with the IRS.   *See* Allen Dep. 150:22–151:5.

59.   At no time did an auditor or attorney responsible for enforcement ever complain about, or feel hindered by, the absence of a Schedule B.   Bauman Dep. 46:6–47:15, 126:12–22 (Mr. Bauman never pushed to obtain a missing Schedule B so that he could do his job as an auditor); Cantore Dep. 82:8–84:3 (despite noticing that nearly a third of charities do not have Schedule Bs on file, attorney never notified anyone of its absence).   The Attorney General's recent policy change to require charities to file Schedule B was not a response to input from auditors. Foley Dep. 114:18–22 .

60.   Schedule B has not in and of itself ever triggered an audit or investigation.   Bauman Dep. 167:25–168:5; Bauman Dep. 35:23–36:9 (of the five cases assigned to his team where Schedule B was implicated, none were initiated because of the Schedule B).   As one attorney in the Charitable Trusts Section explained, her "investigations are not Schedule B driven."   Cantore Dep. 89:22–90:1.

61.   Nor does Schedule B obviate a need for an audit or an investigation. Reviewing a charity's Schedule B has never resolved the need to investigate,

1  Bauman Dep. 248:15–249:4, or led to the closing or ceasing of an investigation.

2  Zimring Dep. 50:11–51:25; Cantore Dep. 95:9–19, 248:15–249:4.

3        62.     Auditors and attorneys for the Attorney General rarely use Schedule B

4  when auditing or investigating charities.   Out of approximately 360 investigations

5  conducted over the past ten years in the Charitable Trusts Section, the lead auditor's

6  team could recall only five instances (1.4%) where Schedule B was implicated.

7  Bauman Dep. 34:19–35:9.   The lead auditor himself could personally identify only

8  one of those five instances.   Bauman Dep. 36:18–21.

9        63.     An unredacted Schedule B has little value to charity regulators because

10  it does not provide much information.   As one attorney in the Charitable Trusts

11  Section put it, Schedule B is not a "holy grail document."   Cantore Dep. 81:11–14.

12  Charities need to list on the Schedule B only those donors who contribute more than

13  $5,000, or above two percent of the total revenue of the charity, whichever is

14  greater.   PX-237 (Blank IRS 2015 Form 990, Schedule B).   As a result, only a few

15  donors may appear on a Schedule B in any given year.   Furthermore, small

16  charities are not even required to submit any Schedule B.   Bauman Dep. 57:14–22;

17  Fishman Dep. 60:9–15, 61:15–21, 62:4–25; Zimring Dep. 52:23–53:14.

18        64.     Schedule B has proved inconsequential to investigations of

19  wrongdoing.   When asked to describe ten instances in which a Schedule B enabled

20  the Attorney General to determine a charity violated the law, the Attorney General

21  could identify only eight purported instances.   PX-11 (Amended Interrogatory

22  Response No. 10).

23        65.     The Attorney General has withheld as privileged the evidence

24  pertaining to each of these eight purported instances where Schedule B was useful.

1   ECF 87 at 21 (claiming that "all documents" concerning these investigations "are
2   entirely privileged").   It is telling that the Attorney General has withheld the on-
3   point evidence of these eight investigations that would put to the test her asserted
4   need for Schedule B.   An auditor or attorney assigned to an investigation generally
5   drafts a final report at the close of an investigation that specifies the documents that
6   went into an investigation, and Schedule B would be "reflected" in the final report if
7   it was "important" to an investigation.   Bauman Dep. 12:13–19; 186:21–187:14.
8   All electronic copies of investigatory documents, memorandum, and reports are
9   organized in an database called ProLaw.   Bauman Dep. 21:22–22:14; Berndt Dep.
10  24:6–11; Zimring Dep. 37:10–38:14.   To date, the Attorney General has not
11  provided any copies of these final reports, nor did she have any of her witnesses,
12  including her relevant Rule 30(b)(6) designee, review them before testifying in
13  generalities.   This head-in-the-sand approach itself affords powerful indication that
14  the contemporaneous, on-point documentation belies any claim that Schedule Bs
15  actually mattered to any particular investigation.

16          66.    Based on the available evidence, it appears that Schedule B played
17  either no part or an inconsequential part in the eight investigations.   In one, an
18  investigative letter and a settlement proposal were sent to a charity suspected of
19  wrongdoing, but there was no mention of Schedule B or any indication that
20  Schedule B played any part.   PX-274; Berndt Dep. 103:1–3.   In another of the
21  eight investigations, the Schedule B was not even provided, and in fact was never
22  obtained by the Attorney General.   Zimring Dep. 59:18–62:1.   In instances where
23  Schedule B was provided, the relevant information it contained could have been
24

obtained from other sources.   *See* Bauman Dep. 237:11–239:25; Cantore Dep. 57:18–73:12.

67.   In the handful of instances where the Attorney General's auditors or attorneys in California have actually used a Schedule B, it made no difference whether the Schedule B was found in the file in the outset or subsequently obtained upon request from the charity.   Indeed, the auditors and attorneys generally draw no difference between one approach versus the other.   Thus, in the eight investigations identified by the Attorney General, investigators were unable to recall whether they had unredacted Schedule Bs on file before initiating the investigation. PX-11 (Attorney General's First Amendment Responses Interrogatory No. 10) at 7; Bauman Dep. 241:13–18; Berndt Dep. 59:21–60:7; Cantore Dep. 75:4–10; Zimring Dep. 32:7–16.

68.   The Attorney General's auditors and attorneys in the Charitable Trusts Section can adequately perform their investigations without Schedule B.   One attorney in the Charitable Trusts Sections admitted that, even before the Attorney General began to demand Schedule Bs in 2010, she could perform her investigative work, and she had never personally requested that the Attorney General demand submission of Schedule Bs.   Cantore Dep. 128:5–13, 128:14–18.   The Attorney General's lead auditor, in the one investigation that he could personally recall use of Schedule B, admitted that he "probably could have completed [his investigation] without it."   Bauman Dep. at 248:8–14.

### 3.   Other Forms Are Much More Important Than Schedule B

69.   The Annual Registration Renewal Fee Report ("RRF-1") is a standalone form created specially by the Attorney General.   Charities must submit

the RRF-1 as part of their periodic report when seeking their annual registration renewals.   The point of the RRF-1 is to compile in a single, easily-accessible place the information important the Attorney General needs—even if that information is contained elsewhere in the Form 990—for supervising charities.   Johns Dep. 93:6–25.   Notably, the RRF-1 does not request donor names and addresses.   PX-6 (Annual Registration Renewal Fee, Blank); Bauman Dep. 114:17–116:14; Berndt Dep. 68:3–12.

70.   Other documents are far more useful to auditors for oversight than Schedule B.   In fact, the Attorney General's lead auditor acknowledged that, in each of the following examples of possible wrongdoing by a charity, Schedule B would not be among the initial set of documents he would consult to investigate that wrongdoing:   self-dealing transactions by directors or trustees; loans to a director or an officer; losing money through speculative investments; overspending for salaries, benefits, travel; sales of charitable assets or conversion of corporations for-profit; illegal use of charitable funds; diversion of charitable trust funds from their intended purpose.   Bauman Dep. 178:19–180:3; *cf.* PX-11 at 7 (the Attorney General's list of examples of possible wrongdoing by charities).

71.   One attorney for the Attorney General claims she "predominantly uses the information in Schedule B to evaluate whether a charity is engaged in transactions with disqualified persons."   PX-198 at 3 (Letter from T. Ibanez to M. Fitzgibbons); *see* Cantore Dep. 92:1–10.   But Schedule L of Form 990 is more useful for purposes of investigating whether a charity has transacted with an "interested person."   Schedule L requires information about "Transactions with Interested Persons," and those "interested persons" include substantial donors.

This schedule can be used to determine whether the charity is engaged in self-dealing or is funneling money.   PX-8 (Blank IRS 2012 Schedule L); PX-9 (IRS 2012 Instructions for Schedule L); Bauman Dep. 162:9–163:17; *see also* Bauman Dep. 108:11–12 ("Schedule B is not about reporting self-dealing transactions.").

72.    Similarly, Schedule M is more useful than Schedule B for purposes of identifying suspect or misreported noncash contributions to charities.   Schedule M provides the total amount of gifts-in-kind transactions, which is useful for determining related party transactions or fraud.   PX-4 (Blank IRS 2012 Schedule M – Noncash Contributions).   Parallel reference to a *redacted* Schedule B then enables investigators to determine the breakdown of the noncash contributions. Bauman Dep. 78:1–20, 117:18–121:2.

73.    Schedule B cannot alleviate concerns or suspicions about overcompensation of a charity's directors or officers.   Rather, details about compensation to officers, directors, and key employees are in other parts of the Form 990, including Part VII and Schedule J.   Such information is far more useful than information on Schedule B when it comes to determining whether the organization is paying excessive compensation.   PX-3 (Blank IRS 2012 Form 990); Bauman Dep. 174:25–176:14.

F.    **The Foundation's Schedule B Would Not Aid the Attorney General's Oversight of the Foundation**

74.    The Attorney General and her witnesses claim that Schedule B theoretically might be useful for investigating certain illegal activities.   Attorney General's Opposition to the Preliminary Injunction, ECF 23 at 17 (Jan. 21, 2015); PX-15 at 20 (Attorney General Response to Interrogatory No. 8); Berndt Dep.

42:16–43:7 (self-dealing and excessive compensation); Zimring Dep. 30:12–32:6 (misuse of charitable assets); Cantore Dep. 61:3–12 (fraud), 69:22–70:6 (interested party transactions); Ibanez Dep. 36:7–12.

75.    In none of the initial correspondence with the Foundation notifying it of filing deficiencies did the Attorney General indicate that the Foundation was suspected of any wrongdoing.    PX-31, PX-204, PX-206, PX-207, PX-208, PX-209, PX-210.

76.    At no point before the Foundation filed this lawsuit to seek vindication of its First Amendment rights did the Attorney General allege or suspect any wrongdoing by the Foundation.    Ibanez Dep. 208:24–210:14.    Thus, she had not alleged or suspected that the Foundation (i) engaged in an improper self-dealing transaction; (ii) made an improper loan to a director or officer; (iii) paid excessive amounts for salaries, benefits, travel, entertainment, legal and other professional fees; (iv) illegally used its charitable funds; (v) improperly diverted charitable funds from their intended purpose; or (vi) falsely or misleadingly solicited charitable donations.    *See id.*

77.    Nor would a Schedule B aid investigation or inquiry into political or electoral activities of a charity, or the distinction between 501(c)(3) and 501(c)(4) tax exempt statuses.    *See* Bauman Dep. 251:22–253:4 (whether a 501(c)(3) engages in impermissible political activity is "not a focus" of the charitable trusts section and testifying that he was "not aware of any cases that we are currently investigating on that").

### G. The Attorney General Has Less Restrictive Means of Obtaining Any Necessary Donor Information

78.     The Attorney General has admitted that she has not considered any alternatives to demanding Schedule Bs from charities.   PX-394 at 6–7 (Responses to the Foundation's Requests for Admission).

79.     One obvious step the Attorney General could take to reduce obvious First Amendment harm from demanding Schedule B would be to adopt a regulation exempting Schedule Bs from the Supervision Act's public-inspection requirement, *see* Cal. Gov. Code § 12590; Cal. Code Regs., tit. 11, § 310, and to adopt more stringent protocols for protecting the confidentiality of Schedule B in practice, such as the protocols the IRS requires state agencies to adopt before it will share confidential tax information with those agencies, *see* Proposed Findings of Fact § III.C, below.

80.     Another obvious alternative would be for the Attorney General to request donor information from charities only in response to a specific complaint or investigation that puts donor information at issue, insomuch as the donor information is reasonably necessary for resolving the complaint or investigation and there is no adequate substitute for it.

81.     When the Attorney General does need to demand a charity's donor information for a valid purpose, she could limit the scope of her demand to the minimum amount of donor information necessary to resolve the particular complaint or investigation at issue.   There will rarely, if ever, be a need to request the names and addresses of all of a charity's donors listed on Schedule B, including those outside the state of California.

82.   The Attorney General can demand donor information from charities on an individualized basis through administrative subpoenas.   Bauman Dep. 88:5–11; Cantore Dep. 83:23–84:3.   Financial records can also be obtained through more informal means, such as an audit request to a particular charity.   Bauman Dep. 238:14–23 (could have asked for financial statements of a for-profit corporation in aid of investigation); Berndt Dep. 62:1–10, 98:17–25 (obtaining financial records of an investigated charity upon request).

83.   Indeed, it is the Attorney General's uniform practice to send an audit letter or administrative subpoena at the outset of any investigation or audit. According to Mr. Bauman, "very early on in the process . . . one of the things we do is send out an audit letter requesting documents, or informing [the charity] that we would like to come and do a field audit," and a request for a copy of the charity's Form 990 is frequently included in that letter.   Bauman Dep. 97:18–98:11; *see* PX-345 (Letter from S. Bauman, Field Audit Form Letter); Berndt Dep. 100:23–102:5; Cantore Dep. 85:6–9.   In fact, even when the Form 990 is already on file with the Registry, the Attorney General has requested in the subpoena or audit letter that the charity provide copies of its Form 990s.   Cantore Dep. 76:2–6; Zimring Dep. 55:6–16.

84.   The Attorney General can and does require more donor lists or financial records, even well beyond what is reflected on Schedule Bs, through audit letters or administrative subpoenas.   The Attorney General has sought donor information beyond what is included on a Schedule B, and has also obtained donor information from third parties.   Bauman Dep. 84:13–23 (seeking from the charity the contact

1  information of a donor, including telephone number); Zimring Dep. 63:3–14

2  (obtaining donor lists from fundraisers for the investigated charities).

3      85.   There is no evidence that charities are likely to tamper with information

4  in response to audit letters or administrative subpoenas.   Previously, the Attorney

5  General relied on the Declaration of Steven Bauman to submit to this Court that,

6  based on the experience of her office, charities alerted that they are under suspicion

7  "are more likely to hide or tamper with evidence."   ECF 23 at 19.   At deposition,

8  however, Steven Bauman testified that he was not aware of anyone ever tampering

9  with or changing schedules of Form 990 to appear differently than what they filed

10  with the IRS.   Bauman Dep. 85:16–24; 88:23–89:15.   Nor—contrary to his

11  declaration—does Mr. Bauman have personal experience of a charity improperly

12  coaching donors on what to say.   *Compare* Bauman Dep. 101:20–25, *with* PX-2 at

13  3 (Declaration of Steven Bauman).

14      86.   Given the availability of less restrictive alternatives for seeking donor

15  information, the only ostensible reason that the Attorney General might (affording

16  her every benefit of the doubt) seek Schedule B from each charity as part of its

17  annual registration renewal, rather than requesting it on a case-by-case basis when it

18  is needed, is that it is supposedly more efficient.   Berndt Dep. 128:3–22; *see* PX-

19  231 at 24 (Expert Report of Dr. James Fishman); Fishman Dep. 67:22–68:3 (burdens

20  on State Attorneys General put efficiency at a premium).   But any such rationale

21  takes no account of the far greater efficiency costs associated with maintaining and

22  enforcing confidentiality across tens of thousands of Schedule Bs that the Attorney

23  General intends to collect each year.

24

III.   **THE ATTORNEY GENERAL SYSTEMATICALLY FAILS TO UPHOLD HER GUARANTEE THAT SHE KEEPS SCHEDULE B CONFIDENTIAL**

    A.    **The Purported Confidentiality Policy**

87.   The Attorney General has repeatedly represented that she treats Schedule B as a confidential document.   The confidentiality the Attorney General purports to accord Schedule B is not codified in any current regulation or statute. Cantore Dep. 135:17–23; Johns Dep. 127:10–14.   Instead, it is merely a purported policy of the Attorney General to treat Schedule B as confidential.   Cantore Dep. 135:17–23.

88.   The Attorney General's purported policy of treating Schedule B as confidential is, at most, a discretionary policy that a future Attorney General could change at any time on a moment's whim.   Foley Dep. 144:6–145:3; *see also* PX-394 at 13 (acknowledging that the Attorney General "can" "set privacy practices and procedure, including the Schedule B Confidentiality Policy").

89.   The Attorney General here disavows any interest in making Schedule Bs public.   Johns Dep. 177:12–15, 178:21–25.   Indeed, she has taken the position in this litigation that a public charity's Schedule B is entitled to confidentiality. Foley Dep. 197:1–4.

90.   Pursuant to the Attorney General's purported confidentiality policy, Schedule Bs should never be accessible through the Registry's public website. Johns Dep. 200:1–201:3.   It is "never acceptable" for even one Schedule B to be available on the Registry's website; if one is available there, it must be "fixed immediately."   Johns Dep. 199:9–200:5.

91.     The Registrar bears operational responsibility for making sure the Schedule B confidentiality policy is bring implemented as represented by the Attorney General.    Eller Dep. 115:14–116:7.

**B.     The Attorney General's Storage of Charities' Files**

92.     Until around 2008, the Registry had a paper-records system under which a charity's periodic reports were divided into a hard-copy public file and a hard-copy confidential file (or "red file").    Foley Dep. 147:6–19, 149:23–150:9. Members of the public could view the public file only by physically visiting the Registry and reviewing the file in the presence of a member of the Registry's staff, who would double-check prior to permitting that review in order to ensure that no confidential materials were in the public file.    Johns Dep. 128:8–16, 133:5–137:18. If any Schedule B had been filed by a charity and inadvertently placed in the charity's public file (instead of its confidential file), the Registry staff member would remove it before the member of the public could see it.    Johns Dep. 139:25–140:25.

93.     Starting around 2007 and continuing to the present, the Registry began using an "automated" system to store charities' files electronically, rather than in paper copies.    PX-14 ¶ 8; Foley Dep. 28:16–24.    The Registry still receives paper filings, which staff separates out by hand into public and confidential documents. Harryman Dep. 102:1–8.    Confidential and public documents are then separately scanned into the Registry's database.    Johns Dep. 218:2–15.    Registry practice is for an outside vendor to scan in the public documents, whereas Registry staff scans in the confidential documents. Foley Dep. 155:5–156:3.    All scanned documents, both public and confidential, are stored in the same database, called EMC

Documentum.   Harryman Dep. 73:11–22.   EMC Documentum has an indicator for every document as to whether it is public or confidential.   Harryman Dep. 78:24–79:20.

94.   The Charitable Trusts Section uses a software application called My License Office to manage and store its files.   Bauman Dep. 127:7–14.   My License Office is an off-the-shelf product provided by third-party vendor Systems Automation.   Foley Dep. 124:3–7.   My License Office links to the EMC Documentum to retrieve both confidential and public documents.   Harryman Dep. 73:11–22.

95.   The full contents of My License Office, including both public and confidential documents, are supposed to be accessible only by authorized users. Harryman Dep. 172:2–6.   These include lawyers, auditors, paralegals, and Registry staff in the Charitable Trusts Section.   Ibanez Dep. 43:11–22.   Litigation counsel for the Charitable Trusts Section, including counsel in this case, do not have passwords to My License Office and are not authorized to access Schedule Bs. Ibanez Dep. 43:23–44:8, 44:19–45:5, 46:8–46:24.

96.   Members of the public can access and download public documents through the Registry website.   Foley Dep. 211:9–13.

97.   The Attorney General is currently incapable of running searches across the contents of all documents accessible through My License Office and stored in the EMC Documentum.   Harryman Dep. 142:15–18.   Instead, she can at best search the "metadata" associated with those documents, such as the particular names or titles various staff members (who may use differing conventions) happen to input for them.   Foley Dep. 79:1–5, 81:1–16, 176:16–19.   Without "looking at every

document that's been uploaded" by hand, the Attorney General cannot find specific content in individual PDF files.    Foley Dep. 82:14–83:16.

### C.    The Registry Protocols for Storing Schedule B Do Not Meet Basic Security and Cybersecurity Standards

98.    The Attorney General has chosen not to spend resources and energy establishing an adequate confidentiality regime for Schedule B.    For example, the IRS has strict requirements for sharing sensitive tax information, such as Schedule B, with state charity regulators to the extent that individual charities so authorize. The IRS conditions receipt of tax-return information on the implementation of a rigorous set of confidentiality protocols.    *See* PX-529.    For hard copies, recipients must erect "two barriers" between the confidential information and the outside world.    PX-529.    Thus, storing the tax information in a "security room . . . constructed to resist forced entry" is not sufficient; recipients must place the tax information behind a second barrier as well, such as "a storage device . . . with resistance to forced penetration."    PX-529.

99.    The IRS requirements for electronic storage mandate that state regulators construct an "IT infrastructure to ensure that [confidential information] is protected at all points where it is received, processed, stored, or transmitted."    PX-529.    The IRS specifically instructs that, if a recipient "post[s] information onto a publicly accessible information system," the recipient must "[r]eview the proposed content of information prior to posting . . . to ensure that [confidential information] is not included," and must, in addition, conduct quarterly audits of publicly posted content to ensure that it does not include confidential information.    PX-529.

100.   The California Franchise Tax Board complies with IRS Publication 1075 so that it can receive information from the IRS.   PX-553 at 12.   Accordingly, the Franchise Tax Board has implemented robust, systematic confidentiality and electronic security protocols to ensure the confidential tax information it receives from the IRS remains confidential.   PX-554.   Consistent with that emphasis on confidentiality, the Franchise Tax Board threatens criminal and civil penalties for the unauthorized "inspection, disclosure adjustment or destruction" of information on the system.   PX-559.   Similarly, the Franchise Tax Board requires employees, seasonal employees, and third-party vendors to pass a detailed background check, and it requires employees to sign a detailed confidentiality statement pledging to protect specific categories of confidential information in specific, enumerated ways. PX-552; PX-555; PX-556.   Franchise Tax Board employees are also required to limit their access to agency files to occasions when they have a business need.   PX-552.   Finally, the Franchise Tax Board considers all information confidential "unless it is specifically made public by statute."   PX-558.

101.   The Charitable Trusts Section, unlike the Franchise Tax Board, does not come close to meeting the minimum standards for electronic security required by the IRS.   Accordingly, the IRS does not share electronic tax information with it. Johns Dep. 275:2–276:6.

102.   The Attorney General considered the IRS's safeguards to be too onerous and requested that Congress alleviate them.   Johns Dep. 265:7–15; PX-132.   In order to have received electronic tax documents from the IRS, the Charitable Trusts Section would have had to have undergone what it deemed

"convoluted" procedures, including a two-day audit by PricewaterhouseCoopers, which it refused to do.   *Id.*

103.   For a time, the IRS used to share paper copies of confidential tax materials with the Charitable Trusts Section, but it no longer does because the Charitable Trusts Section found it too onerous to comply with the IRS requirements for handling even paper copies of sensitive tax information.   Johns Dep. 271:16–23.   For hard-copy files, the IRS would require the Attorney General to store the files behind two locked doors, log who accessed the files, shred the files for disposal, and be subject to regular audits by the IRS safeguards team; the Attorney General, however, does none of that.   Johns Dep. 269:1–275:4.

104.   The Registry has never had a cybersecurity audit performed to determine the extent to which its electronic systems are vulnerable to hacking or other threats.   Harryman Dep. 156:25–158:11.   The Registry has untested exposure to cyber-attacks and hacking attempts; it has never conducted a cyber-security audit or developed a cyber-attack response plan.   Harryman Dep. 156:6–16.

105.   There are no technical or physical impediments to audit staff printing, copying, emailing, or saving to a thumb or local drive, copies of Schedule Bs. Bauman Dep. 131:5–10, 132:18–134:6.   Staff are permitted to take confidential documents outside of the office, such as to work at home or to travel.   No records are kept regarding what confidential documents leave the premises.   Bauman Dep. 136:23–137:12.

106.   Likewise, there are no technical restrictions on Registry staff.   They can e-mail, download, save, print, or carry hard-copy Schedule Bs outside of the

Registry.   Foley Dep. 138:12–139:10, 140:23–141:1; Harryman Dep. 172:7–173:11; Eller Dep. 88:20–89:25, 110:20–111:5.

107.   Although the offices of the Registry and Charitable Trusts Section are behind locked suite doors, once inside that suite confidential documents and Schedule Bs are not further locked up.   Many staff members work in open cubicles, and are not instructed to put confidential documents into locked filing cabinets at the end of the day.   Bauman Dep. 135:17–137:17.

**D.      The Attorney General Does Not Stringently Train Staff on the Confidentiality of Schedule B**

108.   The Attorney General has not provided individual employees in the Charitable Trusts Section with meaningful, concrete instruction regarding what is and is not permissible consistent with maintaining confidentiality, or regarding what penalties may attach for violations.   Foley Dep. 206:13–207:13;   Eller Dep. 101:12-25, 103:6-106:7.

109.   The Attorney General has not provided written instructions to the Charitable Trusts Section's investigative auditors as to the confidentiality of Schedule B, only "inform[ing]" them after this litigation was commenced that Schedule B was to be deemed confidential and treated as such.   *See* Bauman Dep. 139:15–141:7.

110.   Audit staff have never been instructed about the confidential or sensitive nature of Schedule Bs specifically.   Bauman Dep. 140:13–141:7.   There is no protocol provided to staff regarding how to access Schedule B.   Bauman Dep. 128:21–129:1.

111.   The Registry has never spoken with the audit staff regarding their training on the confidentiality of Schedule B.   Foley Dep. 141:2–142:9.

**E.     The Attorney General Acknowledges but Fails To Rectify Human Error in Processing Confidential Filings**

112.   Human error occurs routinely in the processing of charitable filings. It is supposedly a simple and clear process to separate out confidential Schedule Bs from public IRS Form 990s.   Foley Dep. 173:24–174:3.   In reality, however, Registry staff process "60,000 forms a year" and do not have sufficient time to do "in-depth review of every form."   Foley Dep. 94:5–16.

113.   The Attorney General recognizes that the mechanisms in place to prevent confidential documents from being publicly uploaded have gaps.   Foley Dep. 176:9–22.

114.   Staff separate out by hand Schedule Bs and other confidential materials from public filings.   Harryman Dep. 102:1–8.   Confidential and public documents are then separately scanned into the Registry's database.   Johns Dep. 218:2–15.   It is "very tedious, very boring work" where "there is room for errors to be made."   Foley Dep. 174:8–21.   Because the Registry "is staffed by fairly low-level clerks", "there's always human error."   Johns Dep. 151:8–24.   For example, staff sometimes fails to separate out the Schedule B as a confidential document from the broader Form 990 and instead upload a single integrated document to the public website.   Foley Dep. 132:9–25.

115.   When separating Schedule Bs from the Form 990s, new staff are especially prone to make mistakes and make them frequently.   During the training process, a more senior staff member will double-check new staff work in prepping

paper files for scanning to make sure new staff is properly separating confidential and public documents. These training records frequently show Schedule Bs being left in the public boxes. *See, e.g.,* Foley Dep. 160:16–161:15, 166:7–16, 167:8–14, 168:3–16, 169:1–3, 169:24–170:8, 181:3–182:6; PX-45; PX-46, PX-47.   After training for an individual is deemed complete, there is no longer a second review or quality-control check process.

116.   Because of this "human error", the Attorney General is not "a hundred percent confident" that she prevents Schedule B from being posted on the Registry's website.   Foley Dep. 176:4–11.

F.   **The Attorney General Believes It Is the "Responsibility" of Charities Themselves To Ensure That the Attorney General Does Not Publish Schedule B**

117.   Despite her repeated assurances to charities that she will keep Schedule B confidential, the Attorney General has suggested in this litigation that charities should take on the "responsibility" of monitoring the Registry website themselves to make sure their Schedule Bs have not been published.   Foley Dep. 221:22–222:16; Johns Dep. 205:25–208:5.

118.   It is totally unrealistic, impracticable and unfair to ask that charities do as the Attorney General has suggested.   The Registry often can have up to a six-month lag time between when charities submit documents and when those documents are uploaded to the public website.   Eller Dep. 166:2–167:12.   The Registry does not notify charities when new documents are posted so that the charities can timely check the uploads themselves.   Foley Dep. 225:10–226:18. Notably, the Attorney General's newfound suggestion in this litigation is not

reflected in what she has conveyed or suggested to charities via her website, Charitable Guide, and general instructions.

### G.   The Attorney General Runs Inadequate Searches To Identify Mistakenly Uploaded Confidential Documents

119.   In an attempt to mitigate human error, the Registry runs a weekly report to search for confidential documents that have been inadvertently tagged as public. Foley Dep. 175:5–176:3.   Specifically, the weekly report searches for the phrase "confid" or "sched" in the title of publicly available documents.   Foley Dep. 176:16–22; Harryman Dep. 114:1–4; PX-48.

120.   The search for "confid" has been running since late 2010 or early 2011. Harryman Dep. 113:8–14, 134:5–135:4.   The search for "sched" has been running only since August 2014.   PX-50; PX-51; Harryman Dep. 218:20–219:2.   Before August 2014, the Registry "didn't really have an automated fashion to look for that kind of information," namely, Schedule Bs which had been improperly uploaded as public.   Foley Dep. 194:11–195:6, 198:20–199:7.   Since that time, these searches have regularly found confidential documents improperly made public.   Foley Dep. 188:6–9.   If searches indicate that a confidential document is publicly available, Registry staff will switch it back to non-public.   Foley Dep. 187:19–188:5.

121.   To facilitate these searches, Registry staff were first instructed in August 2014 to adopt a naming convention in which they always use the word "Confidential" in the title of confidential documents.   PX-53; PX-54; PX-138; Harryman Dep. 153:17–154:1, 232:4–23.   That convention is not seriously enforced or followed.   Allen Dep. 159:23–165:1.   Registry staff regularly uploads confidential documents under other titles, such as "Miscellaneous."   Allen Dep.

110:16–23.   The Registry's automated weekly report does not catch those instances, because it does not search for "misc" or any other phrases except "sched" and "confid" in document titles.   Nor does the existing script catch misspellings of document titles.   *See* Foley Dep. 200:9–18.   Nor does the script catch instances where a staff member uploaded a confidential document in tandem with other, non-confidential documents, because it does not search within the full text of uploaded documents.   Harryman Dep. 135:25–137:4.

122.   The Attorney General has never searched the full text of all public documents on the Registry's website to identify mistakenly uploaded Schedule Bs. She has no programmer on staff who could help undertake such a task.   Foley Dep. 220:14–25.   The former head of the Charitable Trusts Section "presume[d] there is a way to check to see if any [Schedule Bs] are on the public site" but did not know if the Registry actually performed such checks, and she certainly never instructed the Registry to do so while she was in charge of the Charitable Trusts Section from 2004 through 2013.   Johns Dep. 198:14–199:2, 208:6–209:3.

123.   The Attorney General has never had anyone spend even a single hour manually browsing through the Registry website to check for improperly uploaded Schedule Bs.   Foley Dep. 214:12–25.

**H.    The Attorney General Does Not Impose Penalties for Violating Her Purported Confidentiality Policy**

124.   There is no penalty for inadvertent disclosure of a Schedule B by the Attorney General's Office or any of its officers, employees or agents.   Ibanez Dep. 163:23–25 ("[T]here [are] no penalties . . . for inadvertent disclosure of Schedule B.").   According to the Attorney General, the inadvertent disclosure of Schedule B

1    never warrants discipline.   Johns Dep. 256:23–257:2.   Indeed, the Attorney

2    General does not consider "inadvertent disclosure" even to be a "breach" of any

3    confidentiality policy governing Schedule Bs.   Ibanez Dep. 250:23-252:10.

4         125.   The California Department of Justice requires all employees to sign an

5    Incompatibility Statement, which prohibits employees from "divulging confidential

6    information, data, or records of the Department of Justice to any person to whom

7    issuance of such information, data, or records has not been authorized . . . ."   PX-

8    55.   The Attorney General contends that this prohibition encompasses only the

9    *deliberate* disclosure of Schedule B.   Foley Dep. 204:14–16; Ibanez Dep. 164:1–6.

10   Accidental, inadvertent, or negligent disclosures of confidential information do not

11   fall within its purview.   Foley Dep. 204:17–22.

12        126.   Unlike the Attorney General, the IRS imposes penalties for the

13   unlawful disclosure of confidential information.   Individuals who unlawfully

14   disclose confidential information obtained pursuant to the IRS information-sharing

15   program are subject to criminal and civil penalties.   PX-529 at 1; *see also* 26

16   U.S.C. §§ 7213(a)(2), 7431(a)(2).

17        127.   Other regulatory regimes that protect sensitive individual data have

18   much stricter enforcement protocols, including penalties for violations.   Failure to

19   comply with HIPAA at the California Department of Health Services, for example,

20   carries reporting obligations as well as disciplinary consequences.   Eller Dep.

21   46:7–48:13.

22

23

24

## I.   The Attorney General Discloses Schedule B to Vendors Outside of the Charitable Trusts Section

128.   The Attorney General has sworn that only members of the Charitable Trusts Section may access a confidential Schedule B.   PX-14; PX-15.   She failed to disclose, however, that the Attorney General ships hard copy Schedule Bs to the third-party Pacific Storage Company for archival.   Eller Dep. 80:6–12; Ibanez Dep. 48:4–8.

129.   The Attorney General has also attested that she does not send Schedule Bs to the third-party vendors she uses to scan documents for the Registry's website. Foley Dep. 155:5–156:1.   She has failed to acknowledge, however, that staff members leave confidential scan sheets in public scan boxes, enabling the scanning vendor to access Schedule Bs.   Eller Dep. 80:13–18.

130.   Moreover, as described below in Section III.K, the fact that over 1700 Schedule Bs have been scanned and uploaded to the Attorney General's public-facing website indicates that her third-party scanning vendors *do* have access to at least these Schedule Bs.   Yet the Attorney General has not followed up to investigate such access or taken any affirmative steps to remediate it. *See* Eller Dep. 187:15-189:22 (acknowledging that the Registry is looking into implementing new procedures to reduce mistakes related to scanning processing and vendors).

131.   The Attorney General has never confirmed with her third-party vendors that they abide by any Department of Justice confidentiality policies.   Ibanez Dep. 95:18–98:13.   The Attorney General has not undertaken to investigate her third-party vendors' confidentiality policies and has not bothered even to confirm the

1  third-party vendors' understanding that Schedule B is a confidential document.
2  Eller Dep. 78:22–80:18, 82:8–85:6.

3      132.  The Attorney General's own designee agrees that the sending of
4  confidential Schedule Bs to outside vendors for public uploading confirms that the
5  Attorney General's confidentiality "protocols need[ ] to be amended."   Johns Dep.
6  214:22–215:7.

7      **J.    The Attorney General's Knowledge of Inadvertent Disclosures**

8      133.  Before this litigation, the Attorney General generally purported to know
9  of no instances in which she had inadvertently disclosed a Schedule B to the public.

10     134.  In 2011 and 2012, however, Belinda Johns, the former Senior Assistant
11  Attorney General in charge of the Charitable Trusts Section, who had supervisory
12  responsibility for the Registry, wrote a series of letters assuring concerned charities
13  that "The Registry has for at least the last 21 years maintained Schedule for public
14  charities as a confidential document…I am not aware of an inadvertent disclosure in
15  the 21 years I have been in the Charitable Trusts Section."   PX-42; PX-43; PX-44;
16  Johns Dep. 195:19–198:13.

17     135.  As recently as July 2014, the Attorney General submitted to the Ninth
18  Circuit, in response to a legal challenge that preceded the instant one, there was no
19  evidence that she had ever inadvertently disclosed Schedule Bs.   *See* Answering
20  Brief, *Center for Competitive Politics v. Harris*, No. 14-15978, Dkt. 17-1 at 32–33
21  (July 8, 2014) ("[T]he fact remains that . . . there is no evidence to suggest that any
22  'inadvertent disclosure' has occurred or will occur.").

23     136.  Then, in the face of pointed discovery requests in this litigation, the
24  Attorney General acknowledged two instances, and only two instances, in which she

had inadvertently disclosed a Schedule B to the public.   PX-15 (Attorney General Response to Interrogatory No. 18).   At no time subsequent did the Attorney General supplement or amend that relevant interrogatory response.

137.   As to the first, in 2012, Johns had learned via email of the publication on the Registry's website of a Planned Parenthood Schedule B.   PX-131; Johns Dep. 148:20–149:12, 243:14–245:7.   Johns responded by forwarding the email to the Registrar to take down the Schedule B "ASAP," because "any time there is a document on the public website that shouldn't be, it's a serious issue."   PX-131; Johns Dep. 247:11–24.   Johns understood that Planned Parenthood was a controversial organization and that public disclosure of its donors could be "potentially damaging."   Johns Dep. 249:1–250:19.   The Attorney General did not initiate any disciplinary proceedings or take any further actions in response to this disclosure, considering it to merely be "an inadvertent error."   Johns Dep. 252:21–253:14.

138.   As to the second, the current head of the Charitable Trusts Section learned of a second public disclosure of a Schedule B on the Registry's website, which had occurred in the past, this one involving Asian Americans Advancing Justice.   Ibanez Dep. 117:7–118:6, 162:6–163:25; PX-196; PX-36.

139.   Kevis Foley, who served as the Registrar of Charitable Trusts for 10 years before retiring in 2015 and who signed the Attorney Genera's relevant interrogatory response, testified that the Attorney General had understated the instances of known disclosures by reporting only two.   According to Ms. Foley's 30(b)(6) deposition testimony, closer to 25 Schedule Bs had been made publicly available during her tenure as Registrar, none of which were further recorded and

– 47 –

1  tracked, and none of which prompted any follow up or investigation.   Foley Dep.

2  128:10–130:1, 194:2–10.

3  **K.    The Attorney General Has Repeatedly, Systematically, and Predictably Violated Her Confidentiality Policy by Publishing Over 1700 Schedule Bs on Her Website**

4

5  140.   During the course of this litigation, the Foundation undertook the

6  searches of the Attorney General's public website that the Attorney General had

7  failed to undertake herself.   PX-248 at 11 ¶ 21 (Expert Report of James T.

8  McClave).   To do so, the Foundation downloaded all publicly-available documents

9  on the Registry website and then ran search terms across all of them, targeted at

10  finding certain sets of Schedule Bs, without purporting to be comprehensive.   PX-

11  248 at 11–14, 23–26.

12  141.   On November 4, 2015, the Foundation presented a list of 1471 publicly

13  available Schedule Bs to Kevis Foley.   PX-56.   Foley randomly picked three

14  examples off that list during her deposition and confirmed by visiting the Registry

15  website that those three were being made publicly available in violation of the

16  confidentiality policy described by the Attorney General.   Foley Dep. 215:19–

17  219:10.   The Attorney General's Office admitted that the disclosure of these

18  Schedule Bs violated her purported confidentiality policy.   Ibanez Dep. 68:22–

19  70:3; Eller Dep. 142:3–143:8, 157:1–9.

20  142.   These Schedule Bs were accessible to any person with an Internet

21  connection.   *See* PX-394 at 12–13, 18 (acknowledging that the Foundation was

22  "able to access approximately 1,470 Schedule Bs from the Registry website").

23  143.   All 1471 Schedule Bs were removed from the Registry website the next

24  day.   Harryman Dep. 107:12–15.   This was an issue that the Attorney General

– 48 –

1   considered time sensitive and moved quickly to fix.   Eller Dep. 144:4–146:18.

2   The Attorney General was surprised that so many examples existed, and admitted

3   that she needed to hire a programmer to help identify such instances.   Foley Dep.

4   220:14–25.   The Attorney General did not take down any of these Schedule Bs

5   until after the Foundation alerted the Attorney General to these disclosures.   PX-

6   394 at 18–19.

7       144.   Over the next two months, the Foundation presented lists containing an

8   additional 270 publically available Schedule Bs to the Attorney General; each time,

9   the Attorney General confirmed that the presence of the Schedule Bs on her public

10  website violated her purported confidentiality policy, and she removed them from

11  the website within 24 hours.   Harryman Dep. 129:2–25; Ibanez Dep. 70:4–10; Eller

12  Dep. 173:22–174:7, 215:21–217:20, 218:11–221:3, 224:5–226:22; PX-134; PX-187;

13  PX-188.

14      145.   Specifically, on November 25, 2015, the Foundation included 50

15  additional publicly available Schedule Bs in the expert report of Dr. James T.

16  McClave.   PX-134; Eller Dep. 173:22–174:15.   Those 50 Schedule Bs were

17  removed immediately.   Eller Dep. 175:2–9.   On January 4, 2015, the Foundation

18  presented a list of 185 publicly available Schedule Bs to the Registrar.   PX-187.

19  Eller randomly picked an example off that list during his deposition and confirmed

20  by visiting the Registry website that it violated the Attorney General's purported

21  confidentiality policy.   Eller Dep. 224:18–226:22.

22      146.  Even after this litigation commenced, after the Ninth Circuit had

23  credited the Attorney General's confidentiality policy in its *Center for Competitive*

24  *Politics* decision, and after the Foundation had conducted its initial download and

searches of the Registry's website, the Attorney General uploaded 35 more Schedule Bs that she was supposedly treating as confidential.   On January 4, 2015, the Foundation presented this list of 35 publicly available Schedule Bs to the Registrar. This list represented Schedule Bs uploaded by the Registry between June and October 2015.   PX-188.   Eller randomly picked an example off that list during his deposition and confirmed by visiting the Registry website that it, too, was being publicly made available in violation of the Attorney General's purported confidentiality policy.   Eller Dep. 226:23–227:15, 228:12–22.

147.   All told, the Foundation has so far turned up over 1740 Schedule Bs that have been disclosed to the public by being published on the Registry's website. *See* ¶¶ 140–146, above.

148.   The Attorney General has confirmed that these disclosures began in 2008, continued every year to the present—including while this litigation has been proceeding—and are *still* ongoing.   As reflected in the most recent batch the Foundation was able to identify prior to the close of fact discovery, the Attorney General uploaded thirteen Schedule Bs on October 30, 2015 alone.   As indicated by the below chart, hundreds of Schedule Bs have been publicly accessible on the Attorney General's website for five or more *years,* yet she took no initiative and made no attempt to identify or takedown these confidential documents until the Foundation specifically brought each to her attention.   *See* PX-56, PX-134, PX-187, PX-188 (Foundation Identified Schedule B Public Disclosures) and PX-349, PX-350, PX-532, PX-533 (related upload dates provided by Attorney General).



149.   All told, 1390 different individual charities have had their Schedule Bs publicly disclosed by the Attorney General.   *See* PX-56, PX-134, PX-187, PX-188. These include charities that are typically associated with controversial or vulnerable causes or groups, and whose donors are likely to have grave concerns about anonymity and safety.   A sample of affected charities include:

- AIDS Alliance;
- American Center for Law and Justice;
- American Constitution Society;
- Central Coast Pregnancy Center;
- Concerns of Police Survivors;
- End Violence Against Women International;
- Greenpeace;

- I Have A Dream Foundation;

- Jewish Community Relations Council;

- League of Women Voters;

- Long Beach Lesbian & Gay Pride;

- Martin Luther King Jr. Center for Social Change;

- People for the Ethical Treatment of Animals;

- Planned Parenthood;

- Rape Trauma Services;

- San Francisco Child Abuse Prevention Center; and

- Zionist Organization of America.

150.   Even after all these disclosures came to light in this litigation and were acknowledged by the Attorney General, the Attorney General made no report of them outside of this litigation.   Ibanez Dep. 80:18–82:6 (acknowledging that the Attorney General had done "nothing" to report disclosures because "[w]e didn't have the legal obligation to do so.").   Instead, in proposing a new confidentiality regulation in December 2015, after some 1500 violations had already come to light, the Attorney General flatly represented, without qualification or equivocation, as follows:   "Similar to the Internal Revenue Service, the Attorney General does not disclose Schedule B donor information and does not post the document on its website or otherwise make it available to the public."   Ex. 285 at 1.

151.   The Attorney General's express assurances of confidentiality have proved to be hollow.   The Attorney General's Schedule B deficiency form letter assures charities that the "Registry retains Schedule B as a confidential record for IRS Form 990 and 990-EZ filers."   *See, e.g.*, PX-204.   But the Foundation has

identified at least 75 instances where the Attorney General uploaded a charity's confidential Schedule B to the Registry website, *after* sending that charity a letter demanding it and representing that it would be a "confidential record." *See* McClave Dep. 158:10–25; PX-255.

152.   Belinda Johns, the former head of the Charitable Trusts Section testified that, as of April 2012, neither she nor anyone in the Registry was aware of any inadvertent disclosures of Schedule B, Johns Dep. 212:23–214:1, even though, by that point, the Registry had already posted *hundreds* of Schedule Bs online.   *See* ¶ 148, above.

153.   Given the extensive disclosures of Schedule B, even after explicit promises to keep it confidential, the current confidentiality policy, as implemented by the Attorney General, obviously risks disclosure of the Foundation's Schedule B.

154.   Once a confidential Schedule B has been publicly disseminated via the Internet, there is no way to meaningfully restore confidentiality.   *E.g.*, PX-160 at 18–19; PX-462 at 971.

**L.   During This Lawsuit, Every Single Confidential Record About A Charity Was Available Through The Registry's Website**

155.   The Attorney General has declared under oath that "[t]he Registry employees who review and process annual reports are instructed to remove all confidential documents including the Schedule scan them separately and upload them into the backend Registry database that is not available to the public and is accessible to in-house staff only."   PX-14 at 3 ¶ 8 (Declaration of Kevis Foley); *see also* PX-15 at 10 (similar verified statement of Kevis Foley in Response to

1   Foundation Interrogatory No. 3).   Neither statement has ever been modified or
2   withdrawn.

3        156.   In the course of downloading the Registry's publicly available
4   documents in July 2015, the Foundation's statistical expert perceived that the
5   supposed "back end" of the Registry's database was in fact accessible through the
6   public website.   Specifically, he noted that all of the Registry's documents were
7   within a set range of Document ID numbers and could be downloaded directly from
8   the Registry's website just by entering the Document ID number into the URL.   In
9   other words, he could download documents based on a Document ID number even if
10  he did not click on, or even find a specific link to, that document on the Registry
11  website.   PX-248 at 26–29.   He attempted to download only 50 such documents
12  as a test, before realizing that some of those documents contained confidential
13  information, including Schedule Bs.   He theorized that the Attorney General had
14  failed to program her database to prevent confidential documents from being
15  downloaded directly through a document ID.   When he came to this realization, he
16  stopped his attempts to download documents based on their document IDs alone.
17  PX-248 at 28.   The Attorney General has admitted that the Foundation's
18  representatives "accessed certain confidential files through the Registry's website."
19  PX-394 at 19.

20       157.   The Attorney General did not discover this same vulnerability until late
21  October 2015.   Harryman Dep. 242:16–244:7.   At that time, the Attorney General
22  came to realize that every single one of her confidential documents—even if they
23  were marked confidential in her database—could be downloaded by any member of
24  the public who was able to ascertain a confidential document ID number.

Harryman Dep. 257:25–258:14; Ibanez Dep. 71:25–72:17; *see also generally* PX-265, PX-266, PX-267, PX-268, PX-269, PX-270, PX-272.   Because document ID numbers are in sequential order, this meant the public could "harvest confidential documents."   Harryman Dep. 247:10–14.

158.   The Attorney General escalated the issue to her outside vendor, Systems Automation, to patch this security vulnerability.   It took more than a week after the realization, eight days, to actually patch the gap even after the Attorney General identified it.   To the best of her knowledge, this error could have existed for six months or even years.   *See generally* Harryman Dep. 241:3–252:24; Eller Dep. 200:3–202:19, 205:20–206:7; Ibanez Dep. 73:23–74:11.

159.   The Attorney General did not shut down the Registry's website during the week she was aware of the security risk.   Eller Dep. 202:21–23.   Aside from Systems Automation and the Department of Justice Data Center, the Attorney General did not notify anyone else of the vulnerability.   Eller Dep. 203:3–204:5. The Attorney General never notified any individual charities, listed donors, or the public generally that the risk existed.   Eller Dep. 202:24–203:2. No one was punished or disciplined for the glaring, acknowledged lapse.   Eller Dep. 204:6–25, 206:8–207:3; Ibanez Dep. 83:12–84:4.

160.   The Attorney General has never checked to see if any confidential documents were actually accessed through this vulnerability.   Eller Dep. 207:4–208:16.   She does not know how such a check could be performed.   Ibanez Dep. 76:4–24.

161.   The Attorney General has not made any public disclosure of the vulnerability.   Eller Dep. 208:17–25.   She had no plan to disclose it to the

1 Foundation before it was pulled out of her officers via discovery.   She produced the

2 relevant documentation and communications only after repeated demands from the

3 Foundation.

**M.   The Attorney General Has Not Attempted Any Serious Remediation of Her Schedule B Public Disclosures or Implementation of a Plan To Prevent Future Disclosures**

6    162.   After the first discovery that the Attorney General had published 1471

7 Schedule Bs on the Registry's website, the Attorney General tried to discount the

8 significance.   Harryman Dep. 121:7–16 ("There's going to be some level of human

9 error and technological error, and we're always, you know, trying to improve as best

10 we can when we can.")   She has even disputed that the confidential Schedule Bs

11 were publicly "posted" because they might have been somewhat difficult to find.

12 Ibanez Dep. 77:10–78:20.   Similarly, she contends that she has not "breached" the

13 confidentiality of Schedule B because she claims the publication of the Schedule Bs

14 on her website was not "deliberate."   Ibanez Dep. 250:12–252:10.

15    163.   Within the Registry, the Attorney General has not so much as informed

16 the staff about the discovery of the breaches identified by the Foundation, whether

17 for the sake of underscoring the importance of keeping Schedule B confidential,

18 alerting them to possible lapses, or otherwise.   Eller Dep. 152:4–17, 175:18–24.

19    164.    The only action the Attorney General has ever taken to remediate or

20 respond to instances where confidential documents have been publicly disclosed on

21 the Registry's website is to remove the documents from the public website once they

22 were brought to her attention.   Foley Dep. 190:23–191:4; Eller Dep. 144:16–

23 145:16, 150:6–152:3, 175:2–9.

24

165.   No staff member has ever been retrained because of a failure to keep Schedule B confidential.   Foley Dep. 150:24–151:20.   No one has ever been disciplined, punished, or sanctioned in any way for violating the Attorney General's supposed policy of keeping Schedule B confidential.   Ibanez Dep. 81:23–82:6; Foley Dep. 163:21–25, 204:23–205:8; Johns Dep. 256:18–22;   PX-394 at 14–15 (Attorney General not aware of any instance where she took an adverse employment action because of an employees mishandling of Schedule B).   For example, the Registrar did not reprimand or sanction any employee for causing the publication of the 1700+ Schedule Bs that the Foundation has discovered on the Registry's website.   Eller Dep. 153:20–24.

166.   The Attorney General has never investigated whether confidential documents uploaded to the Registry's website were downloaded, stored, archived, or disseminated by the public or other third parties.   Foley Dep. 191:5–19; *see also* Eller Dep. 97:9–15.   The Attorney General is not capable of determining who may have downloaded or accessed a particular document at any time in the past.   Foley Dep. 226:19–227:6.   She "would have no idea where to even begin to find out" whether documents had been publicly accessed, and she has not asked anyone to find out if its possible.   Ibanez Dep. 79:20–80:17.

167.   The Attorney General recognizes that she needs to look for ways "to improve all aspects of our operational performance," including increasing the quality of Registry services by "making sure that documents are coded properly" for their public accessibility.   Eller Dep. 175:25–176:19.   The Registry is engaged in an "ongoing exercise" to "identif[y] steps that we can take near term/long term that will get us closer to better results."   Eller Dep. 175:25–176:23.   While purporting

1    to have a "goal of zero," she is obviously tolerating an error rate well in excess of

2    that.    Eller Dep. 176:20–178:4.

3         168.   After the Foundation discovered the first set of 1471 improperly public

4    Schedule Bs, the Registry began exploring the possibility of searching the full text

5    of scanned documents, prior to them being uploaded, to make sure no Schedule Bs

6    were included in future uploads.    Harryman Dep. 104:21–107:5, 108:22–109:18.

7    The Attorney General did not even know it was possible to search the full text of

8    scanned documents in this way until after the Foundation reported conducting such

9    searches   and   thereby   discovering   hundreds   of   Schedule   Bs   on   the   Registry's

10   website.    Harryman Dep. 138:15–140:3.    This forward-looking project remains

11   only in the brainstorming process and has not yet been implemented by the Attorney

12   General.    Harryman Dep. 105:10–15, 129:14–130:15.    There is no set timetable

13   for when it will be implemented, but the Attorney General *hopes* it will be done by

14   mid-2016.    Eller Dep. 185:10–187:14.

15        169.   The Attorney General is not currently able to search the full text of

16   documents already on the website for confidential information.    Harryman Dep.

17   136:20–24.   The Registry has no current intention and is not actively working to

18   search for more confidential documents already publicly available on the Registry

19   website.    Harryman Dep. 109:19–110:19.    There has been no serious "discussion

20   about doing some sort of scrub of the—of the database."    Eller Dep. 186:13–187:4.

21   The Attorney General cannot guarantee right now that no confidential documents

22   are publicly available on the website.    Eller Dep. 214:14–215:20.

23        170.   The public Schedule Bs identified by the Foundation were frequently

24   included with other non-public documents.    1651 Schedule Bs were included with

1    IRS Form 990s, and another 62 were included with RRF-1s.   12 Schedule Bs were

2    labeled "Miscellaneous" documents.   *See* PX-56; PX-134; PX-187; PX-188.

3    Despite this, the Attorney General has not updated and does not intend to update her

4    current weekly script to search for more document titles that may indicate

5    confidentiality, such as "Miscellaneous."   Harryman Dep. 150:2–8; Allen Dep.

6    110:16–23.

7        171.   The Attorney General relies on third parties to notify her of her own

8    mistakes.   The Foundation brought to the Attorney General's attention all of the

9    disclosures listed above.   Other third parties, such as Planned Parenthood, have

10   likewise notified her of public disclosures of Schedule Bs in the past.   *See, e.g.*,

11   Johns Dep. 243:19–245:1.

12       **N.    The Attorney General Does Not Notify Charities or Donors When
              She Discloses Their Schedule B Information**

13

14       172.   All the Attorney General has done to remediate instances in which

15   Schedule Bs have been uploaded is to take them down from the website after the

16   fact.   She does not otherwise make a note of when this occurs, because it is just

17   "part of the daily work."   Foley Dep. 136:12–137:1.   Before this litigation, the

18   Attorney General kept no internal record of how many confidentiality mistakes

19   occurred or who was responsible.   Foley Dep. 188:13–16.

20       173.   Before this litigation the Attorney General had never notified a single

21   charity that its Schedule B information was publicly available on the Registry's

22   website.   Foley Dep. 136:6–11, 137:2–8, 188:10–12.   It was the Registry's

23   practice not to do so.   Johns Dep. 258:16–259:1.

24

174.   Likewise, the Attorney General has never notified specific donors that their names have been publicly disclosed in Schedule Bs on the Registry's website, nor has she ever considered providing such notification.   Johns 251:1–19 (no notification to Planned Parenthood donors).

175.   Even after the Foundation's reported the Attorney General's rampant disclosures of Schedule B, the Attorney General made no effort to notify relevant charities or donors.   Harryman Dep. 130:16–21, 149:13–150:1; Eller Dep. 97:16–23, 151:25–152:3, 175:10–17; Ibanez Dep. 81:10–16.   The Attorney General does not notify charities or donors of the release of their confidential information because she believes she has no legal obligation to inform the affected parties.   Ibanez Dep. 80:18–81:22.   Likewise, the Attorney General made no effort to ascertain whether and to what extent the relevant Schedule Bs may have been downloaded, or by whom.

### O.   The Foundation and Its Donors Reasonably Fear Disclosure by the Attorney General and Other California Officials

176.   The Attorney General knows that many donors do not want their names out in the world and that charities wish to protect that from happening.   Johns Dep. 121:4–20.   It is "common sense" that "people don't want other people to know where they're putting their money."   Allen Dep. 136:6–137:7.   Because "some charities are controversial on both sides of the coin," donors might not "want their names to be associated publicly" with a charity because of potential "backlash."   Johns Dep. 122:12–123:13.   Donor lists are "valuable assets": if contact information for individual donors is disseminated, it can dissipate the donations to that charity.   Johns Dep. 172:4–173:4, 175:2–6.   Donors "get angry" or "for one

1  reason or another stop giving to the original charity" if their names are sold.   Johns

2  Dep. 173:21–174:13.   Making a donor list public can harm a charity by reducing

3  the robustness of its donor base.   Johns Dep. 175:24–176:8.

4       177.   The Attorney General's abject inability to enforce her own purported

5  confidentiality policy, as evidenced by the inadequate safeguards and abundant

6  breaches detailed above in Sections III.C through III.N, demonstrates that donors

7  reasonably believe there is a significant and material risk that any charity's Schedule

8  B—including the Foundation's Schedule B—would be disclosed to third parties or

9  the public if it were submitted to the Attorney General.   *See also* PX-160 at 22–23

10  (Expert Report of Dr. Paul Schervish); PX-304 at 4–5 (Supplemental Report) .

11  Donors know and rightly fear that disclosure of their names and addresses to the

12  Attorney General will be the same as disclosure to the public.   PX-160 at 22–23.

13       178.   It is eminently reasonable for the Foundation, its donors, and other

14  charities and their donors at this point to doubt any purported assurance of

15  confidentiality by the Attorney General.   The Attorney General has been offering

16  blithe, absolute assurances of confidentiality, without qualification or equivocation,

17  from before this challenge was brought right through the present.   Yet the record in

18  this case makes all too plain that the Attorney General has been violating her

19  purported confidentiality policy at every turn, opting to ignore and conceal those

20  violations as best she can rather than conscientiously acknowledging, reporting,

21  addressing, and remediating them going forward—as anyone seriously concerned

22  with confidentiality should.

23

24

**P.    The Proposed Rulemaking To Keep Schedule B Confidential**

179.   In December 2015, after the filing of this lawsuit and in direct response to this lawsuit, *see* Cantore Dep. 51:4–52:8, the Attorney General first proposed a new rulemaking that would for the first time codify in California law that Schedule Bs are confidential and exempt from the public-disclosure requirement of the Supervision Act.   *See* PX-279.

180.   The Attorney General's proposed adoption of a confidentiality regulation—which remains simply proposed and lacks force of law—in response to this litigation well confirms that there is no such legal assurance of confidentiality under California law as it currently exists and that the Attorney General herself recognizes as much.   *See id.*

181.   The proposed rulemaking has been the subject of extensive public comment and remains subject to further deliberations and proceedings, such that it may be withdrawn, adopted, or revised pursuant to California law at a later date, still unknown.   The rulemaking has not yet been enacted, and it is subject to a "very, yes, very slow" and "onerous" process before it could even potentially be enacted. Foley Dep. 48:6–13, 107:18–108:18; Ibanez Dep. 167:14–168:7.

182.   Unlike IRS regulations, the proposed rulemaking does not provide for any penalties for confidentiality violations, Cantore Dep. 215:12–216:4; nor does it provide for documentation of violations or notification to affected charities, Cantore Dep. 258:25–259:18, 260:10–261:13; nor does it purport to effectuate any "change in policy or procedure."   PX-285 at 2; PX-279 at 5.

183.   In her notice of proposed rulemaking, the Attorney General reiterated, once again, that she keeps Schedule B confidential.   PX-279; PX-285; PX-413.

The notice was published on December 11, 2015, five weeks after the Foundation had notified the Attorney General of 1471 publicly disclosed Schedule Bs.   PX-285; Cantore Dep. 249:16–255:2.   Shockingly, although she admits the public would want to know these facts, the Attorney General has no intention to notify the public about her confidentiality violations even in the context of public rulemaking proceedings in which she is trumpeting her supposedly preexisting safeguarding of confidentiality.   Cantore Dep. 253:2–15.

## IV.   COMPELLING CHARITABLE ORGANIZATIONS TO DISCLOSE SCHEDULE B BURDENS FIRST AMENDMENT RIGHTS

184.   Social science research defines anonymous giving as "a social relation in which knowledge about the identity of the donor is restricted."   PX-160 at 9 (Expert Report of Dr. Paul G. Schervish); PX-302 at 1.   This research indicates that donors commonly give anonymously in order, *e.g.*, (1) to minimize solicitations from other organizations, (2) to prevent family members or heirs from learning the level of a donor's wealth, or (3) to protect a sense of privacy, humility or modesty. PX-160 at 12; PX-302 at 2, 4–5, 8; PX-303 at 18, 20, 25–26.   In addition, the research reveals that donors give anonymously to protect their own or their family's safety, or to avoid repercussions from giving to a controversial cause or organization.   *E.g.*, PX-160 at 12–13, 19; PX 303 at 25.

185.   Donors who give anonymously often view their anonymity as an essential condition for their gift and "invoke[]" "different levels of anonymity" to meet their needs.   *See* Schervish Dep. 77:11–14; PX-160 at 9–10 (noting different identifiable "realms of anonymity"); PX-302 at 17; PX-426 at 4 (noting that revealing a donor might hurt a charities bottom line).   Accordingly, charities

facilitate and invite anonymous donations, and fundraising professionals recognize a donor's right to the confidentiality of his donation.   *E.g.*, PX-160 at 11; PX-422; PX-425.   Nonprofit officials zealously guard the identities of anonymous donors and view "keeping the secret as an ethical obligation."   PX-160 at 19; PX-426.

186.   Charities generally maintain their Schedule Bs as confidential documents and have emphasized on many occasions to the California Attorney General that their Schedule Bs must be kept confidential.   Johns Dep. 125:22–126:10.   Belinda Johns, the former head of the Attorney General's Charitable Trusts Section, admitted that releasing charities' donor names and addresses has "harmed [charities] by reducing the robustness of [their] donor base[s]."   Johns Dep. 175:18–176:8.

187.   Maintaining donor anonymity is especially important in today's politicized climate, where businesses, individuals, and foundations are often punished for their associations with controversial groups or causes.   PX-160 at 15–16.   In California in particular, donors have been attacked for contributing to controversial causes.   For example, Brendan Eich, co-founder of Mozilla, was forced to resign as Mozilla's CEO in 2014 after his $1000 contribution to support the Proposition 8 campaign six years earlier led to social media attacks.   *E.g.*, PX-160 at 15; PX-452.   Other donors to the Proposition 8 campaign faced threats, boycotts, harassment, and vandalism after their names were posted on the Internet.   *E.g.*, PX-160 at 15–17; PX-449; PX-450; PX-451; PX-454.

188.   This phenomenon runs across the political spectrum and extends beyond California.   For example, McDonald's endured a five-month boycott until one of its executives resigned from the board of the National Gay and Lesbian

Chamber of Commerce in 2008, while Chick-fil-A faced protests for its CEO's comments against gay marriage.   PX-160 at 16; PX-453; PX-455.   The supporters of NARAL, a pro-choice organization, "are often threatened and harassed—even in liberal New York."   PX-160 at 16–17; PX-458.   Other groups have faced similar backlash.   *E.g.*, PX-160 at 15–17; PX-454 (petition to boycott Hobby Lobby for their views lawsuit against mandated healthcare); PX-456 (group calling for boycott of all corporations that make contributions to Planned Parenthood); PX-457 (Planned Parenthood removed its corporate donor page from its website after concern from corporate donors).

189.   The Internet has increased the risk that a donor's anonymity will be forever compromised.   PX-160 at 13–14, 17–19; PX-462.   For-profit prospect research firms and charities track every major gift in the country so that other charities can identify prospective donors.   PX-160 at 13–14, 18; PX-428; PX-447; PX-464.   Donors to controversial organizations are at heightened risk of disclosure as their ideological enemies seek to discover information, including Schedule Bs, in trying to identify and target the people who fund these organizations.   *E.g.* PX-420 (public records act request for Planned Parenthood's Schedule B from the Texas Alliance for Life).   Once a donor's anonymity is lost and the donor's information is posted online, the donor will forever be at risk of reprisal.   PX-160 at 18–19; PX-462 at 971.

190.   Donors and nonprofit participants often respond to the risk and threats of reprisal by withdrawing or reducing their monetary support and participation once their anonymity is compromised.   For example, Chick-fil-A dramatically cut its support of groups considered opposed to homosexuality after it faced protests.

PX-160 at 15–16; PX-453. The ACLU found in a comprehensive report that "the perceived use of informants to infiltrate mosques" had caused some participants and donors to "limit[] their attendance at congregational prayer in mosques and . . . their charitable giving, for fear that an informant was reporting their presence . . . or their individual donations." PX-160 at 14–15; PX-407 at 77.

## V. COMPELLING THE FOUNDATION TO DISCLOSE ITS SCHEDULE B BURDENS ITS FIRST AMENDMENT RIGHTS

### A. The Foundation Keeps Confidential Its Schedule B Information

191. The Foundation promises confidentiality and anonymity when soliciting donations. While some donors may elect to publicize their association with the Foundation, *see* Oelke Dep. 186:11–19 (discussing two donors who voluntarily disclosed their association with the Foundation), Pope Dep. 122:18–124:3, "hundreds" demand anonymity. Fink Dep. 214:8–17. One of the Foundation's donors' top concerns is how well the Foundation secures the confidentiality of donor-identifying information that it collects for fundraising purposes. Oelke Dep. 89:2–12, 90:8–12, 103:11–18. The Foundation's potential and actual donors raise confidentiality concerns regularly and increasingly. Oelke Dep. 91:2–20

192. To assuage fears of public exposure, the Foundation must persuade donors that its confidentiality procedures are effective and adequate. *See, e.g.*, Oelke Dep. 89:2–12, 90:8–12, 103:11–18. To potential donors who are apprehensive about the risks of public disclosure, the Foundation provides reassurance "that [the Foundation] spend[s] a lot of time, and [is] dedicated to keeping [their] contribution[s] anonymous." Fink Dep. 214:25–215:14, and that

the Foundation will not disclose their identity unless doing so is "legally required." Fink Dep. 334:17–335:7.   Individual donors regularly seek assurances that information identifying them will not be disclosed to or by states, and the Foundation provides such assurances while soliciting their financial support and encouraging their association.

193.   The Foundation has a longstanding employee policy that forbids the disclosure of donor-identifying information.   Oelke Dep. 182:7–20; Spady Dep. 91:21–92:10, 98:7–11.   There are no exceptions to this policy.   Spady Dep. 92:25–93:3.   The Foundation provides training on the non-disclosure policy during the orientation that every employee must undergo at the outset of their employment at the Foundation.   Oelke Dep. 182:21–183:4 (noting that during orientation the Foundation "explain[s] and clarif[ies] that [the Foundation] does not disclose donors"); Heaton Dep. 232:11–14 (stating that employees are trained "in their first week in the organization" and are required to "sign a personnel handbook or confidentiality statement"); Spady Dep. 92:17–24.   The Foundation is not aware of an instance in which a staff member has violated its confidentiality policy.   Heaton Dep. 232:24–233:2; Spady Dep. 93:4–6.   The potential "consequence[s]" of violating the confidentiality policy "includ[e] termination."   Heaton Dep. 232:3–7. When one former employee violated the Foundation's policy concerning the nondisclosure of activist-identifying information, that employee was terminated. Spady Dep. 99:2–7.

194.   The Foundation does not disclose donor-identifying to any person or entity other than the IRS, Americans for Prosperity, and Freedom Partners.   *See* Heaton Dep. 224:5–19 (noting that the Foundation does not submit unredacted

copies of its Schedule Bs to state regulators); Heaton Dep. 229:11–18 (noting that he is unaware of any instance where the Foundation has disclosed donors to parties other than the IRS); Oelke Dep. 183:22–184:10 (stating that she does not "believe any information has been disclosed" to any person or entity other than the IRS); Fink Dep. 334:24–335:7; *see also* Fink Dep. 87:23–88:3,133:10–135:7.   Nor does the Foundation share information about a donor with other donors or potential donors unless they have that donor's "express permission" to do so.   Oelke Dep. at 184:11–185:5; *see also* Spady Dep. 93:9–14 (describing an instance when he refused to reveal, at a potential donor's request, the extent of another's involvement with the Foundation).

195.   The Foundation's insistence that its Schedule B not be disclosed to states is well founded on experience.   The few state regulators that collect Schedule B have violated pledges of confidentiality with worrisome frequency.   Moreover, the Foundation's 2003 Schedule B, which it submitted to Massachusetts before implementing the non-disclosure policy, was published on the Internet, where it still remains accessible even today.   PX-396.

196.   The Foundation has adopted a host of security protocols to prevent the disclosure of the Foundation's Schedule B.   The Foundation shares Schedule B with as few parties as it possibly can.   The Foundation discloses Schedule B information only to the IRS, its third-party tax preparer, and its third-party auditor. Heaton Dep. 75:16–22 (discussing tax preparer), 82:18–22 (discussing auditor). When the Foundation transmits Schedule B information to its third-party tax preparer, the Foundation "upload[s it] directly into their system," as opposed to sending it via email.   Heaton Dep. 75:22–25.   The Foundation sends only, and no

more than, the data that the tax preparer and auditor must have to conduct the work necessary to satisfy the Foundation's legal obligations.   Heaton Dep. 76:8–16, 83:3–9 (noting that auditors must have certain information about donations to complete their review).

197.   To ensure that the objectives of the Foundation's strict confidentiality policy are fulfilled, the Foundation has implemented protocols to protect and secure the confidentiality of donor information.   The Foundation minimizes access to records and reports of highly-sensitive donor information.   Fink Dep. 209:2–14; Heaton Dep. 232:11–14.   The Foundation "password-protect[s]" and limits access to Salesforce, the database where it stores confidential information about donors. Heaton Dep. 239:15–19.   The President of the Foundation attests that access to the Salesforce is "incredibly limited."   Phillips Dep. 335:15–20.   Access to Salesforce is governed by rules and procedures to ensure that the contents of the database remain confidential.   Phillips Dep. 334:8–18.   Reports about meetings between Foundation employees and individual donors are rarely put into writing.   Phillips Dep. 268:2–11.   The Foundation goes to great lengths to prevent leaks of confidential donor information because one of the Foundation's "biggest worries . . . on an ongoing basis" is not to compromise the anonymity of its donors.   Phillips Dep. 334:23–335:7.

198.   When the Foundation transfers information about donors, the Foundation takes precautions to minimize the risk that the transfer will reach unintended recipients.   Fink Dep. 207:12–15, 209:9–14.   To the extent possible, the Foundation does not send donor information electronically.    Fink Dep. 207:2–5. When the Foundation distributes confidential information to donors, the Foundation

1 individually numbers the documents, and employs a policy for disposing of such

2 documents.   Fink Dep. 114:16–115:2.   The Foundation's information-sharing

3 agreement with Freedom Partners, under which it shares a limited amount of

4 information about donors who are associated with both organizations, is subject to a

5 confidentiality guarantee.   Fink Dep. 133:10–20, 135:8–18.

6       199.   This lawsuit reflects the Foundation's diligence and commitment when

7 it comes to vindicating the assurances it has provided to individual donors that their

8 individual donor information will not generally become known outside the

9 Foundation.   Individual donors have indicated that they are interested in the

10 litigation and gratified to see the Foundation standing up for their interests in court.

11 Spady Dep. 108:22–109:25; 111:25–113:1 (discussing the litigation with several

12 donors who were interested in the case, and assuring them that "Americans for

13 Prosperity Foundation [was] defending the First Amendment in an aggressive

14 way").

15       **B.**   **The Foundation's Donors Have Valid Reasons for Maintaining
            Their Anonymity and Fearing Public Reprisal if Their Identities
16          Are Disclosed**

17       200.   Many of the Foundation's donors require anonymity, and would reduce

18 their gifts or cease donating to the Foundation to the extent that donor names and

19 addresses are subject to disclosure outside the organization.   *E.g.*, Fink Dep.

20 336:18–338:1 (testifying that about fifty donors or potential donors have told him

21 that they would like to contribute to the Foundation, but are too fearful of reprisal),

22 368:12–369:2 (donors have told Fink that they would not contribute because they

23 did not want to "be targeted again" by local governments); Oelke Dep. 93:25–94:3

24 (three donors stopped contributing because of concern that their association with the

Foundation "would affect their business and their business interactions with the government"); PX-160 at 26.   These donors' decisions to reduce their gifts or cease donating to the Foundation in response to the disclosure of the Foundation's Schedule B to the Attorney General, would be reasonable, legitimate, and expected. PX-160 at 26.

201.   Consistent with social science research, and other related phenomena, the Foundation's donors reasonably fear disclosure of donor names and addresses to the public as well as to the California Attorney General.   *E.g.*, PX-160 at 8. Donors to the Foundation and the Foundation's affiliates and employees are subjected to threats and harassment at the hands of members of the public and local officials "daily."   *E.g.*, Fink Dep. 349:6–7; *see also* Oelke Dep. 100:8–14 (donors reporting increased government inspections).   Accordingly, disclosure of the Foundation's Schedule B to the California Attorney General's office or to the public will chill donations to the Foundation.   *E.g.*, PX-160 at 9.

202.   This widespread chilling effect will extend to donors and potential donors who are not listed on the Foundation's Schedule B, especially because the Schedule B threshold is subject to an accounting election and otherwise variable (depending on the total donations received in any given year), such that neither the Foundation nor its individual donors knows in advance who exactly will wind up included on a Schedule B for any given year.   *E.g.*, PX-160 at 9.   Moreover, because individual states may potentially demand different information identifying individual donors in different ways, there is no assurance that omission from a Schedule B will itself ensure a donor's anonymity once California or any other state enforces a policy of compelling disclosure of individual donors.

**C.    The Foundation's Donors Reasonably, Legitimately, and Predictably Fear Public Reprisal, if Their Donations to the Foundation Become Known.**

203.   Donors to the Foundation and other Koch-affiliated groups are regularly targeted for "outing."   For example, American Bridge, a Democratic group devoted to uncovering politically damaging information about Republicans, has ten employees dedicated to digging up dirt on the Koch Brothers.   PX-160 at 18; PX-463.   Once American Bridge or another individual or entity discovers a donor's name and posts it on a public website, it will remain public for all time. PX-160 at 18; PX-462 at 971–72.   To protect themselves from the reprisal that would likely follow, the Foundation's donors know, like other donors to controversial organizations, that they must remain anonymous to individuals outside the organization and effectively resist disclosure of their identities in the first instance.   PX-160 at 18–19.

204.   The public and news media have a high level of interest in identifying the Foundation and AFP's supporters.   For example, President Barack Obama has consistently called out in his stump speech that we don't know who Americans for Prosperity's "donors are" and that disclosure of those donors is important.   *E.g.*, PX-513 at 16; PX-514 at 9; *see also* PX-511 at 7 (it is a "huge problem" that American for Prosperity does not disclose its donors); PX-512 at 9–10; PX-515 at 9–10; PX-516 at 10; PX-517 at 10; PX-518 at 12; PX-519 at 14; PX-520 at 10; PX-521 at 8–9; PX-522 at 12.   Senate Minority Leader Harry Reid gave a speech on the Senate floor attacking Americans for Prosperity and its supporters, accusing David and Charles Koch of "trying" to "buy America."   PX-523.   In a recent debate for the Democratic presidential nomination, David and Charles Koch were

1    mentioned a "record" number of times.   PX-564.   Nearly every day, it seems that

2    a new story comes out seeking to expose more information on the "Kochtopus," the

3    name for David and Charles Koch's "ideological network" in political circles, which

4    includes the Foundation.   PX-424; *see also* PX-160 at 19; PX-353 (asking "Who is

5    Americans for Prosperity?").

6        205.   More specifically, lists and audio of donors, potential donors, and

7    potential supporters of the Foundation and other groups in its affiliated network

8    have been widely sought after and disseminated by liberal websites, such as Mother

9    Jones and Think Progress.   *E.g.*, PX-338; PX-500; PX-501; PX-503; PX-530; *see*

10   *also* PX-332 (exposure of an individual supporter); PX-502.   As a result of these

11   leaks and other media efforts to uncover the names of supporters, donors, and

12   potential donors to the Foundation and other groups in its affiliated network,

13   Freedom Partner seminar attendees are required to sign confidentiality agreements,

14   check their smart phones at the door, and minimize the number of copies of lists of

15   attendees, among other restrictions.   *E.g.*, Fink Dep. 114:2–116:2.   Attendees to

16   the seminars are understandably concerned about these leaks.   One donor wrote to

17   the Foundation that he was "very concerned over being taped," after the Mother

18   Jones published audio of Charles Koch thanking him, among others, for his

19   donations.   PX-530.   Attendees who have appeared on these leaked lists have

20   been subject to boycotts, threats, and harassment because of their believed or known

21   association with the Foundation or other groups in its affiliated network.   Fink

22   Dep. 258:10–16; *see also id.* at 287:11–288:4 (Mr. Fink aware of three individuals

23   who had faced boycotts).

24

FOUNDATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    206.   Even the conservative National Journal has sought to uncover the

2  names and addresses of the Foundation's donors.   PX-160 at 22; PX-396.   In

3  2013, the National Journal published two of the Foundation's decade-plus-old

4  confidential Schedule Bs.   PX-160 at 22; PX-396.   At least one of the documents

5  was downloaded from a publicly available state charity registry website, after the

6  state uploaded it by mistake.   PX-160 at 22; PX-396.   Although Massachusetts

7  has since removed the Foundation's Schedule B from its website, the Foundation's

8  Schedule Bs remain publicly accessible through the National Journal website,

9  proving that once a state agency, such as the California Attorney General, breaches

10  the confidentiality of the Foundation's Schedule B, that confidentiality will be lost

11  for all time.   PX-396; PX-462.

12  **D.    The Foundation, Its Employees, Supporters, Donors, and Affiliated**
    **Network Regularly Experience Public Threats, Harassment,**
13  **Intimidation, and Retaliation**

14    207.   The Foundation, its employees, supporters, donors, and affiliated

15  network participants regularly face public threats, harassment, intimidation, and

16  retaliation once their support for and affiliation with the Foundation becomes

17  known.   The Foundation receives threats "on a daily basis."   Fink Dep. 349:6–7;

18  *see also* PX-226 (AFP Related Threat Data).   Death threats against the

19  Foundation's known donors have been deemed "credible" by the FBI.   Fink Dep.

20  348:21–22; Holden Dep. 27:1–29:2.   In fact, threats and harassment against the

21  Foundation and affiliated individuals have become so common, so pervasive, and so

22  scary that Ms. Oelke, the Foundation's Vice President for State Operations, has even

23  "considered quitting" "for [her] children" over safety concerns, and Mr. Fink, the

24  Foundation's COO, acknowledged that "most of [the Foundation's] state directors"

1   have "received threatening phone calls at their homes."   Oelke Dep. 161:4–7; Fink

2   Dep. 224:5–11; *see also* Oelke Dep. 161:20–162:2 (the Foundation paid to install

3   home security systems in the homes of some of its Michigan employees because

4   "they had received threatening mail"); *accord* PX-504 (Foundation supporter

5   receives threatening note).

6       208.   The Foundation's offices and website are themselves a frequent target

7   for threats of heinous violence, attempted break-ins, and security breaches.   *E.g.*,

8   Fink Dep. 348:9–14 (noting "break-ins" and "suspicious individuals" trying to gain

9   access); Oelke Dep. 147:13–18 (noting break-in at an Iowa field office).   For

10  example, the hacker group, Anonymous, has targeted AFP and the Foundation's

11  donors and took down AFP's website.   Holden Dep. 31:1–8; Phillips Dep. 121:15–

12  19, 127:10–15; PX-347; PX-348.   The Foundation's headquarters have had to be

13  evacuated in the face of a bomb threat, and the Foundation's Tennessee field office

14  recently faced "a drive by fire bombing."   Fink Dep. 346:23–347:16, 348:6–7,

15  355:14–356:7; Oelke Dep. 147:13–18; Phillips Dep. 127:10–15; PX-306; PX-307;

16  PX-422.   Moreover, the Foundation once found an outside contractor "making

17  threats online" while sitting "in the belly of this horrible beast," threatening to

18  commit "violent acts."   Phillips Dep. 168:18–169:16; Fink Dep. 356:18–357:14;

19  Bernson Dep. 77:5–18, 77:22–24; Oelke Dep. 143:23–143:2.

20      209. The Foundation's employees regularly experience threats and

21  harassment because of their association with the Foundation.   These threats range

22  from the relatively mild—Mr. Fink has "had threats while making phone calls" and

23  "had bad things yelled at [him]"—to the downright scary—Ms. Oelke received a

24  "creepy" package at her home address that "talk[ed] about where [she] lived" and

"detail[ed] her home." Fink Dep. 367:3–10; Oelke Dep. 153:17–156:10. Such threats are pervasive: Foundation employees frequently receive threatening emails and phone calls and are targeted on social media or in the press. *E.g.*, PX-434 (Teresa Oelke attacked as the "Hypocrite of the Day"); PX-148; PX-159; PX-226; PX-309; PX-310; PX-311; PX-312; PX-313; PX-315; PX-316; PX-317; PX-318; PX-319; PX-320; PX-321; PX-322; PX-323; PX-324; PX-325; PX-326; PX-327; PX-328. Comments on the Internet blog post about Ms. Oelke called her a "two-faced, hypocrisy-spouting bought-and-paid shill." PX-434. One individual even created a first-person shooter video game whose objective is to kill employees in corporate offices with banners reading "Americans for Prosperity." PX-377; PX-378. In the field, employees have been "stalked," threatened, shouted down, and spit upon. Fink Dep. 349:4; PX-314 (stalking email); Oelke Dep. 148:3–7, 155:21–156:6, 158:24–159:13; Spady Dep. 131:1–4; Phillips Dep. 118:10–18. The Pennsylvania state director had her tires slashed at an event, and other property has been vandalized. Fink Dep. 348:25–349:2; Phillips Dep. 118:21–119:9.

210. In fact, several of the Foundation and AFP's events have been interrupted by violent protests and threats. *See*, *e.g.*, Spady Dep. 135:3–18 (testifying that a speaker at an AFP event was greeted by shout of "You should be shot"). At the Foundation's Defending the American Dream Summit in Washington, DC in 2011, "about 2500 protesters swarm[ed] the convention center, block[ed] the exits, and [tried] to get into the convention center." *E.g.*, Fink Dep., 228:9–18; *see also* Pope Dep. 161:11–15. The police hung up on the Foundation's request for backup. PX-218. A few activists were injured, including one woman

1   who was pushed down the stairs.   Pope Dep. 165:25–166:3; Phillips Dep. 134:20–

2   135:4, 137:22–138:3; Fink Dep. 350:9–12; PX-217; PX-379; PX-466.

3   211.   AFP's events have faced similar threats and protest.   At one of AFP's

4   events in Michigan, Mr. Hilgemann "prevented a number of protesters from

5   trampling the people who were under the tent" after the protesters "collapsed the

6   tent with people inside."   Hilgemann Dep. 64:3–66:6; Oelke Dep. 144:18–21;

7   145:16–146:5, PX-308; PX-380 (YouTube video entitled "Violent Mob Destroys

8   AFP Tent in Lansing").   Some of these protestors used "box cutters or knives" to

9   slash at the ropes of the tent.   Hilgemann Dep. 64:12–17.

10   212.   Threatening protests are also regularly directed at events that the

11   Foundation does not host but are known to draw its members and network affiliates.

12   Donors and potential donors to the Foundation and its network affiliates congregate

13   at the Freedom Partners seminars in California each year.   These seminars are

14   themselves lightning rods for attack, and often face protests, including protests that

15   have turned violent.   Holden Dep. 32:3–7; PX-465.

16   213.   Outside of these large events, the Foundation's and AFP's supporters

17   also often find themselves with targets on their back.   There are "roughly two

18   [threats] a year" "involving weapons on activists."   Fink Dep. 348:5–6.

19   214.   Individuals who are "believed to be investors" with the Foundation

20   have received threats of physical harm, have had their businesses boycotted, and

21   have been subjected to character assassinations in their hometown papers.   Fink

22   Dep. 222:3–15; *see also* Oelke Dep. 171:1–5, 172:7–22 (death threats against major

23   Foundation donors), 174:23–175:1 (boycotts against Foundation donors).   Donors

24   and potential donors to the Foundation have been photographed by "Paparazzi

1  types," as a cottage industry has grown up trying to uncover the Foundation's and

2  related organization's donor base.   *E.g.*, Fink Dep. 231:20–232:1; *see, e.g.*, PX-338

3  (Mother Jones article).   Donors to the Foundation have been portrayed as

4  "unethical" and "self-interested" because of their donations to the Foundation and

5  AFP.   Oelke Dep. 176:12–178:3.

6      215.  More specifically, Charles Koch and David Koch, two of the

7  Foundation's most high-profile associates, have faced "a lot of death threats"

8  beginning in 2011.   Holden Dep. 32:8–10; PX-216; PX-225.   They are regularly

9  threatened and attacked via social media, phone calls, email, and protests outside

10  their homes and places of business, in part because of their ties to the Foundation.

11  PX-216; PX-226; PX-329; PX-330; PX-333; PX-337.   Koch Industries has been

12  targeted by Anonymous, and threats against Charles and David Koch have included

13  threats against their families and threats to firebomb their company's facilities.

14  PX-216; PX-331.

15      216.  Art Pope, head of the John William Pope Foundation, has received

16  "threats, harassment, intimidation, boycotts and other things . . . because of the Pope

17  Foundation's giving."   Pope Dep. 138:4–15; *see also* PX-98 (list of articles); PX-

18  113; PX-372.   Mr. Pope has been consistently linked to AFP and the Foundation in

19  the media.   *E.g.*, PX-353; PX-354; PX-357; PX-358; PX-361; PX-368.   Mr. Pope

20  installed a video camera system to monitor his home after a blogger wrote about

21  assassinating him. Pope Dep. 21:12–22:22; *see* PX-371 (blog post about Mr. Pope:

22  "I know it's bad when I wake up thinking *assassination*."); PX-112.   His stores

23  have been boycotted, and he has been "accused of being a segregationist, a global

24  warming denier, other pejorative terms, portrayed as a bigot, a right-wing extremist

1   because of the Pope Foundation's grants to groups such as, and oftentimes expressly

2   citing, Americans for Prosperity Foundation."    Pope Dep. 33:21–34:17, 137:7–18;

3   PX-355; PX-373.   Media outlets and bloggers have used Mr. Pope's contributions

4   to the Foundation to accuse him of racism, pro-segregation policies, and denials of

5   climate change.   *E.g.*, PX-356 (racism), PX-365 (segregation); PX-367 (climate

6   change denial); *see also* PX-359; PX-362; PX-364.

7   **E.     The Foundation's Donors Fear Disclosure on Schedule B**

8        217.   In light of these numerous threats against the Foundation, its

9   employees, supporters, donors, and network affiliates, numerous donors have

10   expressed concern to Foundation employees about disclosure of their donations on

11   Schedule B.   *E.g.*, Heaton Dep. 258:14–16.   The Foundation's donors have

12   expressed concern with disclosure to the IRS on Schedule B, disclosure to state and

13   local officials, and disclosure to the public.   *E.g.*, Fink Dep. 214:8–20 ("[h]undreds

14   of the Foundation's "prospective donors and donors" are concerned with public

15   disclosure), 334:9–335:7 (donors concerned with disclosure to the IRS), 340:9–

16   341:8 (state officials).   Because of these donor concerns, the Foundation tells

17   donors as part of its pitch that it doesn't "disclose [its] donors."   Fink Dep. 333:25–

18   334:13.

19        218.   As a group, the Foundation's donors have a pronounced and well

20   justified fear of public disclosure.   Donors are concerned that "their home

21   addresses will be published" and are fearful for their safety if they are exposed as

22   donors to the Foundation.   *E.g.*, Oelke Dep. 169:3–6; Spady Dep. 140:15–16.

23   Because of these donor fears, the Foundation does not generally mention donor

24   names even to other potential donors without the "express permission of a supporter

or investor" even though the mention would help the Foundation's efforts.   Fink Dep. 198:12–199:17.   Relatedly, none of Mr. Fink's fifty to 100 major donors have agreed to be recognized for their donations to the Foundation "at a summit or a major" event because they fear "harassment," "boycott[s]," "threats to themselves or their families," and "character assassinations."   Fink Dep. 201:6–202:23.

219.   Foundation donors' fears of disclosure extend to disclosure to the IRS through inclusion on the Foundation's Schedule B.   Donors who give between $25,000 and $250,000 repeatedly express concern that they will be targeted by the IRS because of their donations to the Foundation.   Oelke Dep. 90:8–24, 97:10–15, 99:22–100:5.   "Well over half" of the major donors that Mr. Phillips talks to have this concern.   Phillips Dep. 278:11–19.

220.   Many Foundation donors have singled out disclosure to state officials as a prime area of concern.   Fink Dep. 340:9–341:8 (close to a dozen donors have expressed this concern).   This is a "bigger concern in liberal areas," including California.   Fink Dep. 340:9–341:8.   In fact, the Foundation's donors have reported "increased inspections" by "[f]ederal and state government agencies" following their donation to the Foundation.   Oelke Dep. 100:8–12; Fink Dep. 258:21–25 (one donor believed "local regulators" were investigating his business because of his association with the Koch network or the Foundation); Spady Dep. 69:19–70:3 (two donors have told him that they believed they were audited because of their contributions to the Foundation or AFP).

221.   Because of this concern with disclosure to the government, at least one donor specifically sought to donate below the Schedule B threshold to avoid appearance on Schedule B.   The donor specifically asked the Foundation what

1   level of contribution he could "make and have it not show up on the IRS Schedule

2   B." Heaton Dep. 258:14–16; *see also* PX-335. Robert Heaton, the Foundation's

3   Chief Financial Officer, wrote to that donor to inform him that he could safely

4   donate up to $400,000. PX-336.

### F.   The Foundation and Its Donors Reasonably Fear Disclosure to and Reprisal by the Attorney General and Other California Officials

222. The Foundation and its donors have reasonably defined their anonymity to mean that donors' "identities are known within the [Foundation], but [their] identities are kept confidential from third parties," including the California Attorney General. PX-160 at 10, 24–26. Consistent with this interest, the Foundation's donors, in particular, are concerned with "disclosure of their identities to the State of California." PX-160 at 24–26. Most broadly, they are reasonably concerned that the Attorney General will not keep their identities confidential, for the risk of a leak is not acceptable. Schervish Dep. 145:10–16 ("the more people that touch the data, the more there's a possibility for leakage"), 157:18–158:19 (noting that a low risk is unacceptable because of the "high consequence"). More specifically, they are concerned with disclosure of their donation to government officials, and exhibit the "classic concern" that the government will "truncate their liberty." Schervish Dep. 170:24–172:16, 94:20–95:22; PX-160 at 4–26. They are reasonably concerned that the Attorney General is currently running for political office and "[i]n that profile, it is all too obvious that political agendas stand to influence how she and her colleagues now conduct themselves in office." Schervish Dep. 169:9–170:22; PX-160 at 25.

1    223.   The Attorney General's own expert witness admitted that state attorney

2  generals have political motivations.   He has written that "AG" often stands for

3  "aspiring governor."   Fishman Dep. 68:18–15.   "They are political people.   In

4  other words, they have to run for [office].   They want to move up."   Fishman Dep.

5  69:17–19; *see id.* at 71:22–72:1 ("[P]eople who are Attorneys General, usually that

6  office is an elective office so they are in public life and most politicians want to

7  move up . . . .").   "Political factors have become a factor in some cases" that a state

8  attorney general pursues.   Fishman Dep. 70:10–13.   For example, Dr. Fishman

9  acknowledged specific instances in New York and Pennsylvania where the state

10  attorney generals' political decisions involving charities were contrary to the best

11  interests of the public.   *See* Fishman Dep. 274:5–275:4 (agreeing that "principle

12  was trumped by politics" when Attorney General Eliot Spitzer failed to prevent

13  conversion of Empire Blue Cross Blue Shield into a for-profit corporation), 272:13–

14  19 (agreeing that the Pennsylvania Attorney General "took actions that were

15  contrary to the trust and beneficiaries' best interests in order to advance the Attorney

16  General's own agenda").

17    224.  The Foundation's donors have reasonably pointed specifically to

18  disclosure to the California Attorney General's offices as disturbing them and their

19  continuing decision to donate.   Donors have "consistently" expressed concern over

20  disclosure to the IRS or to other government entities, which includes the "the

21  Attorney General of California."   Phillips Dep. 270:5–25.   Many donors and

22  potential donors have told Mr. Fink, the Foundation's COO, that they fear

23  persecution for their association with the Foundation if their ties to the group

24  became known to the "government of California."   Fink Dep. 340:8–341:1.

225.   This concern with disclosure to the California Attorney General's office is reasonable, legitimate, and expected.   PX-160 at 24–25.   For example, California has falsely accused David and Charles Koch of close ties to the Center to Protect Patient's Rights, which had illicitly funneled dark money into California political campaigns.   PX-219; PX-220 (acknowledging the Charles and David Koch were not involved).   Years after California acknowledged in 2013 that Charles and David Koch were not involved in the scheme, PX-220, California still regularly receives news articles repeating its false statements about Charles and David Koch without correction.   *E.g.*, PX-400 (received Aug. 8, 2015); PX-401 (received Nov. 11, 2015); PX-402 (received Sep. 12, 2014); PX-403 (received Sep. 23, 2015); PX-404 (received Oct. 10, 2014).   California officials have participated on a campaign-finance listserv that has targeted conservative groups, and California, unlike other states, is aggressively seeking the names of donors to the Foundation and other conservative groups.   PX-406; Phillips Dep. 308:9–14.

226.   The litigation record in this case confirms donors' worst fears about the California Attorney General's office.   For example, the Foundation's witnesses have been harassed by irrelevant partisan questioning about whether they believe President Obama was born in the United States.   Fink Dep. 247:24–248:1.   They have also been subjected to endlessly irrelevant cross-examination regarding the Foundation's relationship with AFP, and AFP's alleged campaign-finance violations, as the Attorney General has sought to turn this case into an FEC investigation. *E.g.*, Bernson Dep. 138:7–150:13.   Finally, the California Attorney General has also used this case to seek discovery into the Foundation's donor base, including into donors not listed on the Foundation's Schedule B.   ECF 98 at 7.

227.   The Attorney General has also implied in its testimony and discovery responses that the Foundation's exercise of its rights in this litigation has raised suspicions and concerns about the Foundation within the California Attorney General's office.   Ibanez Dep. 209:8–210:6 ("You're suing us, so . . . that has put my suspicions somewhat on alert"); PX-394 (noting that "discovery in this litigation has raised questions about the Foundation's relationship with Americans for Prosperity and the legalities regarding financial transactions between the two) (Responses to the Foundation's Requests for Admission).   Ms. Ibanez, the Senior Assistant Attorney General in the Charitable Trusts Section, acknowledged that the Attorney General's suspicions "may" extend past the litigation.   Ibanez Dep. 210:16–21.

228.   Indeed, the Attorney General herself has been an outspoken critic of organizations related to the Foundation.   *See, e.g.*, PX-438 (YouTube video entitled "Kamala Harris Speaks at the 2011 California Democratic Convention").   She has not levied any similar criticism against organizations associated with the opposite side of the political spectrum.   The Attorney General is currently running as a Democrat for the United States Senate.   PX-435.   She also has close ties with President Barack Obama.   *See* PX-521 at 1 (during a stump speech, President Obama called Kamala Harris "a dear, dear friend of his"); PX-561 (Kamala Harris was a co-chair to President Obama's 2012 campaign).

229.   In her 2011 address to California Democrats, Attorney Kamala Harris, citing Wisconsin, where the Foundation was actively engaged, slams as "frankly outrageous" the attempt of an "extreme minority" to revisit the "fundamental . . .

1   right" to bargain collectively.   The Attorney General then vowed to "go on
2   offense" against proponents of Wisconsin-style policy reform.   PX-438.

3       230.   Attorney General Kamala Harris delivered an address to the April 2015
4   meeting of the Democracy Alliance, a cadre of wealthy donors who conceptualize
5   themselves as a countervailing force against Charles and David Koch.   The day
6   before she addressed the Democracy Alliance, the group had convened a panel to
7   strategize the defeat of the Koch brothers specifically.   PX-436 at 2–3.

8       231.   After securing the Democratic primary in her 2010 campaign for
9   Attorney General, Kamala Harris delivered a victory speech in San Francisco.   A
10  divisive issue on that year's ballot was Proposition 23, which sought to overturn an
11  environmental law.   Charles and David Koch contributed substantially to
12  an advertisement campaign in support of Proposition 23.   At her victory speech in
13  discussing her aspiration to respond to climate change, Kamala Harris specifically
14  called out and pledged to defeat the Texas oil companies (Charles and David Koch
15  operated an oil refinery with a location in Texas) behind Proposition 23.   PX-439.

16      232.   The Foundation and its donors have a legitimate fear of disclosure to
17  the California Attorney General because they see it as "a powerful partisan office."
18  Phillips Dep. 311:6–14.   The Attorney General herself is currently running for
19  Senate, and the Foundation's donors reasonably fear how she and her colleagues
20  will allow politics to influence their treatment of the Foundation and its donors.
21  PX-160 at 25; Phillips Dep. 311:6–14; *see also* PX-96.   As the Attorney General's
22  own expert witness acknowledged, some Attorney Generals have "pursued
23  particular cases or particular approaches based largely on politics."   Fishman Dep.
24  69:21–70:14.

233.   As the Foundation's Chief Operating Officer remarked, disclosure fears are heightened in states such as California, which donors "have recognized . . . tak[e] action against individuals for their social and political beliefs."   Fink Dep. 340:4–8.   The other aspect of this concern is that the California Attorney General, with her policies that are at best *ad hoc*, lacks a rigorous, comprehensive regime for protecting the confidentiality of nonpublic tax filings.   PX-529.   Moreover, the Attorney General has demonstrated that she does not take confidentiality breaches seriously. *Compare* PX-279 (prescribing no penalty whatsoever for Attorney General confidentiality breaches) *with* 26 U.S.C. §§ 7213(a)(2), 7431(a)(2) (defining civil and criminal penalties applicable to IRS confidentiality breaches).

234.   In addition, donors reasonably fear the prospect that the Attorney General's assurances of confidentiality will prove false or else hollow.   As is now undisputed, the Attorney General has been disclosing countless Schedule Bs to the public even while she was providing blithe, absolute, continuous assurances that there would never be any such disclosure.   In this circumstance, reasonable donors have every reason to believe that they cannot trust the Attorney General and that their identities and addresses will not be safe in her hands.

**G.   The Foundation's Charitable Activities Have Been Chilled by the Attorney General's Demand for Schedule B and Will Be Chilled Further if the Foundation Is Required To Disclose Its Schedule B**

235.   The Foundation's donors and contributions to the Foundation will be chilled if the Foundation is required to release names and addresses of its current donors to the California Attorney General's office.   *E.g.*, Fink Dep. 342:5–21 (noting that "we'd lose some" donors if the information was released to California); *see also* PX-160 at 26.   Already, some donors have ceased donating to the

1   Foundation, others have reduced their donations to the Foundation, and many

2   potential donors have declined to donate to the Foundation.   This donor chill has

3   already damaged the Foundation's ability to carry out its mission.

4       236.   Predictably, many of the Foundation's donors have ceased donating or

5   reduced their donations because they are concerned that their name will be disclosed

6   to the government or become publicly known.   *E.g.*, Spady Dep. 58:9–23.   For

7   example, three donors have ceased donating to the Foundation because of "concerns

8   that their name and association with [the Foundation] would affect their business

9   and their business interactions with the government."   Oelke Dep. 93:25–94:3,

10  95:16–20.   Other donors have told Mr. Fink that they would not contribute to the

11  Foundation because they did not want to get on the local government's "radar to be

12  targeted again."   Fink Dep. 368:12–369:2.   Donors have told Mr. Phillips that

13  they would no longer donate because they were afraid.   Phillips Dep. 282:4–283:6.

14  Finally, rather than stop giving entirely, other donors to the Foundation have cut

15  back their donations to avoid appearance on the Foundation's Schedule B.   Heaton

16  Dep. 258:14–259:3 (inquiry from a donor about the Schedule B reporting threshold).

17      237.   Many potential donors have similarly refrained from donating because

18  they are too fearful that their gifts would become known outside the organization.

19  Mr. Fink reported that "somewhere between a dozen and a couple dozen" potential

20  donors or donors have refused to contribute because they were afraid that their

21  contribution would become public.   Fink Dep. 214:25–215:6.   He further reported

22  that about fifty potential donors, including "close to a dozen" who live in California,

23  have told him that they would like to contribute to the Foundation, but are too

24  fearful of reprisal.   Fink Dep. 368:12–369:2.

1    238.   This chilling effect on donors has already affected the Foundation and

2    its activities.    Mr. Phillips, the Foundation's President, stated, "We have left a lot of

3    money . . . on the table that could have been with the Foundation, helping to achieve

4    our mission."    Phillips Dep. 322:19–323:3.    This chill has impacted the

5    Foundation's activities in California, such that it has not been able to reach as many

6    people and conduct as many activities as it would have otherwise.    Spady Dep.

7    85:12–86:14.

8                          **PROPOSED CONCLUSIONS OF LAW**

9    239.   The Court hereby makes the following conclusions of law and finds

10   that the Foundation has shown that the Attorney General is violating the First

11   Amendment by demanding the Foundation's Schedule B.    The Court hereby directs

12   entry of judgment for the Foundation and against the Attorney General on the

13   Foundation's facial and as-applied First Amendment challenges.

14   **I.      THIS COURT HAS JURISDICTION**

15   240.   This Court has subject-matter jurisdiction over this case under 28

16   U.S.C. §§ 1331, 1343.

17   241.   The Foundation has Article III standing to bring its First Amendment

18   and preemption claims.    It has long been established that an organization has

19   Article III standing to challenge a state's demand that the organization identify its

20   supporters.    *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 55 (1974); *Louisiana*

21   *ex rel. Gremillion v. NAACP*, 366 U.S. 293, 296 (1961); *NAACP v. Alabama ex rel.*

22   *Patterson*, 357 U.S. 449, 458–60 (1958); *ACLU of Nevada v. Heller*, 378 F.3d 979,

23   983–84 (9th Cir. 2004); *In re First National Bank*, 701 F.2d 115, 117–18 (10th Cir.

24   1983); *Familias Unidas v. Briscoe*, 619 F.2d 391, 398 n.7 (5th Cir. 1980).

## II. THE FOUNDATION PREVAILS ON ITS FIRST AMENDMENT CLAIMS

### A. The First Amendment

242.   The First Amendment expressly guarantees the freedom of speech, the freedom of the press, the right to assemble peaceably, and the right to petition the government for redress of grievances.   U.S. Constitution amendment I.

243.   The First Amendment applies to state officials by virtue of the Fourteenth Amendment.   *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1664 (2015); *NAACP v. Alabama*, 357 U.S. at 460 (1958); *Wolfson v. Concannon*, --- F.3d ----, 2016 WL 363202, at *1 (9th Cir. Jan. 27, 2016) (en banc).

244.   One aspect of the freedom of speech is the right to speak anonymously. *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995); *Talley v. California*, 362 U.S. 60, 64–65 (1960); *ACLU v. Heller*, 378 F.3d at 988; *Washington Initiatives Now v. Rippie*, 213 F.3d 1132, 1138 (9th Cir. 2000).

245.   The right to speak anonymously is essential to enable speakers who fear "economic or official retaliation" or a "threat of persecution" from those who dislike the speaker's message to contribute their speech to the marketplace of ideas without fear or inhibition.   *McIntyre*, 514 U.S. at 341–43; *accord Talley*, 362 U.S. at 64–65.

246.   A speaker's right to remain anonymous is equally important to those who are concerned about "social ostracism," to those who wish "to preserve as much of one's privacy as possible," as well as to those who believe that their "ideas will be more persuasive" if their identity is unknown so that listeners "will not

prejudge" their message "simply because they do not like its proponent." *McIntyre*, 514 U.S. at 341–43.

247.   Anonymous speech is not only accepted but celebrated in America. As "famously embodied in the Federalist Papers," which were published under the pseudonym "Publius," there is a long and "respected tradition of anonymity in the advocacy of political causes" in this country.   *McIntyre*, 514 U.S. at 343 & n.6.

248.   The freedom of speech also includes the right to engage in charitable solicitation.   *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 611–12 (2003); *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 787–89 (1988); *Secretary of State v. Joseph H. Munson Co.*, 467 U.S. 947, 959–61 (1984); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 628–633 (1980); *Gaudiya Vaishnava Society v. City & County of San Francisco*, 952 F.2d 1059, 1063 (9th Cir. 1991).

249.   Charitable solicitations are protected First Amendment speech because "solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues," and because funding is necessary to the continued survival of charitable organizations, so "without solicitation the flow of such information and advocacy would likely cease."   *Schaumburg*, 444 U.S. at 632.

250.   Implicit in the right to engage in activities protected by the First Amendment is a corresponding "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648–49 (2000); *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984); *Vasquez v. Rackauckas*, 734 F.3d 1025,

– 90 –

1043 (9th Cir. 2013); *White v. Lee*, 227 F.3d 1214, 1227 (9th Cir. 2000); *Brock v. Local 375, Plumbers International Union*, 860 F.2d 346, 349 (9th Cir. 1988).   This right is often called the "right of expressive association."   *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006); *Dale*, 530 U.S. at 644.

251.   The right of expressive association is fundamental because the right to speak or to engage in other First Amendment activities is often exercised most effectively by combining one's voice with the voices of others.   If the government could restrict the ability of individuals to join together and speak, it could essentially silence views that the First Amendment is intended to protect.   *Forum for Academic and Institutional Rights*, 547 U.S. at 68; *Roberts*, 468 U.S. at 622.

252.   The Supreme Court has invoked the right of expressive association to hold "laws unconstitutional that require disclosure of membership lists for groups seeking anonymity."   *Forum for Academic and Institutional Rights*, 547 U.S. at 69 (citation omitted).   "Although these laws did not directly interfere with an organization's composition, they made group membership less attractive," which raises "First Amendment concerns about affecting the group's ability to express its message."   *Id.*

253.   To invoke the right of expressive association, a group must engage in some form of expression.   *Dale*, 530 U.S. at 648; *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 797 n.2 (9th Cir. 2011).

254.   The Foundation engages in charitable, civic, educational, and fundraising activities.   *See* Proposed Findings of Fact § I.A, above.   Through these activities, the Foundation engages in expressive activity more than sufficient

to invoke the right of expressive association.   *See Roberts*, 468 U.S. at 612–13, 622, 626–27 (a group's charitable, civic, educational, and fundraising activities are all expressive activity protected by the right to expressive association).

### B.   The Attorney General's Demand for Schedule Bs Triggers First Amendment Scrutiny

255.   To safeguard First Amendment freedoms to speak anonymously, to solicit charitable donations, and to engage in expressive association, the First Amendment gives nonprofit organizations such as the Foundation the right to maintain confidentiality over the names of those who belong or contribute to the organization, absent a compelling governmental interest requiring disclosure.   To vindicate this right, the Supreme Court has repeatedly struck down state requirements compelling an organization to divulge a roster of its supporters. *Pollard v. Roberts*, 393 U.S. 14 (1968), *affirming* 283 F. Supp. 248 (E.D. Ark. 1968) (three-judge panel); *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963); *Gremillion*, 366 U.S. at 296 (1961); *Bates v. City of Little Rock*, 361 U.S. 516 (1960); *NAACP v. Alabama* , 357 U.S. at 458–60.

256.   "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective restraint on freedom of association."   *NAACP v. Alabama*, 357 U.S. at 462.   First Amendment freedoms are "delicate and vulnerable" and "need breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963).   Forcing an advocacy group to identify its supporters is akin to a "requirement that adherents of particular religious faiths or political parties wear identifying arm-bands."   *Id.* (quoting *American Communications Ass'n v. Douds*, 339 U.S. 382, 402 (1950)).   Such compulsion has

1  a "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined

2  rights of free speech, expression, and association"—especially when the targeted

3  group espouses "unpopular" beliefs.   *Gibson*, 372 U.S. at 557.

4     257.   It is just as noxious for a state to compel disclosure of an organization's

5  *donors* as it is for the state to compel disclosure of the organization's *members*.   In

6  this context, the Supreme Court has "not drawn fine lines between contributors and

7  members," but has instead "treated them interchangeably."   *Buckley v. Valeo*, 424

8  U.S. at 1, 66 (1976).

9     258.   Accordingly, a state's requirement that an organization identify the

10  names and addresses of its supporters is constitutional under the First Amendment

11  only if it passes "exacting scrutiny."   *Americans for Prosperity Foundation v.*

12  *Harris*, 809 F.3d 536, 538 (9th Cir. 2015); *Center for Competitive Politics v. Harris*,

13  784 F.3d 1307, 1312 (9th Cir. 2015).   The Supreme Court has framed this test as

14  the "closest scrutiny."   *Buckley v. Valeo*, 424 U.S. at 25; *NAACP v. Alabama*, 357

15  U.S. at 460–61.

16     259.   It is in part to protect these First Amendment interests that federal tax

17  law expressly provides that 501(c)(3) nonprofit organizations are "not required to

18  publicly disclose their donors."   *McCutcheon v. FEC*, 134 S. Ct. 1434, 1460 (2014)

19  (plurality opinion) (citing 26 U.S.C. § 6104(d)(3)(A)).

20     260.   Under exacting scrutiny, the Government bears the burden of showing

21  that there is "a substantial relation between the disclosure requirement and a

22  sufficiently important governmental interest."   *Citizens United v. FEC*, 558 U.S.

23  310, 366 (2010) (quoting *Buckley v. Valeo*, 424 U.S. at 64, 66).

24

261.   What constitutes a *sufficiently* important interest fluctuates depending on context:   "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."   *Davis v. FEC*, 554 U.S. 724, 744 (2008).

262.   In this case, the Attorney General must prove that she has a "compelling interest" in demanding Schedule B.   When, like here, the government demands the names and addresses of contributors to a private advocacy group, there is a "significant encroachment upon personal liberty" such that "the State may prevail only upon showing a subordinating interest that is compelling."   *Bates*, 361 U.S. at 524; *accord Gibson*, 372 U.S. at 546, 555, 557; *NAACP v. Alabama*, 357 U.S. at 463.

263.   The reason why the burden is on the Attorney General to satisfy such a high threshold is that the compelled disclosure of the identities of an organization's supporters is inherently harmful.   As the Supreme Court has noted, "we have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."   *Buckley v. Valeo*, 424 U.S. at 64.   Many cases have struck down disclosure requirements, even when the challengers presented no evidence of actual harm, simply because the potential chilling effect of forced disclosure of the identities of a group's supporters is itself First Amendment injury.   *See Pollard*, 283 F. Supp. at 258, *affirmed*, 393 U.S. 14; *Talley*, 362 U.S. at 64–65; *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 119–20 (3d Cir. 1987); *Boorda v. Subversive Activities Control Board*, 421 F.2d 1142, 1148 & n.20 (D.C. Cir. 1969); *see also ACLU v. Clapper*, 785 F.3d 787, 802–03 (2d Cir. 2015) (the "potential 'chilling effect'" of

governmental collection of data about an organization's members is itself a "concrete, fairly traceable, and redressable injury").

264.   To establish that her Schedule B requirement passes exacting scrutiny, the Attorney General must show that it is "the least restrictive means" to achieve her compelling interest.   *McCutcheon*, 134 S. Ct. at 1444; *Buckley v. Valeo*, 424 U.S. at 68; *Perry v. Schwarzenegger*, 591 F.3d 1147, 1161 (9th Cir. 2010); *Dole v. Service Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1461 (9th Cir. 1991); *Brock*, 860 F.2d at 350; *Wilson v. Stocker*, 819 F.2d 943, 949 (10th Cir. 1987); *Clark v. Library of Congress*, 750 F.2d 89, 94 (D.C. Cir. 1984); *Familias Unidas*, 619 F.2d at 399.   The Supreme Court has long held that a State, when it encroaches on associational freedoms, "may not choose means that unnecessarily restrict constitutionally protected liberty."   *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973).   A government demand that an organization release its donor list must be "narrowly drawn to prevent the supposed evil."   *Gremillion*, 366 U.S. at 296.   Disclosure demands are unconstitutional if they use "means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."   *Shelton v. Tucker*, 364 U.S. 479, 488 (1960).

265.   In recent years, most Supreme Court and Ninth Circuit decisions applying exacting scrutiny did so in the context of campaign finance.   *See Center for Competitive Politics*, 784 F.3d at 1312 n.2 ("most of the cases in which we and the Supreme Court have applied exacting scrutiny arise in the electoral context"); *e.g.*, *Citizens United*, 558 U.S. 310; *Doe v. Reed*, 561 U.S. 186 (2010); *Davis*, 554 U.S. 724; *Buckley v. Valeo*, 424 U.S. 1; *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520 (9th Cir. 2015) (en banc); *Family PAC v.*

*McKenna*, 685 F.3d 800 (9th Cir. 2012); *Human Life of Washington, Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010).   In the electoral context, unique considerations apply that alter the application of exacting scrutiny.   There are such substantial governmental interests in "'provid[ing] the electorate with information" about the sources of election-related spending, in "deter[ring] actual corruption," in "avoid[ing] the appearance of corruption," and in "gathering the data necessary to detect violations of . . . contribution limits," that the Supreme Court has held that campaign-finance disclosure requirements are virtually *per se* "the least restrictive means" of achieving the government's interests.   *Buckley v. Valeo*, 424 U.S. at 66–68.

266.   Thus, when those cases include statements like "exacting scrutiny is not a least-restrictive-means test," that is true only for the application of exacting scrutiny in the campaign-finance context.   As the Ninth Circuit has recognized, the application of exacting scrutiny in these election cases is *sui generis* and "readily distinguishable" from this case, where the Attorney General's Schedule B disclosure requirement has nothing to do with campaign finance, and there is no substantial governmental interest in publicly disclosing the identities of the sources of election-related spending.   *Americans for Prosperity Foundation*, 809 F.3d at 538.

267.   In sum, to survive First Amendment scrutiny, the Attorney General bears the burden of showing that her demand for Schedule B is substantially related to a compelling interest, including by being the least restrictive means of achieving that interest.

268.   In the First Amendment context, a law will be deemed facially unconstitutional if 'a substantial number of its applications are unconstitutional,

judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

269.   Even if the Attorney General shows that her Schedule B disclosure requirement is facially constitutional, a particular organization will nonetheless prevail in an as-applied First Amendment challenge if it "can show a 'reasonable probability' that the compelled disclosures will subject those identified to 'threats, harassment, or reprisals.'"   *Brown v. Socialist Workers '74 Campaign Committee (Ohio)*, 459 U.S. 87, 92 (1982) (quoting *Buckley v. Valeo*, 424 U.S. at 74); *accord Center for Competitive Politics*, 784 F.3d at 1317.

### C.   The Foundation Prevails on Its Facial Challenge

270.   The Foundation has proven that the Attorney General's demand that all charities submit Schedule Bs is facially unconstitutional.   The Attorney General has failed to carry her burden of proving that her demand for Schedule Bs is substantially related to a compelling interest, including by being the least restrictive means of achieving that interest.   Accordingly, a "substantial number" of the applications of this Schedule B demand are unconstitutional—indeed all of them are unconstitutional—when judged in relation to the "plainly legitimate sweep" of the Schedule B demand.   *Stevens*, 559 U.S. at 473 (citation omitted).

271.   The Attorney General lacks a compelling interest because her demand for the Schedule Bs of charities is not authorized by California law.   The Supervision Act expressly states the limited circumstances in which the Attorney General can demand the names and addresses of donors for purposes of regulating charities.   For example, California Government Code § 12599.7(a)(1) authorizes

the Attorney General to demand "the names and mailing address" of each noncash contributor who donates to a commercial fundraiser as a result of a solicitation campaign.   The Attorney General has identified the basis of her demand for Schedule B as a different provision of the Supervision Act:   California Government Code § 12586.   *See* PX-31 (October 29, 2014, demand letter to the Foundation); PX-42; PX-43; PX-44; PX-128 (form letter); PX-199; PX-200; PX-201; PX-202. Section 12586(b) empowers the Attorney General to set rules and regulations establishing the "contents" of the periodic report, § 12586(b), so long as the required contents are limited to "information as to the nature of the assets held for charitable purposes and the administration thereof," § 12586(a).   Unlike § 12599.7(a)(1), nothing in § 12586 authorizes the Attorney General to demand the names and addresses of donors.   The Legislature's decision to include language in one section of a statute but omit it from a neighboring section signifies its intent. *Mississippi ex rel. Hood v. AU Optronics*, 134 S. Ct. 736, 742 (2014); *Sebelius v. Cloer*, 133 S. Ct. 1886, 1894 (2013); *Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 687–88 (2012); *Red Lion Hotels Franchising, Inc. v. MAK, LLC*, 663 F.3d 1080, 1089–90 (9th Cir. 2011); *National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043, 1054 n.7 (9th Cir. 2000); *Gikas v. Zolin*, 863 P.2d 745, 752 (Cal. 1993); *Clark v. Burleigh*, 841 P.2d 975, 984 (Cal. 1992). By intentionally limiting § 12586(a) to authorize periodic reports concerning only the "nature" or "administration" of assets but not the "name and mailing address" of the donors of those assets, California's Legislature has foreclosed the Attorney General's ability to demand Schedule Bs from all charities as a condition of their annual registration.

272.   Further support for this conclusion comes from another provision of the Supervision Act: California Government Code § 12595.   The Supervision Act is a uniform statute that was adopted by four states: California, Illinois, Michigan, and Oregon.   *See* Proposed Findings of Fact ¶ 13, above.   Section 12595 provides that the Supervision Act "shall be so construed to effectuate its general purpose to make uniform the law of those states which enact it." This language requires courts interpreting the Supervision Act to "strive to achieve uniformity with sister states when possible." *General Motors Corp. v. Franchise Tax Board*, 139 P.3d 1183, 1992 (Cal. 2006).   Each of the three others states that adopted the uniform act—Illinois, Michigan, and Oregon—specifically instruct charities *not* to file Schedule B as part of their annual registration renewals.   *See* Proposed Findings of Fact ¶ 31, above. Section 12595 of the Supervision Act envisions uniformity with Illinois, Michigan, and Oregon on this point.   That uniformity is achieved under the plain-language reading of § 12586(a), which limits the contents of periodic reports to information concerning the "nature" and "administration" of assets, rather than the names and mailing addresses of the donors of those assets.

273.   Because California law does not authorize the Attorney General's demand for Schedule B, she has no legitimate interest, let alone a "compelling interest," in requiring charities to submit Schedule B, and her Schedule B disclosure requirement lacks a "plainly legitimate sweep."

274.   The Attorney General further fails to justify her demand for names and addresses of all the Foundation's donors on Schedule B rather than just the Californian donors.   The Attorney General has argued that she collects nationwide Schedule B information "to identify possible wrongdoing and *refer matters to other*

1    *state and federal agencies*." That is a wholly illegitimate aim. The jurisdiction of

2    California and its officials is confined to California. *See* California Constitution

3    art. V, § 13. California has no legitimate interest, let alone a *compelling* interest, in

4    equipping itself as the United States' police force for charities.

5        275. The Attorney General's blanket demand for Schedule B also does not

6    bear a substantial relation to her articulated interest. The Foundation has proven

7    that Schedule B is inconsequential to the Attorney General's audits and

8    investigations of charities; indeed, the Attorney General never even looks at most of

9    the Schedule Bs she is able to collect, not least because other records, such as Form

10   990 and Form RRF-1 supply information much more important to the Attorney

11   General's supervision of charities. *See* Proposed Findings of Fact § II.E, above.

12   Over the past 10 years, at most only 1.4% of the investigations (5 of 360) carried out

13   by the Attorney General's Charitable Trust Section have implicated Schedule B, and

14   even when Schedule B has been implicated, the relevant information always could

15   have been obtained from sources other than Schedule B. *See* Proposed Findings of

16   Fact ¶¶ 62, 66, above. A demand that *tens of thousands* of charities submit

17   confidential donor information *each year* just to facilitate a mere *five* investigations

18   over a *10-year period*, especially when all of that information is available from other

19   sources pursuant to particularized audit letters or subpoenas, is not a compelled

20   disclosure "substantially related" to any government interest.

21       276. Evidence from other states confirms that Schedule B is unnecessary to

22   regulate charities properly. All state attorneys general posses a law-enforcement

23   interest in protecting their citizens from fraudulent or illegal behavior by nonprofit

24   organizations. Yet forty-eight of the fifty other states (counting the District of

Columbia) do not specifically require charities to file Schedule B—indeed, many of these states explicitly instruct charities *not* to file Schedule B.   *See* Proposed Findings of Fact ¶ 32 and accompanying chart.   In particular, the three states that have adopted the same uniform statute for regulating charities that California adopted—Illinois, Michigan, and Oregon—expressly tell charities not to file Schedule Bs.   *See* Proposed Findings of Fact ¶ 31.   If Schedule B were important to preventing fraud or illegality by charities, then 48 other jurisdictions would not forgo collection of it.   Or if there were some particular quirk in California's Supervision Act that made Schedule B important to the supervision of charities, then Illinois, Michigan, and Oregon, which have adopted the same uniform statute, would not forgo it.   The fact that so many other states—including the three states with the regulatory schemes most comparable to California's—do not specifically require submission of Schedule B demonstrates that Schedule B is not substantially related to a compelling governmental interest in preventing fraud or illegality by charities or in enforcing the laws governing the supervision of charities.

277.   On the other side of the equation, the Foundation has proven that compelled disclosure of Schedule Bs to the Attorney General will have a significant chilling effect on donors.   *See* Proposed Findings of Fact § IV, above.   The risk of harm is greatly exasperated by the Attorney General's inability—both as a matter of California law and as a matter of fact—to keep confidential the Schedule Bs that charities file with her.   *See* Cal. Gov. Code § 12590; Cal Code Regs., tit. 11, § 310; *Americans for Prosperity Foundation*, 809 F.3d at 542; Proposed Findings of Fact § III, above.   More so in California than in other parts of the country, donors have been attacked by the public for contributing to controversial causes.   *See* Proposed

Findings of Fact ¶ 187.   Compelling charities to submit Schedule Bs to the Attorney General would thus severely infringe First Amendment freedoms for thousands of donors to thousands of charities, as those Schedule Bs will be available to public and will likely result in attacks on donors, especially those who support controversial causes.

278.   In a belated attempted to rectify some of this harm, the Attorney General proposed for the first time in December 2015 to amend her existing regulations to exempt Schedule B from California's public-disclosure requirement. *See* Proposed Findings of Fact § III.P.   That proposed rulemaking is still in its incubation period—it is not final.   As a mere *proposed* rulemaking, it has "no legal effect."   *Center for Food Safety v. Vilsack*, 718 F.3d 829, 843 (9th Cir. 2013); *accord, e.g.*, *Eustace v. Commissioner of Internal Revenue*, 312 F.3d 905, 908 (7th Cir. 2002); *Sweet v. Sheahan*, 235 F.3d 80, 87 (2d Cir. 2000).   Unless and until a proposed regulatory amendment becomes law, it is "the current regulation," not the proposed amendment, that "remains binding."   *Santomenno ex rel. John Hancock Trust v. John Hancock Life Insurance Co.*, 768 F.3d 284, 298 (3d Cir. 2014). Accordingly, the Attorney General's proposed rulemaking lacks the force of law and cannot establish that she keeps Schedule Bs confidential.   To the contrary, her proposed adoption of a confidentiality regulation in response to this litigation well confirms that there is no such legal assurance of confidentiality under California law as it currently exists, and that the Attorney General herself recognizes as much.

279.   One further important consideration is that the Attorney General has numerous alternatives available for achieving her goals of enforcing the law and supervising charities without demanding that all charities submit Schedule B

annually as part of their registration renewal.   *See* Proposed Findings of Fact § II.G, above.   In particular, the Attorney General could (1) request Schedule B from charities only when reasonably necessary for a complaint or investigation that puts donor information at issue; (2) when requesting Schedule B, limit the request to only those portions of Schedule B necessary to resolve the particular complaint or investigation at issue; (3) adopt a regulation that exempts Schedule B from California's public-disclosure requirement; and (4) adopt more stringent protocols (such as those of the IRS) to protect the confidentiality of Schedule B in practice. *See id.*   These alternatives would enable the Attorney General to achieve her goals while drastically cutting back on the infringement of First Amendment freedoms of nonprofit organizations and donors.

280.   The Attorney General has proposed a new rulemaking that is a gesture towards implementing alternative (3).   But there are significant doubts about the legality and efficacy of that proposed rulemaking.   *See* Proposed Findings of Fact § III.P, above.   Moreover, the proposed rulemaking has not yet been adopted, so it lacks the force of law.   *See* Proposed Conclusions of Law ¶ 278, above.

281.   The Attorney General has refused to implement alternatives (1), (2), and (4), contending that it is more efficient to require Schedule B to be submitted by each charity as part of its annual registration renewal rather than requesting it on a case-by-case basis when it is needed.   *See* Proposed Findings of Fact ¶ 86, above. As a matter of a fact, these alternatives do not appear to be less efficient.   The Attorney General has no need to collect Schedule Bs from all charities; most simply go unread, collecting dust on bookshelves and in computer files.   *See* Proposed Findings of Fact § II.E.1.   Moreover, it appears that the Attorney General would

save significant time and money by switching to requesting Schedule B on a need-to-know basis.   It is already the Attorney General's uniform practice at the outset of any audit or investigation to issue an audit letter or administrative subpoena requesting records and information from the affected charity or charities.   It would be a negligible cost for the Attorney General, in appropriate cases, to add a tailored request for Schedule B information to such records requests.   Indeed, given that the Attorney General has sent around *8,000* Schedule B deficiency letters over the past *five years* demanding that particular charities submit a Schedule B for their annual registration renewal, *see* Proposed Findings of Fact ¶ 48, and given that over the past *ten years* the Attorney General has used a Schedule B in no more than five cases (*i.e.*, once every two years), *see* Proposed Findings of Fact ¶ 62, it appears that it would be *less* costly for the Attorney General to demand Schedule B on an as-needed basis once every two years, as that would save the cost of issuing thousands of needless Schedule B deficiency letters.   The Attorney General would also save the time and expense of attempting to separate out by hand every Schedule B so that it can be maintained confidentiality and of policing for inadvertent disclosures of Schedule B.   *See* Proposed Findings of Fact § III.B.

282.   In any event, "efficiency" is not a valid justification to trample First Amendment interests.   As the Supreme Court explained when rejecting another state's effort to regulate charities in a manner the state deemed efficient for combating fraud but that intruded on First Amendment rights:   "If this is not the most efficient means of preventing fraud, we reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency." *Riley*, 487 U.S. at 795 (citing *Schaumburg*, 444 U.S. at 639; *Schneider v. State*, 308

U.S. 147, 164 (1939)); *accord, e.g.*, *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2824 (2011).   The Attorney General's failure to adopt readily available less-restrictive alternatives to her Schedule B disclosure requirement is yet further confirmation that this disclosure requirement is not substantially related to a compelling government interest.

283.   In sum, in light of (1) the lack of authorization under California law to demand Schedule Bs, (2) the lack of an interest in obtaining information about donors outside the state of California, (3) the uselessness of Schedule Bs to the Attorney General's supervision of charities, (4) the fact that 48 other jurisdiction do not specifically require Schedule B, (5) the severe chill that compelled disclosure of Schedule B will have on thousands of charities and donors (driven in part by the Attorney General's inability to keep Schedule B confidential), and (6) the availability of effective alternatives that are less destructive of First Amendment rights, the Attorney General has failed to prove that her Schedule B disclosure requirement is substantially related to a compelling interest.

284.   There is an important counterargument to address.   In *Center for Competitive Politics v. Harris*, the Ninth Circuit held that the Attorney General's Schedule B disclosure requirement bears a substantial relation to a sufficiently important government interest.   784 F.3d at 1317.   Without engaging in further analysis, the Ninth Circuit repeated that holding in *Americans for Prosperity Foundation v. Harris*, 809 F.3d at 538.   These holdings are not binding on this Court.   Both *Center for Competitive Politics* and *Americans for Prosperity Foundation* involved appeals concerning the propriety of a preliminary injunction; as such, they were necessarily confined to the minimal factual records available at

the preliminary-injunction phase of those cases, rather than the full-fledged trial record now available to this Court.   *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (noting that preliminary injunctions are usually decided "on the basis of . . . evidence that is less complete than in a trial on the merits"); *Southern Oregon Barter Fair v. Jackson County*, 372 F.3d 1128, 1136 (9th Cir. 2004) ("decisions on preliminary injunctions are just that—preliminary—and must often be made hastily and on less than a full record").   Precisely because such records are inherently incomplete, it is black-letter law that Ninth Circuit "decisions at the preliminary injunction phase" are not binding on any questions of fact or mixed questions of fact and law; they are binding only for "conclusions on pure issues of law" where the facts are irrelevant.   *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Department of Agriculture*, 499 F.3d 1108, 1114 (9th Cir. 2007); *accord Southern Oregon*, 372 F.3d at 1136.   Whether a mandatory disclosure requirement is substantially related to a compelling interest is a mixed question of fact and law—the facts on the ground are essential to deciding whether an interest is "compelling" and whether a relationship is "substantial."   *See California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1107 (9th Cir. 2003) (whether a government interest is compelling depends on the "factual record").   On the basis of the trial record, the Attorney General has failed to establish that her demand for the Schedule Bs of all charities operating in California is substantially related to a compelling interest, including by being the least restrictive means of achieving that interest.

285.   Accordingly, the Foundation prevails on its First Amendment facial challenge.

### D.    The Foundation Prevails on Its As-Applied Challenge

286.   For the same reasons that the Attorney General has not proven that her requirement that all charities submit their Schedule Bs is substantially related to a compelling interest, including by being the least restrictive means of achieving that interest, she also has not proven that her specific demand that the Foundation submit its Schedule Bs is substantially related to a compelling interest.

287.   In fact, the absence of a substantial relationship between the Attorney General's Schedule B disclosure requirement and a compelling interest is even more pronounced with respect to the Foundation's as-applied challenge.    To establish the "substantial relationship" needed to satisfy exacting scrutiny in an as-applied challenge, the Attorney General must supply a justification for her disclosure tailored to the *specific* organization at issue.    *Gibson*, 372 U.S. at 554–58; *Bates*, 361 U.S. at 525–27; *NAACP v. Alabama*, 357 U.S. at 464–65; *United States v. Mayer*, 503 F.3d 740, 748 (9th Cir. 2007).    A generic law-enforcement interest does not suffice; the Attorney General must have an articulable reason, "tailored" to the specific nonprofit organization at issue, to take action that would impair a specific organization's First Amendment rights to engage in charitable solicitation, expressive association, and anonymous speech.    *Madigan*, 538 U.S. at 617–19.

288.   Before issuing her Schedule B demands to the Foundation, the Attorney General did not allege or even suspect the Foundation of engaging in any wrongdoing whatsoever (and certainly not in the limited categories of wrongdoing she claims Schedule B is useful for investigating).    *See* Proposed Findings of Fact § II.F, above.    Under the heightened scrutiny applicable here, a state's alleged interest "must be genuine, not hypothesized or invested *post hoc* in response to

litigation." *United States v. Virginia*, 518 U.S. 515, 533, 535–36 (1996).   The Attorney General's utter lack of any suspicion of wrongdoing by the Foundation establishes that she has failed to prove there is a substantial relationship between her particular demand for the Foundation's Schedule B and any interest she has in enforcing the law.

289.   Setting aside the Attorney General's failure to satisfy exacting scrutiny of her demand for the Foundation's Schedule B, the Foundation would independently prevail on its as-applied challenge because it is has proven that disclosing its Schedule B to the Attorney General would create a reasonable probability of threats, harassment, or reprisals against the Foundation and its donors. *See* Proposed Findings of Fact § V, above.

290.   In particular, the Foundation has proven that its employees, supporters, and donors regularly experience threats, harassment, intimidation, and retaliation once their support for, and affiliation with, the Foundation becomes known.   *See* Proposed Findings of Fact § V.D, above.   Although the Attorney General claims that she would keep confidential any Schedule B the Foundation files with her, the Foundation has proven that is untrue both as a matter of law, *see* Cal. Gov. Code § 12590; Cal Code Regs., tit. 11, § 310; *Americans for Prosperity Foundation*, 809 F.3d at 542, and as a matter of fact, *see* Proposed Findings of Fact § III, above.   A charity that submits a Schedule B to the Attorney General faces a substantial and material risk that the Attorney General will make that Schedule B public, either on the Internet or through other means.   Once disclosed online, it is extremely difficult, if not impossible, to undo the disclosure.   Accordingly, the Foundation has proven that submitting its Schedule B to the Attorney General would create a

1    reasonable probability of threats, harassment, or reprisals by the public against its

2    donors.   Indeed, because the Attorney General's blithe assurances of confidentiality

3    have proved hollow in fact, reasonable donors have every good reason not to trust in

4    such assurances moving forward and to understand that disclosure of their identities

5    to the Attorney General entails unacceptable and uncontrollable risks of public

6    disclosure.

7        291.   Some of the evidence the Foundation relies on to prove the threats,

8    harassment, and reprisals against its donors concerns conduct outside the State of

9    California or conduct targeted at supporters of groups that are related to, but

10   different than, the Foundation, such as Americans for Prosperity (the 501(c)(4)

11   organization).   Although the Attorney General suggests that such evidence is out of

12   place, the law firmly supports consideration of these materials in assessing the

13   extent of the harm the Foundation faces from disclosing its Schedule B.   The

14   Supreme Court has held that, in First Amendment challenges to the compelled

15   disclosure of donor names, parties "must be allowed sufficient flexibility in the

16   proof of injury to assure a fair consideration of their claim." *Buckley v. Valeo*, 424

17   U.S. at 74.   This evidentiary flexibility allows the Foundation to rely both on

18   evidence of threats from other states, *see Brown*, 459 U.S. 100–01 & n.20, and

19   evidence of threats against similar-but-different groups, *see id.* at 101 n.20.

20   Indeed, because the public rarely distinguishes between the Foundation (the (c)(3)

21   entity) and Americans for Prosperity (the (c)(4) entity), *see, e.g.*, Fink Dep. 141:10–

22   15, it makes perfect sense to construe threats against either organization as threats

23   against both.

24

292.   The Foundation has also proven that disclosing Schedule B to the Attorney General alone, even without further dissemination to the public, creates a reasonable probability of threats, harassment, or reprisals against the Foundation and its donors by California officials.   *See* Proposed Findings of Fact § V.F, above. As the Ninth Circuit has explained, "it is certainly true that non-public disclosures [to state officials] can still chill protected activity where a plaintiff fears the reprisals of a government entity.   *Center for Competitive Politics*, 784 F.3d at 1316; *accord, e.g.*, *Shelton*, 364 U.S. at 486–87 (holding that a compelled disclosure to only the government violated the First Amendment).   This is thus another independent reason to find that the Foundation has prevailed on its as-applied First Amendment claim.

293.   In *Americans for Prosperity Foundation v. Harris*, the Ninth Circuit concluded that the Foundation had not proven "any actual burden on its First Amendment rights."   809 F.3d at 541.   This holding does not preclude this Court from finding that the evidence the Foundation now advances does suffice to prove an actual burden on its First Amendment rights.   The question of whether the Foundation has proven an actual burden on its First Amendment rights requires a fact-intensive inquiry into whether the Foundation has shown that forced disclosure of its Schedule B to the Attorney General "will chill participation or result in harassment of its donors by the state or public."   *Id.* at 539–40.   When it weighed the propriety of the preliminary injunction, the Ninth Circuit did not have the benefit of the expansive factual record of First Amendment harm that the Foundation has assembled for trial.   *See Camenisch*, 451 U.S. at 395 (noting that preliminary injunctions are usually decided "on the basis of . . . evidence that is less complete

than in a trial on the merits"); *Southern Oregon*, 372 F.3d at 1136 ("decisions on preliminary injunctions are just that—preliminary—and must often be made hastily and on less than a full record").   As noted above, because of the incomplete record, it is black-letter law that Ninth Circuit decisions at the preliminary injunction phase are not binding on any questions of fact or mixed questions of fact and law. *Ranchers Cattlemen*, 499 F.3d at 1114 ; *accord Southern Oregon*, 372 F.3d at 1136. On the basis of the trial record, the Foundation has presented evidence sufficient to prove that compelled disclosure of its Schedule B to the Attorney General constitutes an actual burden on its First Amendment rights.   The trial record is especially compelling on this point considering that the Attorney General in this case has gone after the Foundation in ways and for reasons that bear no fair relation to the Schedule Bs at issue and are explicable only by animus towards the plaintiff organization and the views it espouses.

294.   Accordingly, the Foundation prevails on its First Amendment as-applied challenge.

### III.   THE FOUNDATION SHOULD PREVAIL ON ITS PREEMPTION CLAIM BUT IT IS FORECLOSED BY CIRCUIT LAW

295.   The Ninth Circuit previously rejected the Foundation's preemption claim, holding that 26 U.S.C. § 6104 "does not so clearly manifest the purpose of Congress that we could infer from it that Congress intended to bar state attorneys general from requesting the information contained in Form 990 Schedule B." *Center for Competitive Politics*, 784 F.3d at 1319.   This conclusion of law by the Ninth Circuit is binding on this Court.   Nevertheless, the Foundation respectfully contends that the Ninth Circuit's decision on this issue was incorrect.   The

1  Foundation accordingly proposes the following conclusions of law related to

2  preemption in order to preserve and facilitate its right to appeal.

3      296.  Under federal tax law, nonprofits "are not required to publicly disclose

4  their donors."  *McCutcheon*, 134 S. Ct. at 1460.  A nonprofit charity must make

5  "available to the public" every part of its tax return *except* for the "name or address

6  of any contributor" to the organization.  26 U.S.C. § 6104(b).  The IRS cannot

7  publish an organization's Schedule B, *see* § 6104(b), and the charities themselves

8  need not publish their donor information, see § 6104(d)(3)(A).  Congress was clear

9  in exempting "the name or address of any contributor"—*i.e.*, the information in

10  Schedule B—from the requirement that charities make public their own tax returns.

11  *See* § 6104(d)(3)(A).

12      297.  Congress was equally clear in § 6104(c)—entitled "Publication to State

13  officials"—about when and how state charity regulators could obtain additional

14  nonpublic information about an organization's tax return.  Congress limited the

15  circumstances under which state officials who regulate charities might access

16  charities' nonpublic federal tax information. Specifically, Congress provided in

17  § 6104 that state charity regulators can obtain from the IRS the nonpublic tax

18  returns—including Schedule B—of charitable organizations *other* than 501(c)(3)

19  organizations, such as the Foundation. § 6104(c)(3).

20      298.  The Attorney General now attempts to circumvent this regime by

21  demanding from the Foundation the very same Schedule B that Congress has

22  expressly authorized the Foundation to keep to itself and has expressly prevented

23  California from obtaining from the IRS.  Such an end-run around the statute

24

FOUNDATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

"frustrate[s] federal policies" and is therefore preempted.   *Arizona v. United States*, 132 S. Ct. 2492, 2503 (2012).

299.   By comprehensively addressing when an organization's tax return is to be made public or shared with state charity regulators, § 6104 signifies Congress's clear intent to preempt contrary disclosure requirements, including the instant one from the California Attorney General.   Otherwise, § 6104 would be substantively negated: States could circumvent it at their whim simply by demanding from 501(c)(3) organizations the very same Schedule Bs that Congress shielded against disclosure and prohibited States from obtaining from the IRS.   The "ultimate touchstone" in a preemption challenge is "the clear and manifest purpose of Congress."   *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). The comprehensive provisions of § 6104 show Congress intended to preclude release of federal tax returns containing a nonprofit's donor information to the state, absent an express state legal regime requiring it.

## IV.   THE ATTORNEY GENERAL HAS ABANDONED HER AFFIRMATIVE DEFENSES

300.   The Attorney General pleaded five affirmative defenses in her Answer. ECF 34 at 7–8.   In the proposed pretrial order, the Attorney General announced that she no longer would "pursue any affirmative defense."   ECF 127 at 5. Accordingly, these affirmative defenses are dismissed as abandoned.   *See J & J Sports Products v. Zambrano*, 2015 U.S. Dist. Lexis 73999, at *3 (N.D. Cal. June 8, 2015) (dismissing abandoned affirmative defenses).

## V.    THE FOUNDATION IS ENTITLED TO INJUNCTIVE AND DECLARATORY RELIEF

301.   Because the Foundation has prevailed on its First Amendment facial and as-applied challenges, it is entitled to declaratory and injunctive relief. Equitable relief "has long been recognized" as appropriate to prevent government officials from acting unconstitutionally.    *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 491 n.2 (2010) (quoting *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001)).    Injunctive relief is particularly appropriate to prevent state officials from violating the First Amendment by compelling the disclosure of the names of an organization's supporters.    *See Brown*, 492 U.S. at 101–02 (affirming such an injunction).

302.   A "plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."    *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).    Specifically, the plaintiff "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."    *Id.*    Each of these factors points in favor of an injunction here.

303.  The Foundation has suffered irreparable harm.    The Attorney General's requirement that charities submit Schedule B chills the exercise of the First Amendment freedoms to speak anonymously, to solicit charitable donations, and to engage in expressive association.    Among other things, the Schedule B disclosure requirement places donors in fear of exercising their First Amendment

right to support charity groups engaged in expressive activity, the effect of which is to diminish the amount of expressive and associational activity by charitable organizations.   Any "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury."   *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *accord, e.g.*, *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013); *Sanders County Republican Central Committee v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012); *Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128 (9th Cir. 2011); *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009).   In particular, the government causes "irreparable injury" when, like here, it places individuals "in fear of exercising their constitutionally protected rights of free expression, assembly, and association."   *Allee v. Medrano*, 416 U.S. 802, 814–15 (1974).

304.   The Foundation's irreparable First Amendment injuries cannot adequately be compensated by damages or any other remedy available at law. Unlike a monetary injury, violations of the First Amendment "cannot be adequately remedied through damages."   *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

305.   The balance of hardships also favors granting an injunction.   Once the Foundation's donor information is disclosed, it cannot be retracted.   Thus, if the Attorney General is allowed to compel the Foundation to disclose its Schedule B, the ensuing intimidation and harassment of the Foundation's donors, and resulting chilling effect on First Amendment rights, cannot be undone.   *See Hollingsworth v. Perry*, 558 U.S. 183, 196 (2010) (balance of equities prevented public broadcast of

– 115 –

court proceedings that might lead to harassment of witnesses, "for the injury likely cannot be undone once the broadcast takes place").   On the other hand, the Attorney General has offered no evidence of injury if the Foundation or other charities do not produce their Schedule Bs.   The Attorney General does not review Schedule Bs upon collection and virtually never uses them to investigate wrongdoing.   *See* Proposed Findings of Fact § II.E, above.   Indeed, the Attorney General has gone without the Foundation's Schedule Bs for over a decade, yet she has demonstrated no harm from not possessing it.   Balancing the disclosure requirement's severe burden on First Amendment interests against the negligible burden that an injunction would impose, it is clear that the balance of hardships supports enjoining the Attorney General.

306.   Finally, the public interest favors an injunction.   As the Ninth Circuit has "consistently recognized," there is a "significant public interest in upholding First Amendment principles."   *Doe v. Harris*, 772 F.3d at 683 (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002)); *accord, e.g.*, *Thalheimer*, 645 F.3d at 1129; *Klein*, 584 F.3d at 1208.

## VI.   THE FOUNDATION IS ENTITLED TO ATTORNEY'S FEES

307.   A prevailing party in an action to enforce 42 U.S.C. § 1983 may be awarded "a reasonable attorney's fee" in the court's "discretion."   42 U.S.C. § 1988(b); .

308.   A plaintiff who obtains injunctive relief against state officials on First Amendment grounds is a "prevailing party" under § 1988.   *Lefemine v. Wideman*, 133 S. Ct. 9 (2012); *Klein v. City of Laguna Beach*, --- F.3d ----, 2016 WL 158600,

1  at *5–6 (9th Cir. Jan. 14, 2016) (citing *Sanchez v. City of Austin*, 774 F.3d 873 (5th

2  Cir. 2014)).

3      309.  A plaintiff who is a prevailing party "should ordinarily recover an

4  attorney's fee unless special circumstances would render such an award unjust."

5  *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).

6      310.  "The 'special circumstances' exception to an award of attorney's fees to

7  a prevailing party under 42 U.S.C. § 1988 'applies only in unusual cases.'"

8  *Vasquez*, 734 F.3d at 1055 (quoting *Mendez v. City of San Bernardino*, 540 F.3d

9  1109, 1124 (9th Cir. 2008)).   "The defendant has the burden of showing [that]

10  special circumstances warrant a denial of fees, and the defendant's showing must be

11  a strong one."   *Id.* (quoting *Herrington v. County of Sonoma*, 883 F.2d 739, 744

12  (9th Cir. 1989) (alteration in *Vasquez*)).   To determine if such special circumstances

13  exist, a court looks at "(1) whether allowing attorney's fees would further the

14  purposes of § 1988; and (2) whether the balance of equities favors or disfavors the

15  denial of fees."   *Democratic Party of Washington State v. Reed*, 388 F.3d 1281,

16  1285 (9th Cir. 2004).

17      311.  The Attorney General has not made the requisite strong showing that

18  special circumstances warrant a denial of fees in this case.  First, § 1988 was

19  enacted to "attract competent counsel to represent citizens deprived of their civil

20  rights," and "to encourage compliance with and enforcement of the civil rights

21  laws."   *Bernhardt v. Los Angeles County*, 339 F.3d 920, 930 (9th Cir. 2003).

22  Allowing attorney's fees furthers these purposes by encouraging lawsuits, like this

23  one, that force state official to honor constitutional rights, including the rights to free

24  speech and free association, and by encouraging nonprofit charities to "expend

– 117 –

1   [their] limited resources" to enforce their constitutional rights.  *Dennis v. Chang*,

2   611 F.2d 1302, 1306 (9th Cir. 1980).   Second, the balance of equities disfavors the

3   denial of fees because the Foundation has litigated this case in good faith, has not

4   multiplied the proceedings in any way, and has sought a speedy determination of the

5   issues.   The Attorney General cannot and has not pointed to anything in the record

6   that would render an award of fees to the Foundation inequitable.

7        312.   By contrast, the Attorney's General's defense has not been substantially

8   justified.   To the contrary, her defense has been conspicuously lacking in

9   justification.   She has presented the Court with implausible accounts of her

10  Schedule B submission requirement, including by continuing to deny that her recent

11  demands for the Foundation's and other charities' Schedule Bs was a change in

12  policy.   *See* Proposed Findings of Fact § II.D, above.   She has asserted

13  governmental interests in obtaining Schedule B that, through litigation, were

14  exposed as false at best or else as wildly exaggerated.   *See* Proposed Findings of

15  Fact § II.E, above.   Similarly, she has repeatedly and continuously told this Court

16  and the Ninth Circuit that she keeps Schedule Bs confidential, *see, e.g.*, ECF 23 at 6;

17  Brief of Appellant, ECF 12-1 at 8, 9-10, *Americans for Prosperity Foundation v.*

18  *Harris*, No. 15-55446 (9th Cir. May 7, 2015), even after being confronted with

19  numerous incontestable facts that thoroughly discredit her story, *see* Proposed

20  Findings of Fact § III, above.   Indeed, she completely ignored governing California

21  law that *requires* disclosure of Schedule B, and she made no effort to amend the law

22  or promulgate a new confidentiality regulation until after the Foundation obtained a

23  preliminary injunction against her.   *See* Proposed Findings of Fact §§ II.C, III.P,

24  above.   Finally, rather than use the discovery process to develop facts and proof

relevant to the issues at hand, the Attorney General has used discovery to harass, abuse, and chill the Foundation and its donors.   *See* ECF 57 at 24-43 (moving to compel the Foundation to respond to interrogatories and requests for production demanding the identities of the Foundation's donors); ECF 98 (moving to reconsider the denial of the motion to compel); Proposed Findings of Fact § V.F, above.

313.   Accordingly, the Foundation is entitled to reasonable attorney's fees under § 1988.

Dated:   February 9, 2016

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN LLP

By _____
Derek Shaffer

*Attorneys for Plaintiff*
*Americans for Prosperity Foundation*